**KLESTADT & WINTERS, LLP**
570 Seventh Avenue, 17th Floor
New York, NY 10018
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Fred Stevens

*Counsel to Plaintiff Gregory Messer, as Trustee*
*of the FKF Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

| | |
|---|---|
| In re | : |
| | :    Chapter 11 |
| FKF 3, LLC, | : |
| | :    Case No. 10-37170 (CGM) |
|                Debtor. | : |

-------------------------------------------------------------------x

| | |
|---|---|
| GREGORY MESSER, as Trustee of the FKF Trust, | : |
| | : |
|                Plaintiff, | : |
| | :    Adv. Pro. No. 11-_____ |
|           -against- | : |
| | : |
| JOHN F. MAGEE, | : |
| MITCHELL L. KLEIN, | : |
| BURTON R. DORFMAN, | : |
| MELISSA A. MAGEE, | : |
| PATRICE L. MAGEE, | : |
| JONATHAN MAGEE, | : |
| LIZBETH MAGEE KEEFE, | : |
| LAWRENCE J. KEEFE, JR., | : |
| VALERIE MAGEE, | :    **COMPLAINT** |
| FKF HOLDING COMPANY, LP, | : |
| FKF V HOLDING CO., | : |
| S.F. PROPERTIES, LLC, | : |
| COMMERCIAL CONSTRUCTION, INC., | : |
| BRADLEY INDUSTRIAL PARK, INC., | : |
| FKF EDGEWATER, LLC, | : |
| AVENTINE EDGEWATER LLC, | : |
| FKF RETAIL LLC, | : |
| AVENTINE RETAIL, LLC, | : |
| JERRY'S SELF STORAGE, LLC, | : |
| ROSE GLASSES, LLC, | : |
| BASHERT DEVELOPERS, LLC, | : |

TA GROUP, LLC,                                          :
JDJ HOLDING CO., LLC,                                   :
FASMAN, KLEIN & FELDSTEIN, LLP, and                    :
DORFMAN, KNOEBEL & CONWAY, LLP,                        :
                                                       :
                            Defendants.                :
------------------------------------------------------------------x

**COMPLAINT AGAINST DEBTOR'S PRINCIPALS, AND CERTAIN OF THEIR FAMILY MEMBERS AND AFFILIATED ENTITIES, SEEKING: (A) DAMAGES ARISING FROM (i) BREACHES OF THE FIDUCIARY DUTIES OF LOYALTY AND CARE, (ii) CONVERSION, (iii) ACCOUNTING MALPRACTICE AND PROFESSIONAL NEGLIGENCE, (iv) LEGAL MALPRACTICE AND PROFESSIONAL NEGLIGENCE, (v) AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES; (B) CONTRIBUTION; (C) AVOIDANCE OF (i) FRAUDULENT CONVEYANCES, AND (ii) PREFERENTIAL TRANSFERS; (D) TURNOVER OF PROPERTY OF THE DEBTOR'S ESTATE; AND (E) EXPUNCTION OF ANY AND ALL CLAIMS ASSERTED AGAINST THE ESTATE, OR ALTERNATIVELY SUBORDINATION OF THOSE CLAIMS OR <u>RE-CHARACTERIZATION OF THOSE CLAIMS TO EQUITY INVESTMENTS</u>**

# TABLE OF CONTENTS

SUMMARY .................................................................................................................1

PRELIMINARY STATEMENT ....................................................................................2

INTRODUCTION.........................................................................................................8

BASIS FOR RELIEF....................................................................................................9

JURISDICTION ...........................................................................................................9

PARTIES ....................................................................................................................10

FACTS COMMON TO ALL CAUSES OF ACTION................................................14

    I.      THE DEBTOR, ITS PRINCIPALS, CREDITORS, AND ITS RISE AND FALL.....14

        a.    Introduction – The Debtors' Principals...................................................14

        b.    Formation and Use of the Debtor ............................................................15

        c.    Compensation and Equity Draws for the Principals................................17

        d.    The Collapse of the Debtor......................................................................19

        e.    The Bankruptcy Proceedings ...................................................................27

    II.     THE DEBTOR'S LOAN PORTFOLIO – CONFLICTS OF INTEREST, INSIDER LOANS, INVESTMENTS AND RELATED ACTIONABLE CONDUCT.......................29

        a.    Diane Roberts, LLC – Magee Collects and Retains $1.34 Million Due to the Debtor.......................................................................................................29

        b.    Aventine Edgewater LLC – The Debtor Lost Over $6.5 million in Loans and Transfers to a Project Owned in Large Part by the Principals.......................34

        c.    Aventine Retail LLC - The Debtor Lost Over $2.7 Million in Transfers to a Project Owned in Large Part by the Principals.......................................42

        d.    One Madison Park – The Debtor Lost Over $30 million in Loans and Investments to a Project Owned in Part by the Principals ............................44

        e.    Bashert Developers, LLC – The Debtor Lost Over $7.7 million in Loans and Investments to a Project Owned in Large Part by the Principals.................50

    f.    **Jerry's Self Storage – The Debtor Misappropriated Over $3 million in Funds Received from a Repayment, and Lost Over $1.5 million in Remaining Loans and Investments to a Project Owned in Part by the Principals** .................55

    g.    **Gregory Hayden – Magee Collects and Retains $100,000 Due to the Debtor** .........58

    h.    **Other Insider Loans – The Debtor Lost Over $750,000 in Other Loans to Insider Entities** ................58

    i.    **Caulfield Loans – Debtor Loses Not Less than $4.7 Million on Third Party Loans** ................60

**III.    OTHER ACTS, CONDUCT, TRANSFERS, CONFLICTS AND ACTIVITIES OF THE DEBTOR AND ITS PRINCIPALS RELEVANT TO THE CLAIMS ASSERTED IN THE COMPLAINT** ................64

    a.    **The FKF Firm and the Dorfman Firm – The FKF Firm and the Dorfman Firm have Numerous Conflicts of Interest, and Failed to Properly Advise the Debtor and Account for the Debtor's Funds.  The FKF Firm was Paid Not Less Than $384,200 for Accounting Services by the Debtor and the Dorfman Firm was Paid Not Less Than $57,356 for Legal Services by the Debtor** ................64

    b.    **Kennedy Funding Invitational – The Debtor Transferred Over $718,500 to a Charity Tennis Tournament Run by Klein** ................67

    c.    **FKF Holding – The Debtor Fraudulently Transferred Over $1.1 million to FKF Holding** ................69

    d.    **Commercial Construction – The Debtor Fraudulently Transferred Over $954,551.72 to Magee's Defunct Construction Company** ................69

    e.    **Bradley Corporate Park – The Debtor Fraudulently Transferred Over $1.3 million to Magee's Construction Company** ................71

    f.    **SF Properties – The Debtor Fraudulently Transferred at Least $137,812 to an Insider** ................72

    g.    **TA Group, FKF V and JDJ Holding – The Debtor Fraudulently Transferred over $2.1 to an Insider** ................72

    h.    **Principals' Loan Accounts and Claims** ................74

    i.    **Magee's Children – The Debtor Makes over $1.2 Million in Avoidable Transfers Directly to Magee's Children** ................76

**COUNT ONE** ................81

**(Breach of Fiduciary Duties and Corporate Waste)**

**(Against Klein, Dorfman and Magee)**

I. THE PRINCIPALS OWED FIDUCIARY DUTIES TO THE DEBTOR ..................81

II. BREACHES OF FIDUCIARY DUTIES.......................................................81

    a. Member Distributions and Capital Accounts.......................................81

    b. Diane Roberts, LLC Transactions.......................................................82

    c. Aventine Edgewater/FKF Edgewater Transactions ...........................84

    d. Aventine Retail Transactions ...............................................................86

    e. One Madison Park Transactions...........................................................88

    f. Bashert/Rose Glasses Transactions .....................................................89

    g. Jerry's Self Storage Transactions.........................................................91

    h. Gregory Hayden Transactions..............................................................94

    i. Historic Cars Transactions...................................................................95

    j. Magee Mt. Vernon Transactions..........................................................96

    k. Rhonda & Michael Conte Transactions ..............................................96

    l. Dorfman Loan .......................................................................................98

    m. Route 9W Transactions ........................................................................99

    n. The Caulfield Loan Transactions .......................................................100

    o. Use of Legal and Accounting Services ..............................................102

    p. Kennedy Funding Invitational Transactions ......................................103

    q. The FKF Holding Transactions...........................................................104

    r. Commercial Construction Transactions .............................................105

    s. Bradley Corporate Park Transactions.................................................108

    t. SF Properties Transactions.................................................................109

    u. TA Group, FKF V and JDJ Holding Transactions ...........................110

III. DAMAGES ...............................................................................................112

**COUNT TWO** ...................................................................................................112

**(Turnover of Property of the Estate – 11 U.S.C. § 542(a) and (b))**

**(Against Klein, Magee, Bashert, Rose Glasses, Jerry's)**

    I.    PROPERTY IN POSSESSION OF KLEIN .................................................112

    II.    PROPERTY IN POSSESSION OF MAGEE .........................................113

    III.    BASHERT – MATURE DEBT DUE AND OWING ...............................113

    IV.    ROSE GLASSES – MATURE DEBT DUE AND OWING....................114

    V.    JERRY'S – MATURE DEBT DUE AND OWING.................................115

**COUNT THREE** ...............................................................................................115

**(Fraudulent Conveyance – Actual Fraud – 11 U.S.C. §§ 548(a)(1)(A) and 550)**

**(Against Magee, Klein, Dorfman, Melissa Magee, Patrice Magee, Lizbeth Keefe, Lawrence Keefe, Valerie Magee, Jonathan Magee, FKF Holding, Aventine Edgewater, FKF Edgewater, Aventine Retail, FKF Retail, Bashert, Rose Glasses, Jerry's, the FKF Firm, the Dorfman Firm, Commercial Construction, Bradley, SF Properties, the TA Group, FKF V, JDJ Holding and Lawrence Keefe)**

    I.    THE MEMBER DISTRIBUTIONS.......................................................115

        a.    The Magee Distributions .........................................................115

        b.    The Klein Distributions ...........................................................116

        c.    The Dorfman Distributions.......................................................117

    II.    THE AVENTINE EDGEWATER & FKF EDGEWATER TRANSFERS ...........117

    III.    THE AVENTINE RETAIL & FKF RETAIL TRANSFERS.................................118

    IV.    THE ONE MADISON PARK TRANSFERS .............................................119

    V.    THE BASHERT & ROSE GLASSES TRANSFERS ...........................................120

    VI.    THE JERRY'S TRANSFERS....................................................................121

    VII.    THE FKF FIRM TRANSFERS.................................................................122

    VIII.    THE FKF HOLDING TRANSFERS........................................................122

    IX.    THE COMMERCIAL CONSTRUCTION TRANSFERS....................................123

X.    THE BRADLEY TRANSFERS ...............................................................124

XI.   THE TA GROUP TRANSFERS ..........................................................124

XII.  THE LAWRENCE & LIZBETH KEEFE TRANSFERS ...................................125

COUNT FOUR ....................................................................................................126

**(Fraudulent Conveyance – Constructive Fraud – 11 U.S.C. §§ 548(a)(1)(B) and 550)**

**(Against Magee, Klein, Dorfman, Melissa Magee, Patrice Magee, Lizbeth Keefe, Valerie Magee, Jonathan Magee, Aventine Edgewater, FKF Edgewater, Aventine Retail, FKF Retail, Bashert, Rose Glasses, Jerry's, the FKF Firm, FKF Holding, Commercial Construction, Bradley, the TA Group, FKF V, JDJ Holding and Lawrence Keefe)**

I.    THE MEMBER DISTRIBUTIONS ........................................................127

  a.  The Magee Distributions ..........................................................127

  b.  The Klein Distributions ............................................................128

  c.  The Dorfman Distributions .......................................................128

II.   THE AVENTINE EDGEWATER & FKF EDGEWATER TRANSFERS ...........129

III.  THE AVENTINE RETAIL & FKF RETAIL TRANSFERS...............................130

IV.   THE ONE MADISON PARK TRANSFERS ............................................131

V.    THE BASHERT & ROSE GLASSES TRANSFERS .................................132

VI.   THE JERRY'S TRANSFERS ...........................................................132

VII.  THE FKF FIRM TRANSFERS ..........................................................133

VIII. THE FKF HOLDING TRANSFERS ...................................................134

IX.   THE COMMERCIAL CONSTRUCTION TRANSFERS .............................135

X.    THE BRADLEY TRANSFERS ...........................................................136

XI.   THE TA GROUP TRANSFERS ..........................................................137

XII.  THE LAWRENCE & LIZBETH KEEFE TRANSFERS ...................................138

COUNT FIVE ......................................................................................................139

**(Fraudulent Conveyance by Insolvent – 11 U.S.C. §§ 544(b) and 550, and N.Y. Debtor and Creditor Law § 273)**

**(Against Magee, Klein, Dorfman, Melissa Magee, Patrice Magee, Lizbeth Keefe, Valerie Magee, Jonathan Magee, Aventine Edgewater, FKF Edgewater, Aventine Retail, FKF Retail, Bashert, Rose Glasses, Jerry's, the FKF Firm, the Dorfman Firm, FKF Holding, Commercial Construction, Bradley, SF Properties, TA Group, FKF V, JDJ Holding and Lawrence Keefe)**

I.     THE MEMBER DISTRIBUTIONS ...............................................................139

    a.   The Magee Distributions .........................................................139

    b.   The Klein Distributions ..........................................................140

    c.   The Dorfman Distributions ....................................................141

II.   THE AVENTINE EDGEWATER & FKF EDGEWATER TRANSFERS ...........141

III.  THE AVENTINE RETAIL & FKF RETAIL TRANSFERS.................................142

IV.  THE ONE MADISON PARK TRANSFERS ..................................................143

V.   THE BASHERT & ROSE GLASSES TRANSFERS .......................................144

VI.  THE JERRY'S TRANSFERS .......................................................................145

VII. THE FKF FIRM TRANSFERS ...................................................................146

VIII.   THE DORFMAN FIRM TRANSFERS ......................................................147

IX.  THE FKF HOLDING TRANSFERS ...........................................................147

X.   THE COMMERCIAL CONSTRUCTION TRANSFERS ...................................148

XI.  THE BRADLEY TRANSFERS ....................................................................149

XII. THE SF PROPERTIES TRANSFERS ..........................................................150

XIII.   THE TA GROUP TRANSFERS ...............................................................151

XIV.  THE LAWRENCE & LIZBETH KEEFE TRANSFERS ..................................151

XV.  THE ADDITIONAL PATRICE MAGEE & JONATHAN MAGEE TRANSFERS152

COUNT SIX ......................................................................................................154

**(Fraudulent Conveyance by Insolvent – 11 U.S.C. §§ 544(b) and 550, and N.Y. Debtor and Creditor Law § 274)**

**(Against Magee, Dorfman, Klein, Melissa Magee, Patrice Magee, Lizbeth Keefe, Valerie Magee, Jonathan Magee, Aventine Edgewater, FKF Edgewater, Aventine Retail, FKF**

Retail, Bashert, Rose Glasses, Jerry's, the FKF Firm, the Dorfman Firm, FKF Holding, Commercial Construction, Bradley, SF Properties, TA Group, FKF V, JDJ Holding and Lawrence Keefe)

I. THE MEMBER DISTRIBUTIONS ..............................................................154

   a. The Magee Distributions .................................................................154

   b. The Klein Distributions ...................................................................155

   c. The Dorfman Distributions .............................................................155

II. THE AVENTINE EDGEWATER & FKF EDGEWATER TRANSFERS ...........156

III. THE AVENTINE RETAIL & FKF RETAIL TRANSFERS................................157

IV. THE ONE MADISON PARK TRANSFERS .......................................................158

V. THE BASHERT & ROSE GLASSES TRANSFERS .............................................159

VI. THE JERRY'S TRANSFERS...............................................................................160

VII. THE FKF FIRM TRANSFERS ...........................................................................161

VIII. THE DORFMAN FIRM TRANSFERS ..............................................................162

IX. THE FKF HOLDING TRANSFERS....................................................................163

X. THE COMMERCIAL CONSTRUCTION TRANSFERS....................................164

XI. THE BRADLEY TRANSFERS ............................................................................164

XII. THE SF PROPERTIES TRANSFERS ..................................................................165

XIII. THE TA GROUP TRANSFERS ..........................................................................166

XIV. THE LAWRENCE & LIZBETH KEEFE TRANSFERS ...................................167

XV. THE ADDITIONAL PATRICE MAGEE & JONATHAN MAGEE TRANSFERS168

COUNT SEVEN..........................................................................................................169

(Fraudulent Conveyance by Insolvent –11 U.S.C. §§ 544(b) and 550, and N.Y. Debtor and Creditor Law § 275)

(Against Magee, Klein, Dorfman, Melissa Magee, Patrice Magee, Lizbeth Keefe, Valerie Magee, Jonathan Magee, Aventine Edgewater, FKF Edgewater, Aventine Retail, FKF Retail, Bashert, Rose Glasses, Jerry's, the FKF Firm, the Dorfman Firm, FKF Holding,

Commercial Construction, Bradley, SF Properties, TA Group, FKF V, JDJ Holding and Lawrence Keefe)

I.   THE MEMBER DISTRIBUTIONS ............................................................................169

   a.   The Magee Distributions .................................................................................169

   b.   The Klein Distributions ...................................................................................170

   c.   The Dorfman Distributions ..............................................................................171

II.   THE AVENTINE EDGEWATER & FKF EDGEWATER TRANSFERS ...........171

III.   THE AVENTINE RETAIL & FKF RETAIL TRANSFERS................................173

IV.   THE ONE MADISON PARK TRANSFERS ..........................................................173

V.   THE BASHERT & ROSE GLASSES TRANSFERS ............................................174

VI.   THE JERRY'S TRANSFERS ..................................................................................175

VII.   THE FKF FIRM TRANSFERS ...............................................................................176

VIII.   THE DORFMAN FIRM TRANSFERS ...................................................................177

IX.   THE FKF HOLDING TRANSFERS .......................................................................178

X.   THE COMMERCIAL CONSTRUCTION TRANSFERS .....................................178

XI.   THE BRADLEY TRANSFERS ...............................................................................179

XII.   THE SF PROPERTIES TRANSFERS ....................................................................180

XIII.   THE TA GROUP TRANSFERS .............................................................................181

XIV.   THE LAWRENCE & LIZBETH KEEFE TRANSFERS ..................................182

XV.   THE ADDITIONAL PATRICE MAGEE & JONATHAN MAGEE TRANSFERS183

COUNT EIGHT ..................................................................................................................184

(Conveyance Made With Intent to Defraud–11 U.S.C. §§ 544(b) and 550, and N.Y. Debtor and Creditor Law § 276)

(Against Magee, Klein, Dorfman, Melissa Magee, Patrice Magee, Lizbeth Keefe, Valerie Magee, Jonathan Magee, Aventine Edgewater, FKF Edgewater, Aventine Retail, FKF Retail, Bashert, Rose Glasses, Jerry's, the FKF Firm, the Dorfman Firm, FKF Holding, Commercial Construction, Bradley, SF Properties, TA Group, FKF V, JDJ Holding and Lawrence Keefe)

I.  THE MEMBER DISTRIBUTIONS ...............................................................184

   a.  The Magee Distributions ...............................................................184

   b.  The Klein Distributions ................................................................185

   c.  The Dorfman Distributions ..........................................................185

II.  THE AVENTINE EDGEWATER & FKF EDGEWATER TRANSFERS ...........186

III.  THE AVENTINE RETAIL & FKF RETAIL TRANSFERS ................................187

IV.  THE ONE MADISON PARK TRANSFERS ....................................................188

V.  THE BASHERT & ROSE GLASSES TRANSFERS ..............................................189

VI.  THE JERRY'S TRANSFERS ..........................................................................190

VII.  THE FKF FIRM TRANSFERS ........................................................................192

VIII.  THE DORFMAN FIRM TRANSFERS ............................................................192

IX.  THE FKF HOLDING TRANSFERS .................................................................193

X.  THE COMMERCIAL CONSTRUCTION TRANSFERS ...................................194

XI.  THE BRADLEY TRANSFERS .........................................................................195

XII.  THE SF PROPERTIES TRANSFERS ...............................................................196

XIII  THE TA GROUP TRANSFERS ......................................................................196

XIV.  THE LAWRENCE & LIZBETH KEEFE TRANSFERS ...................................197

XV.  THE ADDITIONAL PATRICE MAGEE & JONATHAN MAGEE TRANSFERS198

COUNT NINE ........................................................................................................199

(Attorneys' Fees for Avoidance of Conveyance Made With Intent to Defraud– 11 U.S.C. §§ 544(b) and 550, and N.Y. Debtor and Creditor Law § 276-a)

(Against Magee, Klein, Dorfman, Patrice Magee, Melissa Page Magee, Lizbeth Keefe, Valerie Magee, Jonathan Magee, Aventine Edgewater, FKF Edgewater, Aventine Retail, FKF Retail, Bashert, Rose Glasses, Jerry's, the FKF Firm, the Dorfman Firm, FKF Holding, Commercial Construction, Bradley, SF Properties, TA Group, FKF V, JDJ Holding and Lawrence Keefe)

COUNT TEN .........................................................................................................200

(Preferential Transfer – 11 U.S.C. §§ 547(b) and 550)

(Against Melissa Magee)

COUNT ELEVEN.............................................................................202

(Conversion)

(Against Magee)

COUNT TWELVE ...........................................................................203

(Accounting Malpractice and Professional Negligence)

(Against Klein and the FKF Firm)

COUNT THIRTEEN ........................................................................206

(Legal Malpractice and Professional Negligence)

(Against Dorfman and the Dorfman Firm)

COUNT FOURTEEN........................................................................209

(Contribution – N.Y. CPLR §§ 1401 & 1402)

(Against Klein, Dorfman, Magee, the FKF Firm and the Dorfman Firm)

COUNT FIFTEEN............................................................................212

(Aiding and Abetting Breach of Fiduciary Duties)

(Against Magee, Klein, Dorfman, the FKF Firm and the Dorfman Firm)

COUNT SIXTEEN............................................................................212

(Objection to Claim – 11 U.S.C. § 502(d))

(Against Magee, Klein, Dorfman, Commercial Construction, FKF V, JDJ Holding, Melissa Magee, Patrice Magee, Jonathan Magee)

COUNT SEVENTEEN ......................................................................214

(Equitable Subordination of Claims – 11 U.S.C. § 510(b))

(Against Magee, Klein, Dorfman, Patrice Magee, Melissa Magee, Jonathan Magee, Commercial Construction, FKF V and JDJ Holding)

COUNT EIGHTEEN.........................................................................216

**(Re-Characterization of Claims from Debt to Equity)**

**(Against Magee, Klein, Dorfman, Commercial Construction, FKF V and JDJ Holding)**

## TABLE OF EXHIBITS

| Exhibit | Description |
|---------|-------------|
| A | Magee Distributions |
| B | Klein Distributions |
| C | Dorfman Distributions |
| D | FKF Edgewater Transfers |
| E | FKF Retail Transfers |
| F | OMP Transfers |
| G | Newtown Transfers |
| H | Jerry's Transfers |
| I | FKF Firm Transfers |
| J | Dorfman Firm Transfers |
| K | Kennedy Funding Transfers |
| L | FKF Holding Transfers |
| M | Commercial Construction Transfers |
| N | Bradley Corporate Park Transfers |
| O | SF Properties Transfers |
| P | TA Group Transfers |

Gregory Messer, as Trustee of the FKF Trust (the "<u>Trustee</u>" or "<u>Plaintiff</u>"), by his attorneys, Klestadt & Winters, LLP, as and for his complaint (the "<u>Complaint</u>") herein against John F. Magee ("<u>Magee</u>"), Mitchell L. Klein ("<u>Klein</u>"), Burton R. Dorfman ("<u>Dorfman</u>"), Melissa A. Magee, a/k/a Melissa A. Magee Page ("<u>Melissa Magee</u>"), Patrice L. Magee, a/k/a Patrice M. Cuzzocrea ("<u>Patrice Magee</u>"), Jonathan Magee ("<u>Jonathan Magee</u>"), Lizbeth Magee Keefe ("<u>Lizbeth Keefe</u>"), Lawrence J. Keefe, Jr. ("<u>Lawrence Keefe</u>"), Valerie Magee ("<u>Valerie Magee</u>"), FKF Holding Company, LP ("<u>FKF Holding</u>"), FKF V Holding Co. ("<u>FKF V</u>"), S.F. Properties, LLC ("<u>SF Properties</u>"), Commercial Construction, Inc. ("<u>Commercial Construction</u>"), Bradley Industrial Park, Inc. ("<u>Bradley</u>"), FKF Edgewater LLC ("<u>FKF Edgewater</u>"), Aventine Edgewater LLC ("<u>Aventine Edgewater</u>"),  FKF Retail LLC ("<u>FKF Retail</u>"), Aventine Retail, LLC ("<u>Aventine Retail</u>"), Jerry's Self Storage, LLC ("<u>Jerry's</u>"), Rose Glasses, LLC ("<u>Rose Glasses</u>"), Bashert Developers, LLC ("<u>Bashert</u>"), TA Group, LLC ("<u>TA Group</u>"), JDJ Holding Co., LLC ("<u>JDJ Holding</u>"), Fasman, Klein & Feldstein, LLP (the "<u>FKF Firm</u>"), and Dorfman, Knoebel & Conway, LLP (the "<u>Dorfman Firm</u>") (each a "<u>Defendant</u>", collectively, the "<u>Defendants</u>"), alleges as follows:

<u>**SUMMARY**</u>

1.     The principals of FKF 3, LLC (the "<u>Debtor</u>") used the Debtor to borrow over $60 million from individual and non-institutional creditors based upon fraudulent misrepresentations regarding the use of the money and safety of the investment.  In truth, the principals used the money to gamble on the principals' own high-risk real estate development projects that ultimately failed miserably, and to make significant distributions to themselves. The Debtor devolved into little more than a Ponzi scheme whereby the principals continued to borrow money to keep interest payments flowing to creditors and keep the fraud from being

discovered. Like all Ponzi schemes, the Debtor ultimately collapsed once it was unable to find sufficient new money to take out old money. This Complaint seeks recovery from the principals and other affiliated parties that benefited from or sought to benefit from the principals' scheme. As detailed below, the principals committed hundreds of actionable separate acts of fraud, breaches of fiduciary duty, and incidences of outright theft, in running this massive investment fraud.

<u>**PRELIMINARY STATEMENT**</u>

2.      The Debtor is owned in equal shares by its principals and members, Magee, Klein and Dorfman, an experienced real estate entrepreneur, an accountant and an attorney, respectively (collectively, the "<u>Principals</u>"). Beginning in 2004, the Principals borrowed on behalf of the Debtor in excess of $60 million from their respective clients, friends and family members, to finance various real estate development projects. The Debtor's business model as explained to the Debtor's creditors was quite simple – the Debtor loaned money at a slightly higher interest rate than it paid to its creditors and profited from the difference. The Principals further represented to creditors that the Debtor's loans and investments were all secured by sufficient collateral to protect the Debtor's principal investment in the event of a default.

3.      Most if not all of the Debtor's creditors had a close professional and personal relationship with one or more of the Principals, so that the Principals were able to borrow significant sums without providing any more than their representation that the Debtor was a "safe" investment. In fact, many of the Debtor's creditors were longtime clients of Klein's accounting practice, and considered Klein to be a close personal friend. None of the Debtor's creditors were banks, institutions or professional investors that would have required more than the Principals' word before making a loan.

4.	The Debtor was operated by the Principals completely free of any oversight or outside review.  The Principals actively solicited investments but never caused the Debtor to register under the Securities Act of 1933, 15 U.S.C. §78a *et seq*., never provided financial statements to the Debtor's creditors or any other party, and never sought qualified, disinterested professional advice with respect to the operation of the Debtor.  The Principals operated the Debtor in complete secrecy, intentionally establishing among creditors a belief that the Principals could obtain exceptional and consistent returns safely through superior knowledge of the real estate development, investment and construction businesses.

5.	The Principals owed the fundamental duty of loyalty to the Debtor.  The duty of loyalty required, among other things, that the Principals not engage in self-dealing or otherwise use their position with the Debtor to further personal interests rather than those of the Debtor, and that the Principals act with the highest degree of honesty and loyalty toward the Debtor and in the best interests of the Debtor.  The Principals committed numerous abhorrent breaches of this duty.

6.	Simply put, the Principals' goal was to get rich.  However, the Principals would never make more than a modest return if they simply profited from the small target interest rate difference between the Debtor's borrowings and its investments (usually 1 to 2%).  In order to get rich, the Principals would have to sit on both sides of the fence and take ownership interests in the Debtor's borrowers, and use the Debtor's borrowed funds to make high-risk investments in their own projects.  This way, the Principals could risk the Debtor's borrowed capital to fund their own investments and make millions if the projects succeeded, but lose nothing if they failed.  Indeed, the Principals owned significant equity in most of the Debtor's borrowers, which they received as a "tip" for arranging for high-risk, often

undocumented, loans and investments from the Debtor. As a result of these conflicts, nobody was looking out for the interests of the Debtor (or its creditors).

7. The Principals were reckless when they invested the Debtor's money. In many instances, the Principals did not protect the Debtor's loan with even so much as a promissory note. The Principals never personally guaranteed any insider borrowers' obligations to the Debtor, which is a customary requirement for any real estate development loans. Also, in all but one instance, the Principals never gave the Debtor a mortgage or security interest in their projects to protect the Debtor's claim. At the same time, the Principals often gave themselves full credit for the Debtor's money by crediting their own personal capital accounts in the borrowers with the Debtor's loans and investments.

8. The Principals operated the Debtor in a constant state of insolvency. The Principals always disbursed more money to themselves than the Debtor made in profits. In total, the Principals paid themselves over $4.2 million collectively in just four years. Even though the Debtor was insolvent, the Principals were able to keep it afloat as long as they were able to make monthly interest payments to creditors, and keep creditors from making a "run to the bank" and requesting a return of their money.

9. Even though the Debtor was always insolvent, keeping the Debtor going was relatively easy for the Principals until 2008 when the economy and real estate market were in collapse and most of the Principals' projects (and consequently, the Debtor's loans) were in default and required significant restructuring. Also, many of the Debtor's creditors had their own financial constraints and were unable to loan any additional money to the Debtor. Creditors were also spooked by the discovery of massive Ponzi schemes and investment frauds like *Dreier*

*LLP* on December 2, 2008, *Bernard L. Madoff Investment Securities LLC* on December 11, 2008, and *Westgate Capital Management LLC* on February 25, 2009.

> 10.     By the summer of 2008, the Principals knew that the Debtor's collapse was imminent. However, rather than timely admit defeat, the Principals continued to operate the Debtor, borrow more money from unknowing creditors, throw precious resources into failing projects, pull as much money out of the Debtor as they could, and in many instances, just outright steal from the Debtor. A brief overview of the timeline of the Debtor's collapse highlights the egregious conduct of the Principals leading up to the inevitable discovery of the fraud:

- **August 2008 – One Madison Park Default** – The Debtor's largest borrower, Slazer Enterprises, LLC, a partial owner of the One Madison Park project, was unable to pay off approximately $23 million in principal obligations that came due to the Debtor. The Principals negotiated to extend the maturity date of the total $29 million owed (inclusive of the $23 million that was past due but excluding an additional $6 million equity investment solicited from certain creditors) to the Debtor to December 31, 2009, and to loan another $1 million to the project. Magee also entered into an agreement to receive a personal $1 million fee for "negotiating" the deal on behalf of the Debtor. All three Principals had equity interests in the One Madison Park project and had credited their personal capital accounts in the project with the funds loaned by the Debtor. Also, Klein and Dorfman served as accountants and legal counsel, respectively, to the One Madison Park owners. The project is now in bankruptcy and the Debtor has yet to receive a dime on account of its $29+ million claim.

- **August 2008 – Debtor Borrowed Another $1 million from Arnie Garelick and $750,000 from Uri Sasson**

- **September 2008 – Debtor Borrowed Another $180,000 from the Rosenzveig family**

- **September 2008 – Debtor Repaid $1 million to close Magee friend, Barbara Callaghan**

- **September 2008 (to March 2010) – Aventine Edgewater Default** – The Debtor's second largest borrower, Aventine Edgewater, was in default on the over $8 million in obligations owed to the Debtor by the Summer of 2008. The lead lender to Aventine, TD Bank, was also threatening foreclosure due to defaults in its loan agreement. In response, the Principals became majority owners in the project and agreed with TD Bank to allow the project to continue provided that the Principals contribute more equity to the project from the Debtor. From September 2008 to March 2010, the Principals transferred over

$1.58 million of the Debtor's funds to Aventine Edgewater. To date, Aventine Edgewater, now managed by Magee, has not repaid a dime to the Debtor.

- **October 2008 – Debtor Borrowed an Additional $250,000 from Arnie Garelick**

- **November 2008 – Debtor Borrowed an Additional $100,000 from Kathryn Bareket**

- **December 2008 – Jerry's Self Storage $5 million Pay Down –** Jerry's had issued a promissory note in favor of the Debtor in the amount of $5 million. However, it became apparent by the summer of 2008 that Jerry's would not be able to finish construction for the $5 million originally budgeted, and until finished, it would be unable to refinance and pay off the Debtor. The Principals transferred over $1.5 million to Jerry's past the $5 million authorized under the note, in order to allow the project to finish, and as detailed below, obtain replacement financing on the original $5 million. Once completed, Magee arranged for a $5+ million bank loan from Oritani Bank to Jerry's, from which the Debtor got $5 million at closing to pay off its original note from Jerry's. The Principals immediately disbursed a majority of the $5 million to insiders as follows: (i) $1.925 million to FKF Holding, which in turn distributed $1 million to Patrick Magee, Magee's brother, and $919,731.46 to Bradley, Magee's company; (ii) $840,000 to Commercial Construction, Magee's defunct construction company; and (iii) $90,000 to Kennedy Funding Invitational, a charity tennis tournament run by Klein. As part of the December 2008 transaction, the Principals took equity stakes in Jerry's where the ownership changed from 100% by Jerry Sabini to 20% Sabini, 20% by Klein, 20% by Dorfman and 40% Magee. Magee has managed Jerry's since December 2008 and has not paid back any of the approximately $1.5 million still owed by Jerry's.

- **January 2009 – Principals Stopped Taking Routine Monthly Equity Draws –** After four years of consistently taking in excess of $300,000 per year each from the Debtor (totaling over $4.2 million collectively), the Principals stopped taking regular monthly draws because the Debtor no longer had sufficient cash to make them.

- **January 2009 (to July 2010) – Magee Stole $1.44 million –** When Magee stopped getting draws, Magee began collecting amounts due the Debtor from third-party borrowers and keeping the money for himself. In total, Magee collected and retained at least $1.44 million in a year and a half.

- **February 2009 – Debtor Borrowed an Additional $200,000 from Arnie Garelick**

- **February 2009 – Debtor Tries to get Another $1 million+ from Kevin Romano –** While representing Mr. Romano as his legal counsel and accountant, respectively, Klein and Dorfman convinced Mr. Romano to loan the Debtor over $1 million recovered from Westgate Capital, another Ponzi scheme where Mr. Romano was a victim. Ultimately, the Westgate Capital checks were not honored when deposited into the Debtor's account and shortly thereafter, Westgate Capital's principal was arrested for fraud.

- **March 2009 – Debtor Borrowed an Additional $250,000 from Forest Mall LLC**

- **August 2009 – Slazer Enterprises LLC Defaulted in Servicing the Interest on the $29+ Million it Owed the Debtor**

- **October 2, 2009 – Debtor Borrowed $600,000 from the Clearys and DiSara** – The Principals solicited and received $600,000 from new creditors Rich and Vicki Cleary and their 94 year-old aunt, Velia DiSara, on October 2, 2009. At the time the Debtor borrowed $600,000 from the Clearys and DiSara, each and every loan in the Debtor's portfolio was non-performing and in default.

- **November 2009 – The Debtor Made its Last Regular Monthly Interest Payment to Creditors** – For the Clearys and DiSara, this was the first and last interest payment they received.

- **December 2009 – Creditor Inquiries** – Creditors made significant inquiries when the interest payments stopped and discovered, among other things, that the Principals were using their money to finance their own real estate projects and that the Debtor did not have collateral to protect an overwhelming majority of its $60 million loan portfolio.

- **May 2010 – Magee Demanded an Assignment of the Debtor's Assets** – In complete disregard for his victims, Magee demanded that the Debtor give him assets worth at least $6.7 million, which is what Magee believed that he and his friends and family members were owed.

- **June 2010 – Magee Demanded and Received Confessions of Judgment for himself and his Family** – Upon Magee's demand, Klein signed confessions of judgment in favor of Magee, his companies and his family members and friends that claimed to be owed money by the Debtor.

- **June 2010 – Klein and Dorfman Replaced Klein with Day Seckler LLP to Manage the Debtor** – At the insistence of creditors, the Debtor appointed disinterested accounting firm, Day Seckler LLP, as manager of the Debtor. Klein and Dorfman approved the appointment, but Magee abstained and refused to support the installation of a disinterested third party to investigate the Debtor's financial affairs and wind-down the Debtor's portfolio.

- **July 19, 2010 – Involuntary Bankruptcy Petition Filed Against Debtor**

- **July 22, 2010 – Magee Executed on Behalf of the Debtor Backdated Mortgage Discharges to the Third Party Borrower of the Debtor that he took $1.34 million from.** Three days after the Debtor became a debtor under the Bankruptcy Code, Magee delivered discharges of the Debtor's collateral mortgages to Diane Roberts LLC and related guarantors. Magee signed those documents on behalf of the Debtor and backdated them to June 16th, three days before the Debtor filed for bankruptcy.

      11.    Blinded by greed, the Principals flagrantly disregarded their duties to the

Debtor and improperly used the Debtor's assets for their own personal gain. Upon information

and belief, every creditor of the Debtor (that is not related to one of the Principals) claims to have been defrauded by the Principals, and to have loaned money to the Debtor relying on the misrepresentation of the Principals that the Debtor's investments were completely safe and secure.

12.     This Complaint seeks an award of actual damages against the Principals on account of the Principals' breaches of their fiduciary duties to the Debtor in an amount not less than $75 million, the amount lost by the Debtor in projects owned by the Principals. Given the egregious nature of the Principals' conduct, the Trustee also seeks an award of punitive damages so that the Debtor is able to fully compensate the victims of the Principals' scheme. The Trustee also seeks the recovery of over $50 million in fraudulent transfers made directly and indirectly to the Principals and their various family members and companies.

13.     The Trustee also seeks damages against the FKF Firm and Dorfman Firm for malpractice, professional negligence, breach of fiduciary duties, and for contributing to the Principals' tortious conduct. Both firms simultaneously represented the Debtor and most of the Debtor's borrowers. The FKF Firm and Dorfman Firm collectively received in excess of $425,000 in fees from or on behalf of the Debtor. The failure of both firms to provide the Debtor with sound, competent and disinterested professional advice constituted legal and professional malpractice that resulted in the initiation and proliferation of the Principals' fraud against the Debtor and its creditors.

## **INTRODUCTION**

14.     On July 19, 2010 (the "Petition Date"), three creditors filed an involuntary petition against the Debtor for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New

York (the or this "Court") [DE 1].[1]   On August 8, 2010, the Debtor filed an answer to the involuntary petition and consented to the entry of an order for relief under chapter 11 [DE 6], and on August 9, 2010, the Court entered an order for relief [DE 8].

15.     On April 18, 2011, this Court entered an order confirming the Joint Plan of Liquidation of FKF 3, LLC and the Official Committee of Unsecured Creditors, dated January 28, 2011 (as amended and supplemented) (the "Plan") [DE 250].  The Plan became effective on May 2, 2011.

16.     Pursuant to the Plan, the FKF Trust was created and Gregory Messer was appointed Trustee of the FKF Trust.  The Trustee is empowered and authorized to assert all rights, claims and causes of action that belonged to the Debtor and its bankruptcy estate.

## BASIS FOR RELIEF

17.     This adversary proceeding is brought pursuant to 11 U.S.C. §§ 502(d), 510(c)(1), 542(a) and (b), 544(a), 547(b), 548(a) and 550, N.Y. Debtor and Creditor Law §§ 273, 274, 275, 276 and 276-a, and under common law claims for damages from breach of contract, breach of fiduciary duties of loyalty and care, corporate waste, legal malpractice, accounting malpractice, contribution, professional negligence and aiding and abetting breach of fiduciary duties.

## JURISDICTION

18.     This Adversary Proceeding relates to the pending bankruptcy case of *In re FKF 3, LLC, Debtor*, Case No. 10-37170 (Bankr. S.D.N.Y. Jul. 19, 2010), which is pending under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York before the Honorable Cecelia G. Morris.

---

[1] Any citation to "DE" contained herein shall refer to the docket entries within the case fashioned *In re FKF 3, LLC*, Case No. 10-37170 (CGM) before the United States Bankruptcy Court for the Southern District of New York.

19.     This Court has jurisdiction over this adversary proceeding by virtue of 28 U.S.C. §§ 157(a) and (b), and 1334(b), and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York (Ward, Acting C.J.), dated July 10, 1984.  This Court has jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367.

20.     This is both a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (C), (E), (F), (H) and (O), and a non-core proceeding under 28 U.S.C. § 157(b).  Plaintiff consents to the entry of final orders or judgments by the Bankruptcy Court with respect to all non-core matters and claims raised by this Complaint.

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1409(a) because this proceeding arises in a case under the Bankruptcy Code pending in this district.

## PARTIES

22.     Gregory Messer is the trustee of the FKF Trust and is empowered to bring this action.  The Trustee maintains an address at 26 Court Street, Suite 2400, Brooklyn, New York 11242.

23.     The Debtor is a limited liability company formed and existing under the laws of the State of New York.  The Debtor originally filed its formation documents with the New York Department of State on May 26, 2004.

24.     Magee is an individual with a principal place of residence at 14 Old Gate Hill Road, Stony Point, New York 10980-3630.  Magee was born in or around October 1940 and is currently seventy (70) years of age.

25.     Klein is an individual with a principal place of residence at 7 Esquire Road, New City, New York 10956-3326.  Klein was born in or around October 1955 and is currently fifty-five (55) years of age.

26.     Dorfman is an individual with a principal place of residence at 790 Piermont Avenue, Piermont, New York 10968-1032.  Dorfman was born on or around July 1953 and is currently fifty-eight (58) years of age.

27.     Melissa Magee is an individual with a residence at 651 Driftwood Lane, Northbrook, IL 60062-5501.  Melissa Magee is Magee's daughter.

28.     Patrice Magee is an individual with residences at 325 N End Ave., Apt. 12P-N, New York, NY 10282-1026, and 605 Springfield Ave., Summit, NJ 07901-4503.  Patrice Magee is Magee's daughter.

29.     Jonathan Magee is an individual with an address for service of process at 33 Soluri Lane, Tomkins Cove, NY 10986-1309.  Jonathan Magee is Magee's son.

30.     Lizbeth Keefe is an individual with a mailing address at PO Box 76, Golf, IL 60029-0076, and a residence at 33 Briar Road, Golf, IL 60029.  Lizbeth Keefe is Magee's daughter.

31.     Lawrence Keefe is an individual with a mailing address at PO Box 76, Golf, IL 60029-0076, and a residence at 33 Briar Road, Golf, IL 60029.  Lawrence Keefe is Magee's son-in-law.

32.     Valerie Magee is an individual with a residence at 5 Cedar Lane, Thiells, NY 10984-1212.  Valerie Magee is Magee's daughter.

33.     FKF Holding is a partnership organized under the laws of the State of New York.  FKF Holding maintains an address for the service of process at 627 Route 304, New City, New York 10956-2921.

34.     FKF V is an unregistered partnership or other business entity organized under the laws of the State of New York.  FKF V maintains an address for the service of process at 627 Route 304, New City, New York 10956-2921.

35.     SF Properties is a limited liability company formed and existing under the laws of the State of New York.  SF Properties maintains an address for the service of process at 627 Route 304, New City, New York 10956-2921.

36.     Commercial Construction is a corporation organized and existing under the laws of the State of New York.  Commercial Construction maintains an address for the service of process at c/o John Magee, 500 Bradley Hill Road, Blauvelt, New York 10913.

37.     Bradley is a corporation organized and existing under the laws of the State of New York.  Bradley maintains an address for the service of process at c/o John Magee, 500 Bradley Hill Road, Blauvelt, New York 10913.

38.     FKF Edgewater is a limited liability company organized under the laws of the State of New Jersey.  FKF Edgewater maintains an address for the service of process at 935 River Rd., Edgewater, NJ 07020-2234.

39.     Aventine Edgewater is a limited liability company organized and existing under the laws of the State of New Jersey.  Aventine Edgewater maintains an address for the service of process at 935 River Rd., Edgewater, NJ 07020-2234.

40.     FKF Retail is a limited liability company organized and existing under the laws of the State of New Jersey.  FKF Retail maintains an address for the service of process at c/o Mitchell Klein, 935 River Rd., Edgewater, NJ 07020-2234.

41.     Aventine Retail is a limited liability company organized and existing under the laws of the State of New Jersey.  Aventine Retail maintains an address for the service of process at 43 North Broadway, Nyack, New York 10960.

42.     Jerry's is a limited liability company organized and existing under the laws of the State of New York.  Jerry's maintains an address for the service of process at 500 Bradley Hill Road, Blauvelt, New York 10913.

43.     Rose Glasses is a limited liability company organized and existing under the laws of the State of New York.  Rose Glasses maintains an address for the service of process at 627 Route 304, New City, New York 10956-2921.

44.     TA Group, LLC is a limited liability company organized and existing under the laws of the State of New York.  Rose Glasses maintains an address for the service of process at 627 South Main Street, New City, New York 10956.

45.     JDJ Holding is an unregistered partnership or other business entity organized under the laws of the State of New York.  JDJ Holding maintains an address for the service of process at 627 S. Main Street, New City, New York 10956.

46.     Bashert is a limited liability company organized and existing under the laws of the State of Connecticut.  Bashert maintains an address for the service of process at 627 Route 304, New City, New York 10956-2921.

47.     The FKF Firm is a limited liability partnership organized and existing under the laws of the State of New York.  The FKF Firm maintains an address for the service of process at 627 South Main St., New City, New York 10956.

48. The Dorfman Firm is a limited liability partnership organized and existing under the laws of the State of New York. The Dorfman Firm maintains an address for the service of process at 51 North Broadway, Nyack, New York 10960.

**FACTS COMMON TO ALL CAUSES OF ACTION**

I. **THE DEBTOR, ITS PRINCIPALS, CREDITORS, AND ITS RISE AND FALL**

    a. **Introduction – The Debtors' Principals**

49. Klein holds a BBA in accounting and MBA in taxation from Hofstra University, and is a certified public accountant. Klein was a partner of the FKF Firm from the 1980's until leaving the firm in 2010 to start the accounting firm ML Klein & Company, CPA's.

50. Dorfman holds a JD from the State University of New York at Buffalo. Dorfman is an attorney licensed to practice in the State of New York since 1979. Dorfman was a founding partner of the Dorfman Firm until leaving the firm in 2010 to start a solo practice.

51. Magee is a businessman and owner, operator and developer of several real estate projects. In 1967, Magee and his brother Patrick started Sullivan, Magee & Sullivan, Inc., a total full service construction company that has built shopping centers, bank branches, and municipal, religious, recreational and hospital facilities. Magee's largest project is the Bradley Corporate Park, located in Blauvelt, New York, which he owns with his brother Patrick.

52. Klein, Dorfman and Magee had professional and personal relationships going back to at least the 1990s. Klein and the FKF Firm were the accountants for Magee and his various businesses. Similarly, Dorfman represented Magee and his businesses as their legal counsel in numerous matters.

b. **Formation and Use of the Debtor**

53.     The Principals formed various entities prior to the Debtor for the purpose of using borrowed funds to loan to various real estate development projects, including FKF Holding, KD Albany, Inc. and FKF II Holding Co.

54.     The Principals created FKF Holding in or around the late 1990's.  FKF Holding is owned 37.5% by Magee, 37.5% by Magee's brother Patrick, 12.5% by Dorfman and 12.5% by Dennis Lynch, Dorfman's then-law partner.  Klein managed FKF Holding and received compensation for doing so, but did not have an equity interest.

55.     FKF Holding was capitalized primarily from equity contributions from its partners, and lent almost exclusively to its partners or to businesses owned or controlled by its partners.  FKF Holding generally held assets on its books of between $6 and $10 million.

56.     In or around 2003, Klein realized that he was able to obtain capital from his wealthy clients and began to arrange for loans from his clients to FKF Holding on an unsecured basis.  Klein quickly realized that he was capable of attracting significant investment capital and that consequently, he should have an ownership interest in a fund that he did not have with FKF Holding.

57.     On May 26, 2004, the Principals created the Debtor which was ultimately owned in equal percentages by the Principals.  Neither Patrick Magee nor Dennis Lynch, both of whom were partners in FKF Holding, became direct investors in or owners of the Debtor.  This was an intentional construct by the Principals because by that time, Klein wanted an equity interest and neither Magee and his brother, nor Dorfman and Dennis Lynch, were getting along.

58.     The Operating Agreement for the Debtor that has been produced by the Principals is undated and only signed by Mitchell Klein (the "Purported Operating Agreement").

The Purported Operating Agreement designates Mitchell Klein as the Managing Member of the Debtor.

59.     The Purported Operating Agreement vested ownership in the Debtor as follows: (i) 33% to Magee; (ii) 1% to Klein; and (iii) 66% to the John Magee Family Partnership. However, on June 24, 2010, two days after Klein relinquished control over the Debtor to Day Seckler LLP, as further described below, Klein executed an amendment to the Purported Operating Agreement recasting ownership in the Debtor to Magee, Klein and Dorfman in equal shares effective May 26, 2004.

60.     The Purported Operating Agreement did not require any capital contribution by the Principals.  Consequently, the Principals did not make any financial contribution in exchange for their membership interests in the Debtor.

61.     There were no documents or contracts other than the Purported Operating Agreement that defined the Principals' relationship to one another, their duties to the Debtor, their entitlement to compensation or distributions from the Debtor, or that otherwise governed these key relationships.

62.     The creditors that Klein attracted to FKF Holding and predecessors of the Debtor, including FKF II Holding Co., had their claims transferred to the Debtor.  However, FKF Holding continued to exist as a going concern and continues to be managed by Klein and Magee to this day.

63.     By 2004, Klein and the other Principals were actively soliciting loans to the Debtor from clients of the FKF Firm, friends and family members.  The Principals' hunger for new money was insatiable, and the Debtor took in as much money as creditors were willing

to lend.  The Debtor borrowed almost exclusively on an unsecured basis at interest rates of between 10 and 12%.

64.    Nearly all of the Debtor's creditors claim that the Principals represented to them that the Debtor always lent on a secured basis with more than ample collateral value to satisfy the Debtor's loans in the event of a default by the borrowers.

65.    At the same time that the Debtor was attracting new capital, the Debtor and its Principals were looking for real estate development projects to invest the Debtor's money in.

66.    The Debtor made some third-party loans to unrelated borrowers. However, the Principals primarily invested the Debtor's funds in their own real estate development projects where they stood to gain not only by any profit made by the Debtor on its lending activity, but also by having large equity positions in the Debtor's borrowers.  In most instances, the Principals did not have to make any capital contribution to the borrowers in exchange for their equity outside of arranging for loans from the Debtor.  This was significantly different than the Debtor's business model as communicated by the Principals to creditors, pursuant to which the Debtor was to make low-risk, fully secured loans to real estate development projects and make money solely from the interest rate differential

67.    By the Petition Date, the Debtor had over $60 million in liabilities on its books, all of which was owed to individuals, estates, family limited partnerships, or closely-held companies.

**c.    Compensation and Equity Draws for the Principals**

68.    Beginning almost as soon as the Debtor was formed, the Principals began taking large monthly draws and distributions from the Debtor.  At Magee's direction, many of

his draws were sent directly to his daughters.  In total, the Debtor made the following draws and distributions to Principals:

a) $1,488,227.50 to Magee as more fully detailed on the table annexed hereto as <u>Exhibit A</u> and incorporated herein by reference (the "<u>Magee Distributions</u>"), many of which were sent directly to Magee's daughters at his direction, as further detailed below

b) $1,418,394.50 to Klein as more fully detailed on the table annexed hereto as <u>Exhibit B</u> and incorporated herein by reference (the "<u>Klein Distributions</u>"); and

c) $1,398,180.39 to Dorfman as more fully detailed on the table annexed hereto as <u>Exhibit C</u> and incorporated herein by reference (the "<u>Dorfman Distributions</u>"); and

(collectively, the "<u>Member Distributions</u>").

69.     The Purported Operating Agreement restricted the Debtor's ability to make distributions to the Principals stating in section 4.3(a) that "distributions are subject to the payment of Company [the Debtor] expenses and the maintenance of sufficient reasonable reserves for such expenses and for alternations, repairs, improvements, maintenance and replacement of Company [the Debtor's] assets."

70.     According to the Schedule K-1s prepared by the Debtor for the Principals, after 2004, the Principals had negative capital accounts and consistently drew more than their respective share of the Debtor's profits, as follows:

| Year | Member | Member's Beginning Capital Account | Capital Contributed During Year | Current Year Increase or (Decrease) | Withdrawals and Distributions Taken by Member | Member's Ending Capital Account |
|---|---|---|---|---|---|---|
| 2004 | Klein | $0.00 | $0.00 | $9,608.00 | ($8,000.00) | $1,608.00 |
| | Dorfman | $0.00 | $0.00 | $9,609.00 | ($8,000.00) | $1,609.00 |
| | Magee | $0.00 | $0.00 | $9,609.00 | ($8,000.00) | $1,609.00 |
| 2005 | Klein | $1,608.00 | $0.00 | $159,113.00 | ($171,846.00) | ($11,125.00) |
| | Dorfman | $1,609.00 | $0.00 | $159,113.00 | ($171,846.00) | ($11,124.00) |
| | Magee | $1,609.00 | $0.00 | $159,113.00 | ($171,846.00) | ($11,124.00) |
| 2006 | Klein | ($11,125.00) | $0.00 | $376,543.00 | ($408,387.00) | ($42,969.00) |
| | Dorfman | ($11,124.00) | $0.00 | $376,542.00 | ($408,387.00) | ($42,969.00) |
| | Magee | ($11,124.00) | $0.00 | $237,333.00 | ($268,387.00) | ($42,178.00) |
| 2007 | Klein | ($42,969.00) | $0.00 | $51,175.00 | ($370,207.00) | ($362,001.00) |
| | Dorfman | ($42,969.00) | $0.00 | $51,173.00 | ($370,206.00) | ($362,002.00) |
| | Magee | ($42,178.00) | $0.00 | $51,173.00 | ($370,206.00) | ($361,211.00) |
| 2008 | Klein | ($362,001.00) | $0.00 | $110,499.00 | ($391,789.00) | ($643,291.00) |
| | Dorfman | ($362,002.00) | $0.00 | $110,498.00 | ($391,789.00) | ($642,502.00) |
| | Magee | ($361,211.00) | $0.00 | $110,498.00 | ($394,630.00) | ($646,134.00) |
| 2009 | Klein | ($643,291.00) | $30,750.00 | ($372,712.00) | ($1,153.00) | ($986,406.00) |
| | Dorfman | ($642,502.00) | $1,056.00 | ($372,711.00) | ($3,571.00) | ($1,021,360.00) |
| | Magee | ($646,134.00) | $189,596.00 | ($372,711.00) | ($1,153.00) | ($826,770.00) |

71.     In addition to the Member Distributions, the Principals took significant additional assets, resources and funds from the Debtor directly and indirectly through various companies and development projects owned by the Principals.

**d.     The Collapse of the Debtor**

72.     The Debtor was never properly capitalized and after 2004, the Debtor was always insolvent on a balance sheet basis according to the balance sheet included in the Debtor's annual tax returns.   According to the Debtor's own books and records, the Debtor's assets, liabilities and Principals' equity for the years ending December 31, 2004 through 2009 were as follows:

| Period | Assets | Liabilities | Members' Equity |
|---|---|---|---|
| Year ending December 31, 2004 | $6,848,326.00 | $6,843,500.00 | $4,826.00 |
| Year ending December 31, 2005 | $25,250,564.00 | $25,283,937.00 | ($33,373.00) |
| Year ending December 31, 2006 | $45,378,882.00 | $45,506,998.00 | ($128,116.00) |
| Year ending December | $56,378,340.00 | $57,463,554.00 | ($1,085,214.00) |

| | | | |
|---|---|---|---|
| 31, 2007 | | | |
| **Year ending December 31, 2008** | $61,024,673.00 | $62,956,600.00 | ($1,931,927.00) |
| **Year ending December 31, 2009** | $58,246,621.00 | $61,081,157.00 | ($2,834,536.00) |

73.     By the summer of 2008, the Debtor had stopped actively searching for and investing in new projects, and at least three of the Debtor's largest borrowers, Slazer Enterprises LLC, Aventine Edgewater and Bashert/Rose Glasses, were unable to timely repay their obligations to the Debtor, and each requested and required significant extensions and restructuring.

74.     Although the Debtor was not originating new loans by the Summer of 2008, the Debtor continued to take in money from new and existing creditors, which was used primarily to service the Debtor's interest obligations to existing creditors.  Among others, the Debtor took in the following:

a)  $1,000,000 from Arnie Garelick in August 2008;

b)  $750,000 from Uri Sasson in August 2008;

c)  $180,000 from the Rosenzveig family in September 2008;

d)  $250,000 from Arnie Garelick in October 2008;

e)  $100,000 from Kathryn Bareket in November 2008;

f)  $200,000 from Isaac Levy in January 2009;

g)  $200,000 from Arnie Garelick in February 2009;

h)  $250,000 from Forest Mall LLC in March 2009;

i)  $100,000 from Stephen Fromson in April 2009; and

j)  $600,000 from new creditors Rich and Vicki Cleary and their 94-year-old aunt, Velia DiSara, on October 2, 2009, exactly one month prior to the final interest payment to creditors.

75.    Many of the Debtor's obligations to its creditors matured throughout 2008 and 2009.  The Debtor's Principals did not inform the Debtor's creditors about the Debtor's financial problems, but rather, simply continued to make monthly interest payments and treat the mature obligations as if they were not fully mature without executing any additional contracts, notes or extension documents.  Among others, the following matured obligations were either ignored by the Debtor, or the Debtor did what was necessary to keep the creditors from demanding full repayment:

| Borrower | Principal | Maturity Date |
| --- | --- | --- |
| Associates of Rockland County, LLC | $200,000.00 | 04/30/2008 |
| JoAnn Romano | $1,408,779.39 | 09/01/2008 |
| Amvet Management Corp. | $800,000.00 | 09/30/2008 |
| Jay Hyman | $1,042,934.56 | 09/30/2008 |
| Paul Solomon | $100,000.00 | 10/31/2008 |
| Israel Krakowski | $1,500,000.00 | 12/01/2008 |
| Jay and Brenda Lender | $250,000.00 | 12/31/2008 |
| Hugh G. Keahon | $75,000.00 | 01/01/2009 |
| Bruce Terrin and Amy Tetenbaum | $400,000.00 | 01/01/2009 |
| Badami Inestors LP | $500,000.00 | 04/30/2009 |
| Patricia Beck | $1,150,000.00 | 04/30/2009 |
| Kathryn Klein Bareket | $1,405,000.00 | 04/30/2009 |
| Kenneth Beck | $250,000.00 | 04/30/2009 |
| John Cuzzocrea | $700,000.00 | 04/30/2009 |
| George Damarest | $300,000.00 | 04/30/2009 |
| Alan H. Feldman and Carol Seitchik | $60,000.00 | 04/30/2009 |
| Becca Feldman | $40,000.00 | 04/30/2009 |
| Shirley Feldman | $250,000.00 | 04/30/2009 |
| Ellen Feldman | $100,000.00 | 04/30/2009 |
| Robert Graziano | $75,000.00 | 04/30/2009 |
| Griff Construction LLC | $2,500,000.00 | 04/30/2009 |
| Robert Knoebel | $50,000.00 | 04/30/2009 |
| Richard and Gloria Landman | $75,000.00 | 04/30/2009 |
| Adeline Lender | $300,000.00 | 04/30/2009 |
| Mica Creek Partners, LLC | $125,000.00 | 04/30/2009 |
| Ely J. Rosenzveig | $100,000.00 | 04/30/2009 |
| Paul Solomon | $200,000.00 | 04/30/2009 |
| Scott Steiner | $200,000.00 | 04/30/2009 |
| James B. Tully | $100,000.00 | 04/30/2009 |
| Clarksville Court Associates | $80,000.00 | 05/31/2009 |
| Fran Kalman | $230,000.00 | 05/31/2009 |
| Gerald Kramer | $350,000.00 | 05/31/2009 |
| Daniel and Colleen Moriarty | $1,448,109.00 | 05/31/2009 |
| Joy Siemens | $50,000.00 | 05/31/2009 |
| Jeffrey E. Chavkin Money Purchase Profit Sharing | $113,187.29 | 07/01/2009 |
| Daniel Napoli | $175,000.00 | 07/01/2009 |

| NCP Realty LLC | $725,000.00 | 07/01/2009 |
|---|---|---|
| Andrew J. Carolan | $100,000.00 | 07/31/2009 |
| David David | $39,500.00 | 07/31/2009 |
| Mary Greco | $250,000.00 | 07/31/2009 |
| Joseph R. Haddad | $20,000.00 | 07/31/2009 |
| Jay and Ann Schneider | $85,000.00 | 07/31/2009 |
| Bruce Terrin and Amy Tetenbaum | $225,000.00 | 07/31/2009 |
| Roger Plotkin Revocable Trust | $1,000,000.00 | 08/01/2009 |
| Harvey Levine | $100,000.00 | 08/31/2009 |
| Herbert Mandel | $300,000.00 | 08/31/2009 |
| Chana Rosenzveig | $50,000.00 | 08/31/2009 |
| Akiva R. Rosenzveig | $10,000.00 | 08/31/2009 |
| Ariel Rosenzveig | $60,000.00 | 09/30/2009 |
| Chani and Ely Rosenzveig | $120,000.00 | 09/30/2009 |
| Richard and Gloria Landman | $50,000.00 | 10/31/2009 |

In reality, the Debtor had no ability to repay the foregoing obligations as they matured.

76. Some of the Debtor's creditors, including Arnie Garelick, Uri Sasson, Walter Klauser, Jack and Julie Hekker, Lilly Stawski and William Selesky, had notes maturing in 2009 and requested revised notes extending the maturity date to 2010. The Debtor executed revised notes for those creditors upon request, but never informed them of the Debtor's financial condition. The creditors were given no reason to believe that the Debtor had any financial problems.

77. As more fully described below, in December 2008, the Debtor received $5 million in connection with the repayment of a loan made to Jerry's Self Storage. The Debtor immediately disbursed most of those proceeds to insiders and preferred creditors, including $1.925 million to FKF Holding, (which FKF Holding immediately disbursed to Patrick Magee ($1 million), and Bradley ($919,731.46)), and $840,000 to Commercial Construction, Magee's company.

78. The Debtor stopped making regular distributions to the Principals in January 2009 because it no longer had cash available to do so. Up to that point, the Principals

had collected in excess of $300,000 per year in draws and compensation on account of their membership interests in the Debtor.

79.     Beginning in February 2009, when the Debtor stopped making regular distributions, Magee began collecting amounts owed to the Debtor by certain third-party borrowers, including $1.34 million from Diane Roberts LLC, and $100,000 from Gregory Hayden.  Magee retained the money collected and never turned it over to the Debtor.

80.     Desperate for cash, the Debtor continued to borrow in 2009 to the extent that it could as detailed above.  Also, at that time, both Klein and Dorfman represented creditor Kevin Romano as his financial advisor and legal counsel, respectively, in connection with Mr. Romano's investment in Westgate Capital Management, a notorious Ponzi scheme perpetrated by James Nicholson.  Klein and Dorfman were successful in redeeming all remaining deposits of Mr. Romano in Westgate.  Knowing that Mr. Romano was just victimized by Mr. Nicholson and while they represented Mr. Romano in a professional capacity, Klein and Dorfman solicited an additional investment by Mr. Romano into the Debtor from the funds just received from Westgate.  Mr. Romano signed over checks from Westgate to the Debtor totaling approximately $1.024 million.  When the Debtor went to deposit the Westgate checks, they were returned for insufficient funds.   Within three weeks, a receiver was appointed by the SEC to oversee Westgate's liquidation and Mr. Nicholson was arrested for fraud.

81.     The Debtor was still able to make monthly interest payments to its creditors throughout 2008 and most of 2009, from the new loans it received as set forth above and from the approximately $386,000 in monthly interest payments that it received on account of its $29+ million loan to Slazer Enterprises LLC.  However, in or around August 2009, Slazer

Enterprises LLC stopped making its monthly interest payments to the Debtor. At the same time, every other one of the over twenty-two loans in the Debtor's portfolio was non-performing.

82. Once the Slazer Enterprises LLC interest payments stopped, the Principals became desperate. On October 21, 2009, Dorfman sent an email to Ira Shapiro, Slazer's CEO, pleading with him to find money, stating as follows:

> Ira
>
> from my heart whatever is left i had to write this letter.
>
> Last night when you advised me no one understands that money is needed for one madison it hit hard, I know that the money is needed. Everyone listed above [Klein, Magee, Kevin Romano, Elias Josephs and Howard Josephs] (including myself [Dorfman]) have lent, invested, had family members loan money in the countless millions, knows and has known when $ is needed and we have come to the call. It hit hard on me because one day soon i may and or will have to face my family members and make good on their money because that is my duty. just as it is and has been to save this deal for everyone. when i was told 2 weeks ago by you why am i concerned that my sister's down payment has not been replaced, the same sister who lent you $ on several occasions on my times on a half hour notice, because i asked, is clearly of no concern. i care about cev and his family, kevin [Romano] and his family, the josephs family, and john [Magee]'s family, as well as you and marc [Jacobs]'s family who i believe i have given blood at all time to represent.
>
> it is now Marc [Jacobs] and yourself's time to go to your bank account or ask your family for the $ that is needed for bovis, gotham and oma. Since you know that this money is needed please see if you can go where we all went to save this project. It is not necessary to go to others if your families are behind you like all of us please go their and get the money.
>
> your friend and attorney

[Spelling, grammatical and punctuation errors in original].

83. In a last desperate attempt to keep the Debtor afloat, the Debtor borrowed $600,000 from Rich and Vicki Cleary and their 94-year-old aunt, Velia DiSara, on October 2, 2009. The Debtor told the Clearys at the time that the Debtor's loans were safe, that none of the Debtor's projects were in trouble, and that the Debtor had not failed to make a single interest

payment or obligation since it started doing business eight or nine years ago. The Clearys and DiSara's money was immediately used to make the October 2009 interest payments to existing creditors.

84. The Debtor's creditors received their last regular monthly interest payment in November 2009. That was the Clearys' and DiSara's first and final interest payment on the $600,000 they had just loaned to the Debtor a month earlier.

85. When the Debtor stopped making interest payments, creditors immediately investigated the issue. Most were shocked to learn that the Debtor had taken in and lent out over $60 million. Significantly, creditors discovered that the Principals had ownership interests in a vast majority of the Debtor's borrowers. Up to this point, most of the Debtor's creditors had not been furnished with a financial statement for the Debtor, a list of the loans receivable, or a list of the Debtor's other creditors.

86. In 2010, Magee continued to collect amounts owed the Debtor from any third-party creditor willing to pay him directly. In addition, Magee attempted to take everything and anything that he could to ensure that any value remaining in the Debtor inured to the benefit of him and his friends and family, and not to any other creditors of the Debtor. Among other things, on May 13, 2010, Magee demanded confessions of judgment from the Debtor on account of what he believed he and certain preferred friends and family members were owed. Klein duly complied and delivered the confessions and on May 24, 2010, Magee sent a letter to Dorfman and Klein claiming that he and his family lent "over $6,700,000 Dollars (plus unpaid and accrued interest)" to the Debtor, and demanded assignments of the Debtor's loans totaling the $6.7 million.

87.    The Principals convened a number of "Town Hall" meetings to try to explain to creditors their version of what was happening, where they blamed the Debtor's financial condition primarily on Slazer Enterprises LLC, which had failed to repay the over $29 million that came due on December 31, 2009.

88.    The Debtor's creditors were unsatisfied with the Principals' conduct and explanations, and certain creditors insisted that control over the Debtor be transferred to an independent professional for purposes of winding down the Debtor's business and investigating the Debtor's financial affairs.  Accordingly, fourteen (14) creditors pooled their resources and paid a $20,000 retainer to Day Seckler LLP to wind down and liquidate the Debtor, and communicate to creditors.

89.    On June 23, 2010, the Debtor amended its Operating Agreement to remove Klein as manager of the Debtor and appoint the accounting firm of Day Seckler LLP effective June 1, 2010 or as soon as the Principals' consent was signed.

90.    Klein and Dorfman consented to the installation of Day Seckler LLP as the manager of the Debtor for purposes of winding the Debtor down and investigating the financial affairs of the Debtor.  Magee refused to consent.

91.    Day Seckler LLP immediately began trying to determine the status of the Debtor's loan portfolio, how best to maximize recovery on the portfolio and what the claims against the Debtor were.

92.    Upon coordination with Day Seckler LLP, on July 19, 2010, certain creditors commenced the Debtor's bankruptcy case by the filing of an involuntary petition so that the Debtor's assets could be liquidated under the oversight of the United States Bankruptcy

Court and the Debtor would have better ability and increased powers to investigate the Debtor's financial affairs and prosecute claims.

e.     **The Bankruptcy Proceedings**

93.     Following the entry of the order for relief, the Debtor commenced efforts to investigate the Debtor's loan portfolio and obtain a turnover of the books and records of the Debtor.

94.     On October 27, 2010, the United States Trustee appointed Kevin Romano, Elias Josephs, Kathryn Bareket, Walter Klauser and Rabbi Ely J. Rosenzveig, to the Official Committee of Unsecured Creditors (the "Committee").

95.     The Committee immediately commenced an aggressive investigation of the Debtor and its financial affairs through the issuance of over twenty Court-authorized subpoenas, and the review of tens of thousands of pages of documents.

96.     Magee adopted a policy of objecting to nearly every effort made by the Debtor and Committee throughout the pendency of the bankruptcy case, significantly increasing the costs of the proceeding to the Principals' victims.  Among other things, Magee:

- objected to the Debtor's motion to expand the time period by which it could remove actions to the bankruptcy court [DE 43];

- objected to the Debtor's application for a claim bar date order [DE 47];

- objected to the Debtor's and Committee's applications to obtain discovery from Mr. Magee pursuant to Fed. R. Bankr. P. 2004(a) [DE 61];

- sued the Debtor and Day Seckler LLP for not giving him copies of the Debtor's books and records [10-09100 DE 1], and objected to the Committee's motion to intervene in that adversary proceeding [10-09100 DE 25];

- objected to the Debtor's application to retain Day Seckler LLP as its non-debtor manager [DE 80];

- moved to quash the Debtor's subpoena and impose sanctions against the Debtor and its counsel [DE 83];

- failed to accept service of the Committee's subpoena, forcing the Committee to incur the cost and expense of personally serving the subpoena;

- appealed this Court's order denying his application to conduct examinations of Mitchell Klein and Burton Dorfman pursuant to Fed. R. Bankr. P. 2004(a) [DE 131];

- filed a motion seeking to convert the Debtor's case [DE 133];

- filed an unsupported proof of claim in the amount of $30,000,000, alleging a derivative claim of the Debtor's estate against Mitchell Klein for breach of fiduciary duty [Claim No. 52];

- objected to the Debtor's and Committee's stipulation to allow the Committee to prosecute the Debtor's claims with respect to the One Madison Park project [DE 144];

- filed a motion to quash the Committee's subpoena and impose sanctions against the Committee and its counsel [DE 148];

- objected to the approval of the Debtor's and Committee's disclosure statement [DE 166];

- made an oral motion for a stay pending appeal of the Court's order denying his motion to quash the Debtor's subpoena [made orally at hearings held on January 24, 2011]; and

- objected to confirmation of the Plan and caused over two-hours of cross-examination of the Debtor's and Committee's witness in support of confirmation [DE 234].

97. Similarly, while Klein did not openly oppose the Debtor's and Committee's efforts, he failed to turn over significant amounts of documents relevant to the Debtor's and Committee's investigation. By way of example, Klein neither reviewed his electronic files nor produced a single e-mail related to the Debtor until almost one year after Day Seckler LLP took over management of the Debtor, and six months after service of a subpoena by

the Committee requesting the production of all electronic mail related to the Debtor. Further, the Trustee had to file a motion in order to compel Klein to permit the copying of his digital files.

98. On April 18, 2011, the Bankruptcy Court entered an order confirming the Joint Plan of Liquidation of the Debtor and the Committee, dated January 28, 2011 (as amended and supplemented) (the "Plan") [DE 250]. The Plan became effective on May 2, 2011. The Committee was consequently disbanded on that day, the FKF Trust was created, and Gregory Messer became the trustee of the FKF Trust.

## II. THE DEBTOR'S LOAN PORTFOLIO – CONFLICTS OF INTEREST, INSIDER LOANS, INVESTMENTS AND RELATED ACTIONABLE CONDUCT

99. The Principals used the Debtor's capital to invest in their own real estate projects resulting in impermissible conflicts of interest. Nearly every one of the Principals' projects failed, resulting in significant damages to the Debtor. Also, with respect to certain third party lending activity, Magee collected and retained amounts due to the Debtor's estate.

### a. Diane Roberts, LLC – Magee Collects and Retains $1.34 Million Due to the Debtor

100. Diane Roberts, LLC ("DRLLC"), was formed in 2006 as a single-asset limited liability entity by principals Robert Schroeder and Diane Zaccaria for the purposes of owning and developing real property at 1620 North Bay Avenue, Dover Township, County of Ocean, New Jersey.

101. On September 21, 2006, DRLLC issued a promissory note to the Debtor (the "DRLLC Note") in the face amount of $1,450,000, in exchange for secured funding of the same amount.

102. DRLLC's obligations under the DRLLC Note were secured by a mortgage, assignment of rents and security agreement, dated September 21, 2006, by DRLLC

with respect to its real property at 1620 North Bay Avenue, Dover Township, County of Ocean, New Jersey.

103.     DRLLC's obligations under the DRLLC Note was further secured by the following mortgages, assignments and security agreements involving the Defendants:

a) a mortgage, assignment of rents and security agreement, dated September 21, 2006, by 99 Roland with respect to its real property at 99 Roland Street, Park Ridge, County of Bergen, New Jersey;

b) a mortgage, assignment of rents and security agreement, dated September 21, 2006, by 459 Broadway with respect to its real property at 459 Broadway, Borough of Westwood, County of Bergen, New Jersey;

c) a mortgage, assignment of rents and security agreement, dated September 21, 2006, by 583 Broadway with respect to its real property at 583 Broadway, Westwood, County of Bergen, New Jersey; and

d) a mortgage, assignment of rents and security agreement, dated September 21, 2006, by 89 Broadway with respect to its real property at 89 Broadway, Westwood, County of Bergen, New Jersey.

(collectively, the "DRLLC Mortgages").

104.     The DRLLC Note was also personally guaranteed by Robert Schroeder and Diane Zaccaria.  The DRLLC Note had an original maturity date of September 21, 2007.

105.     Beginning in October 2006, DRLLC made monthly interest payments on the DRLLC Note to the Debtor.

106.     In or around March 2007, the Debtor advanced an additional $100,000.00 to DRLLC, which brought the total principal amount due to $1,550,000.00.

107.     Following the Debtor's termination of the Member Distributions, on or around February 9, 2009, Magee addressed with Robert Schroeder the maturity of the DRLLC Note, and entered into a handwritten forbearance agreement with DRLLC.  The agreement provided for a 120-day extension of the maturity of the DRLLC Note, the payment of amounts due under the note from contracts awarded to Robert Schroeder's defense contracting company, All Points International Distributors Inc. ("API"), the assignment of all leases after the 120-day forbearance period, and the payment of penalty amounts of $60,000.00, half due on February 18, 2009, and the other half due on February 28, 2009.

108.     On February 13, 2009, DRLLC made an interest payment due on the DRLLC Note to the Debtor in the amount of $15,000.00.

109.     On February 27, 2009, DRLLC obtained a cashier's check from JPMorgan Chase Bank in the amount of $61,000.00 made payable to "JOHN MAGEE" on account of the penalty payments due under the February 9, 2009 handwritten forbearance agreement.

110.     On July 1, 2009, DRLLC obtained a cashier's check from JPMorgan Chase Bank in the amount of $500,000.00 made payable to "JOHN MAGEE" on account of principal obligations due to the Debtor under the DRLLC Note.  This payment reduced the obligations due under the DRLLC Note to approximately $1,021,058.33.

111.     On July 24, 2009, DRLLC closed on a loan from Kearny Federal Savings Bank in the gross amount of $935,000.00.  From the proceeds of the loan, the Debtor was paid $521,058.33 on account of obligations due under the DRLLC Note, and the Debtor released its

mortgage against DRLLC's real property.  Remaining liabilities to the Debtor of approximately $500,000.00 were satisfied by the issuance of an Amended DRLLC Note as set forth below.

112.     On July 24, 2009, an amended and restated mortgage promissory note in the face amount of $500,000.00 was issued to the Debtor by DRLLC, 99 Roland Street, 459 Broadway, 89 Broadway and 583 Broadway (the "Amended DRLLC Note").  The restated note was guaranteed by Robert Schroeder, and was secured by the continuation of the mortgages against the real property of the issuers of the Amended DRLLC Note other than DRLLC.

113.     DRLLC made all future amounts due under the Amended DRLLC Note, in the total combined amount of $778,000, by checks issued to John Magee personally, as follows:

| Check Date | Date Cashed by Magee | Amount |
|---|---|---|
| 09/05/2009 | 09/11/2009 | $    5,000.00 |
| 10/19/2009 | 11/05/2009 | 5,000.00 |
| 11/02/2009 | 11/05/2009 | 5,000.00 |
| 11/17/2009 | 11/18/2009 | 20,000.00 |
| 12/02/2009 | 12/04/2009 | 5,000.00 |
| 01/05/2010 | 01/11/2010 | 5,000.00 |
| 01/22/2010 | 01/25/2010 | 20,000.00 |
| 02/02/2010 | 02/04/2010 | 5,000.00 |
| 02/05/2010 | 02/08/2010 | 30,000.00 |
| 02/23/2010 | 02/24/2010 | 200,000.00 |
| 03/02/2010 | 03/04/2010 | 5,000.00 |
| 03/24/2010 | 03/25/2010 | 50,000.00 |
| 03/31/2010 | 04/05/2010 | 5,000.00 |
| 04/30/2010 | 05/03/2010 | 5,000.00 |
| 05/05/2010 | 05/10/2010 | 50,000.00 |
| 06/04/2010 | 06/07/2010 | 5,000.00 |
| 06/15/2010 | 06/16/2010 | 100,000.00 |
| 06/22/2010 | 06/23/2010 | 25,000.00 |
| 06/29/2010 | 07/06/2010 | 5,000.00 |
| 06/29/2010 | 06/30/2010 | 25,000.00 |
| 07/16/2010 | 07/16/2010 (cashier's check) | 203,000.00 |
|  | TOTAL: | $  778,000.00 |

114.    In total, Magee collected $1,339,000.00, due to the Debtor from DRLLC, from February 27, 2009, to July 16, 2010, on account of obligations owed by DRLLC pursuant to the DRLLC Note and the Amended DRLLC Note (the "<u>Magee-DRLLC Payments</u>").

115.    When Robert Schroeder delivered the final payment due under the Amended DRLLC Note to John Magee on July 16, 2010, Mr. Schroeder requested discharges of the Mortgages.  Magee did not provide them and told Mr. Schroeder to have his attorney contact him regarding the releases and satisfaction of Mortgages.

116.    As previously described, on July 19, 2010, an involuntary petition was filed against the Debtor for relief under chapter 11 of the Bankruptcy Code.

117.    On July 20, 2010, Robert Schroeder sent an email to Dorfman, and Robert Mancinelli and Caryn Lantz of Meyerson, Fox, Mancinelli & Conte, P.A., DRLLC's counsel, requesting execution of the discharges of the Mortgages.  Mr. Dorfman forwarded the e-mail to G. Wayne Day of Day Seckler LLP, the manager of the Debtor.

118.    On July 21, 2010, Mr. Day of Day Seckler LLP, sent an e-mail to Robert Mancinelli of Rubenstein, Meyerson, Fox, Mancinelli & Conte, P.A., DRLLC's counsel, informing him that "the manager of FKF 3 has been changed to Day Seckler LLP, of which I [Wayne Day] am a partner.  Please direct all future correspondence relating to this matter to my attention."

119.    On July 22, 2010, Caryn Lantz, a paralegal at Rubenstein, Meyerson, Fox, Mancinelli & Conte, P.A., DRLLC's counsel, sent an email to Magee at "Brdlypark@aol.com", attaching form discharges of the Mortgages dated as of July 16, 2010, and stating "John McGee [*sic*] has asked that I forward the attached Discharge of Mortgages to you.  Please have the

Discharges executed and contact Robert Schroeder at . . . . so that he may pick up the original signed Discharges from you."

120.     On or after July 22, 2010, three days after the Petition Date, John Magee executed the discharges of mortgages as a "member" of the Debtor (the "DRLLC Mortgage Discharges"). The DRLLC Mortgage Discharges are dated July 16, 2010, three days before the Petition Date.

121.     John Magee's signature on the DRLLC Mortgage Discharges was acknowledged by notary public Daniel F. Mellin, under New York State notary license number 4948328.

122.     On August 18, 2010, the Mortgage Discharges were recorded by the Defendants with the Bergen County Clerk in the State of New Jersey.

**b.     Aventine Edgewater LLC – The Debtor Lost Over $6.5 million in Loans and Transfers to a Project Owned in Large Part by the Principals**

123.     In 2005, Conrad Roncati ("Roncati") had the opportunity to purchase a site at 10 Thompson Lane, Edgewater, New Jersey, for the purposes of developing and constructing a 10-story, 34-unit luxury condominium complex (the "Aventine Property").

124.     Roncati had no financial ability to develop the Aventine Property, so he approached Klein, Dorfman and Magee to provide equity financing in exchange for a preferred return of all equity investments, and fifteen (15%) percent of the profits thereafter.

125.     The parties created Aventine Edgewater to own the Aventine Property. Aventine Edgewater was then owned by eighty-five (85%) percent by Ariston Properties, LLC ("Ariston"), which was owned entirely by Roncati, and fifteen (15%) percent by FKF Edgewater, which was owned in equal percentages by Magee, Klein and Dorfman.

126. Klein was made the managing member of Aventine Edgewater at its inception, and he served in such capacity until in or around June 2010, when Magee became the managing member of Aventine Edgewater.

127. On April 21, 2006, Aventine Edgewater issued a promissory note to the Debtor (the "Aventine Note") in the principal amount of $4,750,000, in exchange for funding of the same amount. Aventine Edgewater's obligations under the Aventine Note were secured by a mortgage, dated April 21, 2006, recorded May 5, 2006 (the "Aventine Mortgage"), and an Assignment of Leases and Rents, dated April 21, 2006, recorded May 5, 2006.

128. Aventine Edgewater never made any payment of interest that accrued on the Aventine Note, or repayment of principal. All interest was capitalized and upon information and belief, all amounts due under the Aventine Note remain due and owing today.

129. The Principals never provided consideration in return for their equity interests in FKF Edgewater. The Principals' interests in FKF Edgewater and FKF Edgewater's interest in Aventine Edgewater, were given to the Principals solely on account of the Debtor's loan to Aventine Edgewater. Regardless, the Principals retained their interests in FKF Edgewater and any upside potential in the project, rather than giving it to the Debtor, which had paid for it.

130. At the inception of the Aventine Property project, projections produced by Aventine Edgewater estimated profits on the project to be approximately $15.7 million. If correct, FKF Edgewater would have received $2,355,000, or fifteen (15%) percent of the profits, on account of its equity interests (which would have resulted in $785,000 to each of the Principals, not one of which invested his own money in the project).

131. In February 2007, Aventine Edgewater issued a promissory note to TD Bank (the "TD Aventine Note") in the face amount of $21,565,000, which TD Bank was going to fund over time as construction took place on the Aventine Property. The obligations under the TD Aventine Note were secured by a first-priority mortgage against the Aventine Property (the "TD Aventine Mortgage"), and a certain Assignment of Leases and Rents. Magee, Klein, Dorfman and Roncati each personally guaranteed Aventine Edgewater's obligations under the TD Aventine Note.

132. At the inception, the total budget for developing the Aventine Property was approximately $26.8 million, with an estimated construction period of eighteen (18) months and a subsequent six to twelve (6-12) month absorption period for sale of the units.

133. There were extensive construction delays and cost overruns on the Aventine Property. As a result, TD Bank called a meeting with the Principals to discuss the delays and the fact that construction would not be completed by the February 2009 maturity date on the TD Aventine Note. Following the meeting, TD Bank informed the Principals that unless Aventine Edgewater "reevaluate the cost to complete the project and provide [TD Bank] with a comprehensive plan, [TD Bank] would reject any future construction draws and requests to extend the loan."

134. Upon information and belief, Magee tried to get out of his personal guaranty of Aventine Edgewater's obligations to TD Bank. In an email from Roncati to Klein on September 24, 2008, he asked:

> When John Magee told me during our meeting last week 'I told LaSpina [TD Bank representative] that I want out of the deal' . . was he [Magee] referring to just him or did 'I' mean all of FKF, you and Burt also? I am just trying to see where I am at this point.

TD Bank was not willing to let anybody off the hook, including Magee.

135. The Principals, through FKF Edgewater, exercised their rights to assume control of the project in light of Roncati's "imprudent management."

136. In October 2008, Aventine Edgewater also removed J.H. Mack, LLC d/b/a Kohl Construction, the third party construction manager, and replaced it with Heather Construction of NJ, Inc., an entity owned ninety-nine (99%) percent by Magee and one (1%) by Ira Shapiro.

137. On October 27, 2008, Ira Shapiro sent a letter to Aventine Edgewater on the letterhead of "Heather Construction Corp.", wherein he stated that Heather Construction Corp. would help complete the project and that "I [Shapiro] will personally oversee this project and I will attend weekly construction meetings, and I will review together with Aventine Edgewater staff all existing and future contracts." In reality, Ira Shapiro had nothing to do with the Aventine Edgewater project and had agreed to provide the commitments as a favor to the Principals.

138. At the same time, Aventine Edgewater hired JAK Construction Management Corp. ("JAK") to manage the project. JAK was a newly-formed entity owned by Klein's son, Jason Klein. At the time his company was hired to manage the construction of the $30+ million Aventine Edgewater project, Jason Klein was just twenty-five years old and had only three years of experience in the construction industry.

139. Further, on October 1, 2008, the membership interests in Aventine Edgewater were reconstituted, FKF Edgewater was made the fifty-one (51%) percent owner, and Ariston's share was reduced to a minority forty-nine (49%) percent. Also, in or around this time, Ariston transferred its membership interest in Aventine Edgewater to its wholly-owned subsidiary, One Development of Edgewater, LLC ("One Development").

140.    On October 1, 2008, Aventine Edgewater issued an Amended and Restated Promissory Note to the Debtor in the principal amount of $6,247,603 (the "Revised Aventine Note"), which reflected the original principal of $4.75 million, plus all accrued but unpaid interest on the Aventine Note.

141.    From October 2008 through January 2009, extensive negotiations took place between Aventine Edgewater and TD Bank regarding a modification and extension of the TD Aventine Note, resulting in Aventine's issuance of an Amended and Restated Construction Loan Note dated February 1, 2009 (the "Revised TD Aventine Note"), together with other restructuring agreements, which extended the repayment period from February 1, 2009 to the earlier of February 1, 2010, or the completion of certain improvements, and also reduced the maximum principal from $21,565,000 to $20,000,000.

142.    The Principals further secured Aventine's obligations under the Revised TD Aventine Note by granting TD Bank mortgages on their respective residences. On February 24, 2009, a Collateral Security Mortgage Security Agreement, Assignment of Leases and Rents and Fixture Filing was entered into by and between Magee, Laurette Klein (Klein's wife), Beth Dubas (Dorfman's wife), and TD Bank, whereby in connection with the Loan Modification the Principals provided TD Bank with additional security against the home residences of Dorfman, Klein and Magee.

143.    TD Bank further required, as a condition of funding the hard costs of the project and not commencing litigation against Aventine Edgewater and the guarantors, that FKF Edgewater and the Principals fund the soft costs of the project through additional equity investments.  The Principals were required to make an equity infusion in excess of $2.5 million in order to get the mortgages on their personal residences released.  The Principals intended on

funding their additional equity investment in FKF Edgewater with the Debtor's funds and even disclosed that intention to TD Bank.

144.    Beginning in May 2006 and continuing through March 2010, the Principals made significant transfers of the Debtor's limited funds to Aventine Edgewater, and booked them as loans or infusions into FKF Edgewater, the Principals' investment vehicle in Aventine Edgewater.    A schedule of these transfers is set forth in <u>Exhibit D</u>, which is incorporated herein and made a part hereof (the "<u>FKF Edgewater Transfers</u>").    The FKF Edgewater Transfers are separate and apart from, and in addition to, Aventine Edgewater's obligations to the Debtor under the Revised Aventine Note.

145.    Beginning in or around September 2008 and continuing through March 2010, the FKF Edgewater Transfers increased substantially.    During that time, the Debtor made gross transfers of over $2.38 million to Aventine Edgewater on account of the Principals' membership interest in the troubled project, in order to keep the project afloat and avoid a default with TD Bank.

146.    In or around March 2009, the Debtor executed a series of partial assignments of its interests in the Revised Aventine Note and related mortgages and claims in the total amount of $1.2 million to Eli Jospehs ($200,000), Ruth Josephs ($100,000), Forest Mall, LLC ($500,000) and the Rubin Josephs Trust ($400,000), four related creditors of the Debtor (collectively with all related individual and entities, the "<u>Josephs Family</u>"), on account of their loans to the Debtor that were allegedly attributable to the Aventine Edgewater loan (the "<u>Josephs Original Aventine Assignment</u>").    The Josephs Family routinely requested and received partial assignments of the Debtor's investments and loans as additional security for the Josephs Family's loans to the Debtor.

147.     The Josephs Original Aventine Assignment was never recorded in any public filing office.

148.     After the Debtor stopped making regular interest payments to creditors, including the Josephs Family, in November 2009, the Josephs Family made efforts to collect amounts due to them.  Further, the Josephs Family discovered that the Debtor had previously breached other assignments made to the Josephs Family by retaining amounts due the Josephs Family and not informing the Josephs Family of the repayments of the assigned notes.

149.     Upon demand, the Debtor transferred to Forest Mall, LLC, an entity owned by the Josephs Family, all right, title and interest in the Revised Aventine Note and Aventine Mortgage on December 28, 2009, on account of the previously unrecorded Josephs Original Aventine Assignment and various other loan assignments previously granted to the Josephs Family but never recorded (the "Josephs Aventine Assignment").

150.     The Josephs Aventine Assignment was approved by all the Principals. The Debtors agreed to the Josephs Aventine Assignment in an effort to avoid the commencement of litigation against the Debtor and Principals.  Ultimately, the Josephs Family commenced litigation against the Principals anyway in an action captioned Forest Mall LLC, et al. v. John F. Magee, et al., Index No. 2010-007652, currently pending in the Supreme Court for the State of New York, County of Rockland.  Among other things, the Josephs Family claims that they were defrauded by the Debtor and Principals in connection with the loans made to the Debtor.

151.     Four days before the Josephs Aventine Assignment, on December 24, 2009, the Debtor wired $300,000 to Aventine Edgewater as part of the FKF Edgewater Transfers.  Even after the Josephs Aventine Assignment, the Debtor transferred another $23,000

to Aventine Edgewater.  In an e-mail to Magee's office, dated June 9, 2010, Adam Kurland, the

Debtor's then-counsel, talked about the FKF Edgewater Transfers as follows:

> I can't imagine the FKF 3 investors give a damn about Aventine's needs, if that's what this [the FKF Edgewater Transfers] is.  And why Mitch [Klein] would be doing this with such a magnifying glass over him is mind boggling.  More reckless than anything.

152.    On May 24, 2010, Magee sent a letter to Dorfman and Klein referencing a

letter that he had written on February 3 or 5, 2010[2], but never sent until May 24, 2010.  In the

February 5th letter, Magee protested the Josephs Aventine Assignment and claimed that he only

agreed to it "under duress."  Magee claimed that he and his family lent "over $6,700,000 Dollars

(plus unpaid and accrued interest)" to the Debtor, and Magee requested "assignments on

outstanding loans totaling the above amount [$6,700,000], as had been done for the Joesphs in

late as Dec-09 [*sic*]", plus "repayment of the over $160,000 that [Magee] personally invested in

the Aventine Project since Nov-09".

153.    Pursuant to a document dated "June ___, 2010" [*blank in original*]

executed by Magee, Dorfman and Klein, Klein was replaced by Magee as the managing member

of Aventine Edgewater.  Shortly thereafter, Magee fired Jason Klein's company, JAK, as

construction manager of the project.

154.    As the managing member of Aventine Edgewater, Magee has frustrated

any and all attempts to collect upon the Revised Aventine Note.

155.    Upon information and belief, Aventine Edgewater has not made any

payments on account of the Revised Aventine Note to the Josephs or any other party.  In total,

the Debtor lost over $9 million in principal and accrued interest on account of the investment

---

[2]  Magee produced two copies of the letter to the Trustee with different dates.

evidenced by the Revised Aventine Note, and over $1.8 million on account of the FKF Edgewater Transfers, for total damages of in excess of $10.8 million.

    **c.**    **Aventine Retail LLC - The Debtor Lost Over $2.7 Million in Transfers to a Project Owned in Large Part by the Principals**

156.    Aventine Retail is owned in equal percentages by One Development, an entity wholly owned by Roncati, and FKF Retail, LLC ("<u>FKF Retail</u>"), an entity owned in equal percentages by Klein, Dorfman and Magee. All tax returns and other documents indicate that Klein, Dorfman and Magee are the owners of FKF Retail. However, according to a certain operating agreement for Aventine Retail, dated April 21, 2006, ownership was shared in equal percentages by Laurette Klein, Klein's wife, Beth Dubas, Dorfman's wife, and John Magee, Jr. (a/k/a Jonathan Magee), Magee's son.

157.    On or around May 8, 2007, Aventine Retail purchased certain commercial real property located at 280 Old River Road, Edgewater, New Jersey (the "<u>Aventine Retail Property</u>"), for $2 million in part with the proceeds of a loan from Oritani Bank in the principal amount of $2.8 million.

158.    Pursuant to the operating agreement for Aventine Retail dated April 21, 2006, Klein is the managing member of Aventine Retail. This contradicted a contract signed on the same date between Aventine Retail and J.H. Mack, LLC where Roncati signed as the managing member of Aventine Retail. Pursuant to that contract, J.H. Mack, LLC was to serve as the construction manager for the Aventine Retail project.

159.    After purchasing the Aventine Retail Property, Aventine Retail constructed and/or improved structures on the property for the purpose of leasing space to businesses. In order to finance the construction, the Principals made a series of transfers to Aventine Retail beginning even prior to acquisition of the Aventine Retail Property in April 2006

and continuing through April 2010. The transfers were booked as loans or infusions into FKF Retail, the Principals' investment vehicle in Aventine Retail. A schedule of these transfers is set forth in <u>Exhibit E</u>, which is incorporated herein and made a part hereof (the "<u>FKF Retail Transfers</u>").

160.     The gross FKF Retail Transfers total $1,838,261.00. The Debtor appears to have received $790,000.00 on account of repayment of the FKF Retail Transfers, and $70,850.00 in non-cash credits to reduce the net amount due to the Debtor on account of the FKF Retail Transfers, leaving a total principal amount owed to the Debtor of $977,411.33.

161.     There is no significant documentation regarding the nature and obligations between the parties with respect to the repayment of the FKF Retail Transfers. At one point, Klein apparently attempted to further define the relationship. On August 18, 2006, Klein sent Roncati an email stating "[i]f you fail to pay us and the project goes belly up we need secondary guarentees [*sic*] that's all. If the project has value and you decide not to pay us then we just take the pledge. We are not double dipping here." There is no sign that anything came of this dialogue.

162.     According to the tax returns filed by FKF Edgewater and the Form K-1s issued to Klein, Dorfman and Magee, the Principals credited their own FKF Edgewater capital accounts with the FKF Retail Transfers made by the Debtor to Aventine Retail.

163.     Like most of the Principals' projects, Aventine Retail was in trouble from a very early stage. On November 18, 2007, Dorfman sent an email to Jason Fusco, the general contractor on the project, stating the following:

> Please do not include me in your mailing list any longer. I am not interested in these reports. To me they are useless!!! . . . The control and management of this project is unacceptable from the head to the toes. I can not [*sic*] accept any further excuses either from you, Conrad [Roncati] or Jonathan [Litt]. I am turning

over all issues of this project to John Magee. I am being played with and I cannot accept the litany of excuses. We want a meeting this week. It appears you like to have meetings. We might as well have a meeting and see how little we can also accomplish."

164. The Principals did not secure from FKF Retail or Aventine Retail any promissory note, mortgage, personal guaranty, or any other contract or collateral that would secure repayment of the FKF Retail Transfers. To date, none of the FKF Retail Transfers have been returned or repaid.

165. Further, the Debtor financed the Aventine Retail project and/or other projects through additional loans made to One Development in the total amount of $1.2 million (the "One Development Loan"). The Debtor is currently seeking repayment of the One Development Loan. Thus far, the Debtor has not received any repayment of the One Development Loan.

166. Since in or around July 2010, Magee has been the managing member of Aventine Retail. Magee has made no attempt to repay the FKF Retail Transfers.

167. In total, the Debtor lost over $1.8 million in principal and accrued interest on account of the One Development Loan, and over $900,000 on account of the FKF Retail Transfers, resulting in total damages of in excess of $2.7 million.

**d. One Madison Park – The Debtor Lost Over $30 million in Loans and Investments to a Project Owned in Part by the Principals**

168. In 2006, construction began on the One Madison Park Condominium, a luxury residential condominium tower, approximately 50 stories tall, located at 23 East 22nd Street, New York, New York (the "OMP Project"). Construction of the OMP Project is still ongoing, although some of the units have been sold and are occupied by residents.

169. The OMP Project is owned seventy-eight (78%) percent by Slazer Enterprises Owner LLC, twelve (12%) percent by Madison Park Group Owner LLC, four (4%)

percent by JMJS 23rd Street Realty Owner LLC, and six (6%) percent by FKF Madison Group Owner LLC (collectively, the "OMP Debtors").  Slazer Enterprises Owner LLC is owned by Slazer Enterprises, LLC, which in turn acts as managing member of all the OMP Project owners.  At inception, Slazer Enterprises, LLC was owned by Ira Shapiro and Marc Jacobs.

170.     The OMP Project and its original managers, Ira Shapiro and Marc Jacobs, have a long and storied history with the Debtor and Principals.  The Principals had been involved in other small and unsuccessful projects with Ira Shapiro prior to becoming involved in the OMP Project.  Prior to the OMP Project, Mr. Shapiro was a moderately successful contractor and a struggling real estate developer, with no real success stories to his name.  The OMP Project was intended to put Mr. Shapiro on the map, and make the Principals and other investors rich.

171.     The OMP Project was billed to the rich and famous as an elite, New York address with one-of-a-kind views and amenities.  Several Hollywood A-list stars had commitments to take condominium units at the OMP Project when construction was completed.

172.     The OMP Project was funded in large part by a series of loans from an investment group led by iStar Tara LLC ("iStar"), until the loans were all purchased by Amalgamated Bank on or around June 7, 2011.  There is currently over $230 million owed to Amalgamated Bank.  Amalgamated Bank claims to enjoy a duly perfected, first priority lien on the OMP Project.

173.     In addition to the iStar loans, the OMP Project was funded by additional loans and equity investments.  At this time, it is estimated that there is between $168-180 million in unsecured claims against the OMP Project in addition to the over $230 million owed to Amalgamated Bank.

174.     In total, the Principals committed over $35 million of the Debtor's and/or its creditors' resources to the OMP Project with very little security or protections. The Principals essentially bet the company on the OMP Project.

175.     The following notes were issued to evidence certain of the Debtor's investments in and loans to the OMP Project: (i) a note issued by Slazer Enterprises Owner LLC, Slazer Enterprises, LLC, Ira Shapiro and Marc Jacobs (collectively, the "OMP Borrowers") in the face amount of $13 million, dated June 16, 2007, maturing on July 31, 2008, and requiring monthly interest payments at fourteen (14%) percent until maturity; (ii) a note issued by the OMP Borrowers in the face amount of $8,382,327, dated June 16, 2007, maturing on December 1, 2008, and requiring monthly interest payments at eighteen (18%) percent until maturity; and (iii) a note issued by the OMP Borrowers in the face amount of $2,784,941, dated June 16, 2007, maturing on December 1, 2008, and requiring monthly interest payments at thirteen (13%) percent until maturity. According to the Debtor's books and records, the total amount due from the OMP Borrowers on account of loans made or around the Petition Date was $30,715,568.19 (the "OMP Loan Account").

176.     Like most of the Debtor's borrowers, the Principals took significant equity in the OMP Project and encouraged certain of the Debtor's creditors to do the same. In addition to the OMP Loan Account, the Debtor took in and disbursed additional funds to the OMP Project on account of purported individual equity investments by certain of the Debtor's creditors as follows: (i) $4 million for Kevin Romano; (ii) $1.5 million for Howard Josephs; (iii) $750,000 for Walter Klauser; and (iv) $250,000 for Klein himself. Several of the Debtor's other creditors purchased condominium units or loaned money to the OMP Project.

177.    The Principals were also equity holders in the OMP Project.    The Principals owned FKF Madison Group LLC ("FKF Madison") in equal shares, which in turn owned a six (6%) percent equity stake in the OMP Project.    However, the Principals did not invest their own money into FKF Madison and the OMP Project, even though they represented to Messrs. Romano and Klauser in order to induce their individual investments in the project. Rather, they credited their own capital accounts in FKF Madison with money loaned by the Debtor to the OMP Project.    According to the 2007 tax returns filed by FKF Madison and the corresponding Form K-1 issued to each of the Principals, each of the Principals had a capital account of $7,900,455 in FKF Madison, all of which was attributable to loans made by the Debtor.

178.    A schedule of all transfers to the OMP Borrowers (collectively, the "OMP Transfers") is annexed hereto as Exhibit F, which is incorporated herein and made a part hereof.

179.    In the spring of 2008, it was clear that the OMP Borrowers would not be able to satisfy the $13 million note coming due on July 31, 2008, and the OMP Borrowers began negotiating with the Principals for a restructuring of the obligations to the Debtor.    On July 7, 2008, Ira Shapiro and Marc Jacobs sent a letter addressed to the Debtor, "Mitch, John and Burt", requesting an extension of certain of the outstanding notes.

180.    On August 14, 2008, the OMP Borrowers, together with Heather Shapiro, Ira Shapiro's wife, and Rochelle Jacobs, Marc Jacobs' wife, issued a note to the Debtor in the principal amount of $29,715,567 (the "OMP Note").    The OMP Note replaced all existing obligations of the OMP Borrowers to the Debtor and required, among other things, monthly interest payments of $386,302.36 (calculated at a rate of 15.6%), and maturity on December 31, 2009.

181.    At the same time as the OMP Note was negotiated, Magee negotiated on his own behalf a personal consulting and brokerage fee from the OMP Borrowers, pursuant to which he would receive $1 million "as a consulting and brokerage fee to you [Magee] in consideration the [*sic*] you [Magee] have provided in connection with obtaining a $29,715,567.00 note from FKF3, LLC." Magee's fee was due upon completion of the project and satisfaction of existing debt.

182.    On August 21 and 22, 2008, the Debtor invested another $1 million in the OMP Project by transferring two equal $500,000 payments to Slazer Development LLC.

183.    By 2009, many of the parties that had originally agreed to buy apartments in the OMP Project were rescinding their contracts because the project was not finished and it was unclear when it would be completed.

184.    By the spring of 2009, the Principals knew that the OMP Project was in big trouble again and were doing nothing about the problem. In an email from Dorfman to Klein at 9:01 a.m. on Sunday, June 28, 2009, with the subject line "one madison", Dorfman stated "I know you like to look at things one day at a time. The day has come to review everything. Not a day is left." Approximately three hours later, Dorfman sends another email to Klein with the subject line "please call me Monday in the am!!".

185.    In or around August 2009, the OMP Borrowers began defaulting on their obligations to pay monthly interest under the terms of the OMP Note. In addition, the OMP Project began defaulting in its obligations to pay monthly installments to iStar, the secured lender.

186.    By November 4, 2009, the Debtor had made its last interest payment and was out of money. It retained Fenster & Kurland LLP as its counsel to help obtain payment on

the OMP Note. In December 2009, the Debtor commenced an action against the OMP Borrowers in New York Supreme Court under Index No. 12371/09, seeking a judgment for all amounts due under the OMP Note.

187. By notice of acceleration dated February 18, 2010, iStar declared immediately due and payable all of the OMP Debtors' obligations to iStar and simultaneously commenced a foreclosure proceeding in New York State Supreme Court.

188. On February 19, 2010, the Debtor obtained a judgment in the amount of $29,715,567, the amount due under the OMP Note (the "OMP Judgment"). On February 23, 2010, the Debtor docketed the OMP Judgment with the New York County Clerk.

189. After commencing its foreclosure action, iStar discovered and alleged that the OMP Debtors and their principals engaged in "gross misconduct, including a scheme whereby numerous purchase agreements for condominium units . . . were entered into between the [OMP] Debtors and their affiliates and/or other third parties without iStar's knowledge or approval." Upon discovery, iStar sought the appointment of a receiver of the OMP Debtors and by order dated April 15, 2010, the New York Supreme Court appointed Jonathan H. Newman as receiver.

190. By March 2010, the Debtor had missed three monthly interest payments to its creditors and was out of money and being attacked by its creditors. On March 10, 2010, Magee sent an email to Adam Kurland, the Debtor's counsel, instructing him to "Take the gloves off, stop dancing, we need money. Please pursue every legal avenue, including foreclosing on Ira and Heathers [Shapiro's] house."

191. On June 8, 2010, certain creditors of the OMP Debtors filed an involuntary petition against the OMP Debtors for relief under chapter 7 of the Bankruptcy Code

in the United States Bankruptcy Court for the District of Delaware.  See In re FKF Madison Group Owner LLC, *et al.*, Case No. 10-11870 (Bankr. Del. Jun. 8, 2010) (Gross, B.J.) (the "OMP Bankruptcy Case").

192.    From June to November, 2010, the OMP Debtors were represented by Dorfman in the OMP Bankruptcy Proceeding.

193.    The OMP Bankruptcy Case is still ongoing.  There have been two plans filed in the case, both of which propose that the secured lender is under-secured by approximately $70 million, and thus, unsecured creditors, including the Debtor, are entitled to little, if anything.

194.    To date, the Debtor has not received anything on account of the OMP Note or OMP Judgment since a partial interest payment in or around September/October 2009. If the plans that have been proposed in the OMP Bankruptcy Case are any indication, the Debtor can expect to receive little, if anything, on account of the over $30 million leant to the OMP Borrowers.

**e.    Bashert Developers, LLC – The Debtor Lost Over $7.7 million in Loans and Investments to a Project Owned in Large Part by the Principals**

195.    Bashert was created on or around May 16, 2005 to construct a 55 and older retirement community at 176 Mount Pleasant Road, Newtown, CT 06470 (the "Newtown Project").  Bashert is owned in equal shares by Rose Glasses and 912 Special, LLC ("912 Special").

196.    Upon inception on May 8, 2003, Rose Glasses was owned one (1%) percent by Klein, thirty-three (33%) percent by Magee, and sixty-six (66%) percent by John Magee Family Partnership II.  No capital contributions were made to Rose Glasses at inception.

197.    On or around May 16, 2005, Bashert acquired the property on which it was to construct the Newtown Project.  Bashert paid approximately $13.2 million for the property, financed $5.5 million from Intervest Bank and $7.7 million from Rose Glasses.  Intervest's loan was secured by a first priority mortgage lien against the Newtown Project.  Rose Glasses did not receive any collateral on account of its investment in Bashert.

198.    Woods at Newtown, LLC was formed for purposes of marketing and selling units at the Newtown Project.  Dorfman was the managing members of Woods at Newtown.

199.    Kohl Partners, an experienced construction company specializing in, among other things, the construction, sale and management of 55+ retirement community properties, was enlisted to construct the Newtown Project.  Kohl Partners was an affiliate of 912 Special.

200.    On July 18, 2005, Rose Glasses and Kevin Romano entered into an agreement pursuant to which Kevin Romano was to acquire a twenty-five (25%) percent interest in Rose Glasses for $1.5 million and according to the K-1s issued by Rose Glasses, Kevin Romano made capital contributions of $1.5 million.  On July 18, 2005, the Debtor transferred $1.5 million to Bashert and subtracted the $1.5 million from the amount owed by the Debtor to Kevin Romano.

201.    In reality, the sale of the membership interest in Rose Glasses to Kevin Romano provided a number of advantages for the Principals.  Among other things, it: (i) reduced the debt owed by Bashert to the Debtor by $1.5 million; (ii) reduced the debt owed by the Debtor to Kevin Romano by $1.5 million, and consequently, significantly reduced the amount of interest paid to Kevin Romano; (iii) provided a mechanism for paying Magee for his equity interest in

the project and removed Magee from his personal guaranty to the lead lender; and (iv) put Mr. Romano on the hook to make capital contributions due from members when the project needed money.

202. At some time after execution of the July 18th agreement, Magee decided that he no longer wanted to be an owner of Rose Glasses and that he no longer wanted to be a guarantor of Bashert's obligations to the senior lender, Commerce Bank (now TD Bank). The members agreed that the equity would be reconstituted in equal shares to Klein, Dorfman and Kevin Romano, and Magee would receive $300,000 of Mr. Romano's capital contribution in exchange for giving up his membership interest in Rose Glasses. On February 1, 2006, Rose Glasses transferred $300,000 to the Debtor with a memo line in the check "John Magee (MK & BD payoff to JM)." Also on February 1, 2006, Rose Glasses issued three other checks to the Debtor as follows: (i) $150,000 with the notation "Kevin Romano – Return of Investment"; (ii) $51,152.94 with the notation "Reduce Loan Balance"; and (iii) $58,106.24 with the notation "Int for 12/1/05 and 1/1/06."

203. On or around August 1, 2005, Bashert, Rose Glasses and 912 Special entered into an Amended Operating Agreement for Bashert. Among other things, the agreement acknowledged that Rose Glasses had already made capital contributions to Bashert in the amount of $7.7 million, and that it would contribute an additional $4 million for the construction of the Newtown Project. Klein signed the Amended Operating Agreement on behalf of Bashert and Rose Glasses.

204. From September 20, 2005 through July 27, 2007, Rose Glasses made payments to the Debtor on account of interest that accrued on the money loaned by the Debtor to

Rose Glasses and Bashert. All payments from Rose Glasses and/or Bashert to the Debtor stopped by September 27, 2007.

205. In total, the Debtor made gross transfers in excess of $5.6 million to Bashert and Rose Glasses, for the benefit of both Bashert and Rose Glasses, as set forth in the scheduled annexed hereto as Exhibit G, which is incorporated herein by reference and made a part hereof (the "Newtown Transfers"). The Newtown Transfers are exclusive of the additional investment of $2.2 million made by the Debtor's predecessor, FKF II Holding, in the Newtown Project.

206. On or around August 1, 2008, Bashert issued an "Amended and Restated and [sic] Promissory Note" to the Debtor in the principal amount of $4,700,000.00 (the "Bashert Note"), evidencing an obligation on accounting of Bashert with respect to some, but not all, of the Newtown Transfers. The Trustee has not discovered any original note. The Bashert Note requires, among other things, maturity and repayment on November 30, 2011, and monthly interest payments of $47,000 per month commencing on November 1, 2008. No interest payments were ever made on account of the Bashert Note, which was issued nearly a year after the last interest payment was received by the Debtor from Rose Glasses.

207. On or around September 10, 2008, Rose Glasses issued an "Amended and Restated and [sic] Promissory Note" to the Debtor in the principal amount of $322,500.00 (the "Rose Glasses Note"), evidencing an obligation on accounting of Rose Glasses with respect to some, but not all, of the Newtown Transfers. The Trustee has not discovered any original note. The Rose Glasses Note requires, among other things, maturity and repayment on October 30, 2011, and monthly interest payments of $3,225.00 per month commencing on November 1,

2008.  No interest payments were made on account of the Rose Glasses Note, which was issued nearly a year after the last interest payment was received by the Debtor from Rose Glasses.

208.    The Debtor did not receive any mortgage, collateral, securities or guarantees to help ensure repayment of the Newtown Transfers, Bashert Note or Rose Glasses Note.

209.    By in or around January 2008, Bashert was making regular capital calls in order to cover its ongoing interest expenses to TD Bank and other expenses.  As part of the Newtown Transfers, from December 22, 2008 to November 13, 2009, the Debtor transferred a total of $633,644.92 to Bashert on account of capital calls made to the members of Rose Glasses, Klein, Dorfman and Kevin Romano.  The amounts transferred were deducted from the Debtor's obligations to Klein, Dorfman and Kevin Romano.

210.    On November 14, 2008, Kohl Partners took the "freshman buyers" of the Newtown Project to the MGM Grand at Foxwoods to celebrate the progress in the Newtown Project, and to meet each other and to form committees.  The "freshman buyers" were expected to move into their newly constructed homes in or around Fall 2009.

211.    Bashert was unable to obtain construction financing for the Newtown Project and the project consequently died after selling a significant number of units.

212.    On October 10, 2009, the "freshman buyers" that had committed to purchase homes at the Newtown Project demanded a meeting with Kohl Partners to discuss the status of construction.  The buyers had anticipated moving in in the Fall of 2009 and construction had not yet commenced.  Deposits were ultimately returned to all prospective buyers and the project was abandoned.

213.    To date, the Debtor has not received any payments on account of the Newtown Transfers.  TD Bank is currently suing Bashert in a foreclosure action.  If a judgment of foreclosure is granted, the current appraised value of the Newtown Project suggests that there will be no money left to pay other obligations, including the obligation to return the Newtown Transfers.

f.    **Jerry's Self Storage – The Debtor Misappropriated Over $3 million in Funds Received from a Repayment, and Lost Over $1.5 million in Remaining Loans and Investments to a Project Owned in Part by the Principals**

214.    Jerry's was formed on or around June 12, 2007 by Jerry Sabini for the purpose of constructing, owning and operating a modern self-storage unit at 469 Temple Hill Road, New Windsor, Orange, NY 12553 (the "Storage Unit"). From inception to December 8, 2008, Jerry Sabini owned a 100% membership interest in Jerry's.

215.    On or around October 12, 2007, Jerry's executed a promissory note in favor of the Debtor in the face amount of $5 million, pursuant to which Jerry's was permitted to borrow a maximum amount of $5 million for the purposes of constructing the Storage Unit.  At or around the same time, Jerry's executed a mortgage in favor of the Debtor securing Jerry's obligations to the Debtor by a first priority lien against the Storage Unit.

216.    In or around July 2008, Jerry's and the Debtor realized that Jerry's would not complete the construction of the Storage Unit for the $5 million contemplated, and by September 5, 2008, the Debtor had extended the full $5 million to Jerry's.

217.    The Debtor began looking for alternative sources of financing and a lender to take it out of the Jerry's loan. The Principals discovered that lenders were only willing to refinance the Debtor's loan to Jerry's if construction was completed.

218.    In order to complete construction, Jerry's required approximately $1.5 million in addition to the $5 million already loaned to Jerry's by the Debtor under the original

loan. The Principals financed this amount through additional advances to Jerry's from the Debtor.

219. In total, the Debtor transferred $6,008,691.39 to Jerry's or for the benefit of Jerry's as detailed on the annexed Exhibit H. The first $5 million transferred to Jerry's was contemplated by the original loan documents, but the additional $1,008,691.39 of which was not (the $1,008,691.39 in transfers in excess of the $5 million are collectively referred to herein as the "Jerry's Transfers"). The Jerry's Transfers were made between October 12, 2007 and December 30, 2008.

220. On or around October 14, 2008, the Principals officially applied on behalf of Jerry's for a $6.5 million loan from Oritani Bank.

221. On or around December 5, 2008, Jerry's closed on a loan with Oritani Bank, pursuant to which the Debtor executed a satisfaction of note and mortgage in favor of Jerry's in exchange for $5 million of the closing proceeds, and Oritani Bank was granted a first-priority security interest in the Storage Unit.

222. The Principals caused the Debtor to release its mortgage and security interest against the Storage Unit in exchange for $5 million, even though the Debtor was owed an additional $1,008,691.39 by Jerry's on account of the Jerry's Transfers.

223. The Debtor did not receive a note from Jerry's to confirm the indebtedness of the Jerry's Transfers. Nor did the Debtor receive any mortgage or security interest from Jerry's to protect or collateralize its receivable from Jerry's.

224. According to the Debtor's books and records, the Jerry's Transfers were booked as a loan from the Debtor to Jerry's accruing interest at the rate of fourteen (14%) percent. Jerry's made two interest payments to the Debtor on account of the Jerry's Transfers in

the amount of $18,626.00 each on January 9, 2009, and January 28, 2009. After January 28, 2009, no interest or payment was made by Jerry's on account of the Jerry's Transfers.

225. The Principals, however, received significant consideration for arranging for the Jerry's Transfers from the Debtor's funds. In return for advancing the additional Jerry's Transfers from the Debtor's funds, the Principals received a redistribution of the Jerry's membership interests in or around November 2008. Originally, Jerry's was owned and operated 100% by Jerry Sabini. Following the Jerry's Transfers, Jerry's was owned only twenty (20%) percent by Mr. Sabini, with the other eighty (80%) percent redistributed forty (40%) percent to Magee, and twenty (20%) percent each to Klein and Dorfman. In addition, Magee replaced Mr. Sabini as the managing member, and he continues to manage Jerry's to this day.

226. Upon the Debtor's receipt of the $5 million in loan proceeds from Oritani Bank, the Principals directed that it be immediately distributed as follows:

- $1.35 million to Abe Goldberger, a sometimes borrower from and sometimes lender to the Debtor;

- $90,000 to Kennedy Funding Invitational, a charity tennis tournament run by Klein;

- $840,000 to Commercial Construction, Magee's construction company; and

- $1.925 million to FKF Holding, which FKF Holding immediately disbursed to Patrick Magee ($1 million) and Bradley ($919,736.41).

227. The Debtor never received any repayment of the Jerry's Transfers which remain outstanding, due and owing to this day, except for the two interest payments made in January 2009.

**g.     Gregory Hayden – Magee Collects and Retains $100,000 Due to the Debtor**

228.    According to the Debtor's books and records, Gregory Hayden is indebted to the Debtor in an amount not less than $100,000.

229.    Shortly after Day Seckler LLP was appointed managing member of the Debtor, it made demand upon Gregory Hayden to repay the $100,000 owed.   In response, Gregory Hayden claimed that he had already repaid the indebtedness.   As proof, Mr. Hayden produced the following two canceled checks: (i) a check dated June 28, 2010 in the amount of $50,000.00 made payable to John Magee with "Payment of Loan FKF III" written in the memo line; and (ii) a check dated June 30, 2010 in the amount of $50,000.00 made payable to John Magee with "Final PM FKF III Loan" written in the memo line.   Both checks were deposited by Magee into his personal bank account.

**h.     Other Insider Loans – The Debtor Lost Over $750,000 in Other Loans to Insider Entities**

230.    According to the Debtor's books and records, Historic Car Sales & Service, Inc. ("Historic Cars") borrowed a principal amount of $110,000.00 from the Debtor and to date has not repaid the indebtedness (the "Historic Car Loan").   Historic Car is an entity owned and controlled by Magee.

231.    According to the Debtor's books and records, Magee borrowed a principal amount of $150,000 from the Debtor on account of the "Vernon Property" and to date has not repaid the indebtedness (the "Vernon Magee Loan").

232.    When Day Seckler LLP made demand upon Magee for the repayment of the Vernon Magee Loan and Historic Car Loan, it was told that it would get paid when Magee was repaid what he was owed.

233.     According to the Debtor's books and records, Michael and Rhonda Conte borrowed a principal amount of $414,085.08 from the Debtor on or around April 10, 2007, and have only repaid $300,000 of that amount, leaving a current balance of $114,085.08 (the "Conte Loan").  No interest was charged or received by the Debtor on the Conte Loan.  Rhonda Conte is Klein's sister.

234.     According to the Debtor's books and records, Dorfman borrowed a principal amount of $211,222 from the Debtor and to date has not repaid the indebtedness (the "Dorfman Loan").  The loan was not originally documented, but Dorfman has admitted to the liability and has been making good faith payments of $2,500 each month to the Trustee on account of the Dorfman Loan.

235.     According to the Debtor's books and records, 9W Station, L.L.C. ("Route 9W") borrowed a principal amount of $650,597 from the Debtor, of which $461,108 was repaid, leaving an outstanding indebtedness of $189,489 (the "Route 9W Loan").  Route 9W is owned in equal shares by Klein, Dorfman and Magee.   The Route 9W Loan was made to finance Route 9W's construction of a commercial building.

236.     On or about September 29, 2010, Villas Properties Equities, L.L.C. ("Villas"), an entity owned and controlled by Jesse Dorfman, Dorfman's son, purchased substantially all the assets of Route 9W.  In consideration for the sale, Villas assumed a certain indebtedness of Route 9W to Provident Bank and the Route 9W Loan.  The Principals were released from their personal guarantees of the Provident Bank debt.  In exchange, Provident Bank received a first priority, senior lien against the property.  Upon information and belief, Provident Bank is receiving monthly interest payments from Villas.  To date, the Debtor has not

received any payments on account of the Route 9W Loan assumed by Villas, but the Trustee has been in active settlement discussions with Villas for the recovery of amounts owed.

237.    In total, the Debtor is owed not less than $774,796 on the insider loans described in this section.

**i.    Caulfield Loans – Debtor Loses Not Less than $4.7 Million on Third Party Loans**

238.    A very small portion of the Debtor's loan portfolio consisted of legitimate, third-party loans.  As set forth in detail above, a vast majority of the Debtor's funds were used by the Principals to invest in their own projects.  On a few occasions, the Debtor did invest in outside projects.  However, even for those projects, the Principals failed to adequately and appropriately protect the Debtor's interest.

**(i)    The Essex Loan**

239.    Essex was created in part by real estate developers James F. Caulfield, Jr. and Robert A. Caulfield (collectively, the "Caulfields"), in order to acquire title to property located at 150 Essex Street and 198 Van Vorst Street, Jersey City, New Jersey (the "Essex Property"), and to build and develop condominiums thereon.  In order to finance the acquisition and construction, Essex borrowed money from both Bank of America, N.A. ("BofA") and the Debtor.  However, after acquiring title to the property, the Caulfields had significant problems obtaining the necessary environmental approvals and ultimately, Essex was unable to build the contemplated projects.

240.    BofA is the owner and holder of a Construction Loan Note dated May 31, 2007, as later amended on August 25, 2008, executed and delivered by Essex and payable to BofA in the maximum principal amount of $6,550,000.00 (collectively, and as may have been further modified or amended from time to time, the "BofA Essex Note").

241.     Essex's obligations under the BofA Essex Note are secured by, among other things, that certain Construction Loan Mortgage, Assignment of Leases and Security Agreement dated May 31, 2007, from Essex to BofA, and properly recorded on June 1, 2007 (as the same may have been amended or otherwise modified from time to time, the "BofA Essex Mortgage"), covering among other things, the Essex Property.

242.     The BofA Essex Note is also guaranteed, jointly and severally, by the Caulfields, pursuant to the terms of that certain Guaranty, dated May 31, 2007, given by each Guarantor to BofA.

243.     By in or around May 2011, approximately $6,350,000.00 remained due and owing to BofA on the BofA Essex Note.

244.     The Debtor is the owner and holder of that certain Promissory Note, dated May 31, 2007, executed and delivered by Essex and payable to the Debtor in the original maximum principal amount of $2,200,000, plus interest at the rate of eighteen percent (18%) per annum (the "FKF Essex Note").  As of May 2011, Essex owed in excess of $3,234,700 to the Debtor on account of the Essex Promissory Note (the "FKF Essex Obligation").

245.     The Principals did minimal due diligence before advancing funds under the FKF Essex Note.  The Principals did not negotiate or obtain any normal protections for the Debtor with respect to the FKF Essex Obligation.  The FKF Essex Obligation was not collateralized with any interest in the Essex Property or any other real or personal property.  Also, the FKF Essex Obligation was not personally guaranteed by the Caulfields.

246.     In or around the Fall 2009, Essex stopped making interest payments due under the FKF Essex Note.

247.     In or around May 2010, Magee called Robert A. Caulfield and asked if the Caulfields would make any payments due on the FKF Essex Note to Magee personally, rather than the Debtor.  Mr. Caulfield replied that Essex did not have the money for any payments, but even if it did, he would not make payments due the Debtor to Magee personally.

248.     Ultimately, the Trustee settled the FKF Essex Obligations of approximately $3,234,700 for a cash payment of $800,000, which settlement was approved by the Bankruptcy Court and consummated by the parties.  The Debtor lost over $2,434,700 on account of the loans made to Essex.

**(ii)     The FTD Loan**

249.     FTD was created in part by the Caulfields in order to acquire title to property located at 217 Newark Avenue, Newark, New Jersey (the "FTD Property"), and to build and develop condominiums thereon.  In order to finance the acquisition and construction, FTD borrowed money from both BofA and the Debtor.  FTD has completed the project, with a total of 76 units, 32 of which are still available for sale as of March 31, 2011.

250.     BofA is the owner and holder of that certain Construction Loan Note dated July 19, 2007 given by FTD to BofA in the original principal amount of $21,800,000 (the "BofA FTD Note").

251.     FTD's obligations under the BofA FTD Note are secured by (i) that certain Construction Loan Mortgage, Assignment of Leases and Security Agreement dated July 19, 2007 given by FTD to BofA and properly recorded on July 26, 2007 (as modified, amended, restated, replaced, supplemented, renewed, extended or otherwise, the "FTD Mortgage") encumbering, among other things, the FTD Property.

252.    The BofA FTD Note is guaranteed by the Caulfields, Adam Mermelstein, and Azriel Mandel, pursuant to a certain Guaranty dated July 19, 2007.

253.    The Debtor is the owner and holder of that certain Promissory Note, dated July 19, 2007, executed and delivered by FTD and payable to the Debtor in the original maximum principal amount of $4,000,000 (the "FKF FTD Note").

254.    As of May 2011, FTD owed in excess of $6,271,320 to the Debtor on account of the FTD Promissory Note (the "FKF FTD Obligation").

255.    The Principals did minimal due diligence before advancing funds under the FKF FTD Note.  The Principals did not negotiate or obtain any normal protections for the Debtor with respect to the FKF FTD Obligation.  The FKF FTD Obligation was not collateralized with any interest in the FTD Property or any other real or personal property.  Also, the FKF FTD Obligation was not personally guaranteed by the Caulfields.

256.    In or around the Fall 2009, FTD stopped making interest payments due under the FKF FTD Note.

257.    In or around May 2010, Magee called Robert A. Caulfield and asked if the Caulfields would make any payments due on the FKF FTD Note to Magee personally, rather than the Debtor.  Mr. Caulfield replied that FTD did not have the money for any payments, but even if it did, he would not make payments due the Debtor to Magee personally.

258.    Ultimately, the Trustee settled the FKF FTD Obligations of approximately $6,271,320 for payments over time totaling $4 million, which settlement was approved by the Bankruptcy Court, but has yet to be consummated by the parties.  The Debtor lost not less than $2,271,320 on account of the loans made to FTD.

### III. OTHER ACTS, CONDUCT, TRANSFERS, CONFLICTS AND ACTIVITIES OF THE DEBTOR AND ITS PRINCIPALS RELEVANT TO THE CLAIMS ASSERTED IN THE COMPLAINT

259. The Principals committed numerous acts that further evidenced their treatment of the Debtor as their personal piggybank to do with as they saw fit. As detailed below, the Principals used their own law and accounting firms to advise and give counsel to the Debtor as well as the Debtor's borrowers. The Principals also freely transferred money between the Debtor and other entities that they owned or controlled, including the Kennedy Funding Invitational charity tennis tournament, FKF Holding, and Commercial Construction.

**a. The FKF Firm and the Dorfman Firm – The FKF Firm and the Dorfman Firm have Numerous Conflicts of Interest, and Failed to Properly Advise the Debtor and Account for the Debtor's Funds. The FKF Firm was Paid Not Less Than $384,200 for Accounting Services by the Debtor and the Dorfman Firm was Paid Not Less Than $57,356 for Legal Services by the Debtor**

260. Klein was an owner of both the Debtor and the FKF Firm. The FKF Firm simultaneously served as the accountant and advisor to the Debtor, a vast majority of the Debtor's creditors, and several of the Debtor's borrowers and recipients of transfers from the Debtor, including: (i) FKF Madison Group LLC; (ii) SF Properties; (iii) Aventine Edgewater; (iv) FKF Edgewater; (v) Aventine Retail; (vi) FKF Retail; (vii) Bashert; (viii) Rose Glasses; (ix) The Kennedy Funding Invitational; (x) Marc Jacobs; (xi) Ira Shapiro; (xii) Slazer Enterprises LLC; (xiii) Slazer Enterprises Owner LLC; (xiv) Madison Park Group Owner LLC; (xv) FKF Holding; (xvi) Route 9W; (xvii) Magee; and (xviii) Bradley Corporate Park.

261. The FKF Firm was paid in excess of $384,200 directly by the Debtor for accounting and advisory services. Also, upon information and belief, the FKF Firm was paid significant sums in accounting fees by the Debtor's borrowers and creditors. In addition, the FKF Firm received $35,729 in direct transfers from the Debtor on account of things other than accounting fees. All transfers made by the Debtor to or for the benefit of the FKF Firm

(collectively, the "FKF Firm Transfers") are detailed on the schedule annexed hereto as Exhibit I, which is incorporated herein and made a part hereof.

262.     Dorfman was an owner of both the Debtor and the Dorfman Firm.  The Dorfman Firm simultaneously served as legal counsel to the Debtor, and several of the Debtor's borrowers and recipients of transfers from the Debtor, including: (i) FKF Madison Group LLC; (ii) SF Properties; (iii) Aventine Edgewater; (iv) FKF Edgewater; (v) Aventine Retail; (vi) FKF Retail; (vii) Bashert; (viii) Rose Glasses; (ix) The Kennedy Funding Invitational; (x) Marc Jacobs; (xi) Ira Shapiro; (xii) Slazer Enterprises LLC; (xiii) Slazer Enterprises Owner LLC; (xiv) Madison Park Group Owner LLC; (xv) FKF Holding; (xvi) Route 9W; (xvii) Magee; and (xviii) Bradley Corporate Park.

263.     The Dorfman Firm was paid in excess of $57,356.75 directly by the Debtor for legal services.  In addition, the Dorfman Firm received in excess of $7 million in transfers from the Debtor while serving in various capacities, including the attorneys and escrow agents for the Debtor and various borrowers of the Debtor.  All transfers made by the Debtor to or for the benefit of the Dorfman Firm (collectively, the "Dorfman Firm Transfers") are detailed on the schedule annexed hereto as Exhibit J, which is incorporated herein and made a part hereof.

264.     The FKF Firm made numerous errors in the performance of services to the Debtor.  Among other things, the FKF Firm kept inconsistent books for its clients.  For example, the FKF Firm booked loans from the Debtor to Bashert and the OMP Borrowers as equity contributions by the Principals to Rose Glasses and FKF Madison, respectively.

265.     The FKF Firm and Dorfman Firm knew or should have known that the notes and agreements entered into between the Debtor and its creditors constitute securities

under the Securities Act of 1933, 15 U.S.C. §78a *et seq*. (the "<u>Securities Act</u>") for which no exemption from registration was available.

266.    If the FKF Firm and Dorfman Firm had provided competent, disinterested accounting and consulting advice regarding the Debtor's obligations under the Securities Act, or disclosed the existing conflicts of interest, the Principals' numerous conflicts and breaches of their duties of loyalty to the Debtor would have been halted in their tracks before millions of dollars worth of damages were inflicted on the Debtor and its creditors.

267.    Even if the Principals had wanted to comply with the Securities Act, they would not have been able to register the Debtor because the Debtor could not comply with the registration requirement under the Securities Action.  The Debtor's lack of certified financial statements, combined with the rampant conflicts of interest between the Debtor and its borrowers and lack of documentation for an overwhelming majority of the Debtor's loans and investments, would have made it impossible to obtain registration.

268.    Alternatively, had the Principals refused to follow the advice of the Dorfman Firm and/or FKF Firm that the Debtor needed to register, the Dorfman Firm's and/or FKF Firm's professional and ethical obligations would have made it incumbent on the firm to report the Principals' actual and intended crimes to the Debtor's creditors and the appropriate authorities.  Thus, had the Dorfman Firm and FKF Firm advised the Debtor properly of its obligations under the federal securities laws, tens of millions of dollars in damages to the Debtor and its creditors could have been avoided.

269.    Similarly, beginning in or around early 2008, the FKF Firm's and/or Dorfman Firm's ethical obligations required the firms to report the Principals' actual and intended crimes to the Debtor's creditors and the appropriate regulatory authorities because the

FKF Firm and the Dorfman Firm knew, or should have known, that the Principals were operating the Debtor as a Ponzi scheme.

270.    The Dorfman Firm and FKF Firm knew, or should have known, that beginning in or around February 2009, Magee was collecting amounts due the Debtor from Diane Roberts and potentially other borrowers.  The Dorfman Firm's and FKF Firm's ethical obligations required the firms to report Magee's crimes to the Debtor's creditors and the appropriate regulatory authorities.  The Dorfman Firm's and FKF Firm's failure to report Magee's theft and conversion caused and augmented damages to the Debtor and its creditors.

271.    The Dorfman Firm and FKF Firm knew, or should have known, that it was improper to distribute the over $4.2 million in Member Distributions while the Debtor was insolvent.  The Dorfman Firm's and FKF Firm's ethical obligations required the firms to report the improper distributions to the Debtor's creditors and the appropriate regulatory authorities.  The Dorfman Firm's and FKF Firm's failure to report the improper Member Distributions caused and augmented damages to the Debtor and its creditors.

272.    Had the Dorfman Firm and FKF Firm heeded their professional responsibilities and reported the Principals' criminal and wrongful acts to the Debtor's creditors, those creditors would have forced the Debtor into bankruptcy much sooner, as they ultimately did in 2010.  The Dorfman Firm's and FKF Firm's negligence and breach of fiduciary duty to the Debtor caused and exacerbated the significant damage caused to the Debtor and its creditors by the wrongful acts of the Principals.

### b.    Kennedy Funding Invitational – The Debtor Transferred Over $718,500 to a Charity Tennis Tournament Run by Klein

273.    The Kennedy Funding Invitational is a charity tennis tournament run by Klein, an avid tennis player, at the Dellwood Country Club in New City, New York.  Money

made from the Kennedy Funding Invitational is donated to local medical facilities focused on the treatment of breast cancer.

274.     Klein had complete control over the bank accounts and books of the Kennedy Funding Invitational. Klein enjoyed the notoriety and attention he received by running the Kennedy Funding Invitational.  Klein is one of the co-executive directors of the Kennedy Funding Invitational, plus Klein secured seats on the board of directors of the Kennedy Funding Invitational for himself and his wife, Laurette Klein, and a set on the board of trustees for the Kennedy Funding Invitational for his son, Jason Klein.  The Debtor and the FKF Firm were among the "platinum" (highest level) sponsors for the event.

275.     Klein boasted to fellow board members regarding the contributions that he secured.  For example, on June 18, 2008, Klein sent an email to the board of the Kennedy Funding Invitational stating that "Our [the Kennedy Funding Invitational's] costs are covered almost entirely by the money given from: . . . . FKF 3 LLC (One of My Companies) Slazer Enterprises (A company owned in part by me . . . "

276.     In total, the Debtor made gross transfers to the Kennedy Funding Invitational in the amount of $718,500.  However, in addition, Klein made significant transfers from the Kennedy Funding Invitational back to the Debtor.  Klein transferred funds between the Debtor and the Kennedy Funding Invitational depending on the cash needs of each.  In total, the Kennedy Funding Invitational was the beneficiary of the unexplained transfers between the two entities.   As detailed on <u>Exhibit K</u>, which is incorporated herein by reference, the Debtor transferred a net amount of $103,500 to the Kennedy Funding Invitational.

**c.** **FKF Holding – The Debtor Fraudulently Transferred Over $1.1 million to FKF Holding**

277.    As described above, FKF Holding is in many ways a predecessor to the Debtor. FKF Holding is/was managed by Klein, but is majority owned by Magee and his brother Patrick, and minority owned by Dorfman and his former law partner Dennis Lynch.

278.    The Principals freely transferred money between FKF Holding and the Debtor depending upon the cash needs of the entities.

279.    The Trustee has not discovered the existence of any contracts, promissory notes or other documents that explain or justify the relationship between the Debtor and FKF Holding.

280.    The Debtor transferred a total of $8,088,029.78 in gross transfers to FKF Holding, and received only $6,924,300.00 from FKF Holding in return, leaving a remaining deficit owed to the Debtor of not less than $1,163,729.78. A schedule of all transfers between the entities is annexed hereto as <u>Exhibit L</u>, which is incorporated herein by reference (the "<u>FKF Holding Transfers</u>").

**d.** **Commercial Construction – The Debtor Fraudulently Transferred Over $954,551.72 to Magee's Defunct Construction Company**

281.    Commercial Construction is an entity owned by Magee. Commercial Construction was dissolved by proclamation on June 25, 2003, due to inactivity. Notwithstanding the dissolution, Magee used Commercial Construction to conduct various financial transactions.

282.    Commercial Construction purportedly maintained a loan account (the "<u>Commercial Construction Loan Account</u>") with the Debtor. The balance on the Commercial Construction Loan Account according to the Debtor's books and records is $1,592,724.85.

283.     On November 24, 2010, Commercial Construction filed a proof of claim with the Bankruptcy Court claiming that it is owed $1,741,939.71 by the Debtor on account of amounts due it from the Commercial Construction Loan Account (the "Commercial Construction Claim").

284.     An examination of the activity in the Commercial Construction Loan Account reveals that it was not treated anything like a traditional loan account.  For example:

- Commercial Construction received a promissory note from the Debtor dated February 1, 2007, in the face amount of $970,051, reflecting one particular deposit made by Commercial Construction.  However, no other promissory notes or evidence of obligations appear to have been issued to Commercial Construction on account of all other activity in the Commercial Construction Loan Account; and

- Money was freely transferred in and out of the Commercial Construction Loan Account, including $175,000 that was transferred to Jonathan Magee, Magee's son, and $150,000 to Patrice Magee, Magee's daughter, and $516,593 to Magee.

285.     For all intents and purposes, the Commercial Construction Loan Account was used as an additional equity account of Magee.

286.     During the entire existence of the Commercial Construction Loan Account, Commercial Construction was a defunct business with no known legitimate business activities of its own.

287.     Separate and apart from deposits and repayments of principal in the Commercial Construction Loan Account, the Debtor made a number of transfers to Commercial Construction and credited those to interest service ($114,551.72), an unexplained transfer on behalf of Magee ($700,000) and a transfer on account of the Jerry's loan account ($140,000) (the

$700,000 attributed to Magee and $140,000 attributed to Jerry's were from the $840,000 transferred to Commercial Construction in December 2008 from the proceeds of the Jerry's closing described above). The schedule of all transfers between the entities not attributable to principal deposits and repayments in the Commercial Construction Loan Account is annexed hereto as <u>Exhibit M</u>, which is incorporated herein by reference (the "<u>Commercial Construction Transfers</u>").

288. After almost eight years of improperly operating a dissolved company, in or around February 2011, Magee reinstated Commercial Construction by filing required tax returns and re-registering with the Department of State.

**e.    Bradley Corporate Park – The Debtor Fraudulently Transferred Over $1.3 million to Magee's Construction Company**

289. Bradley owns and operates a corporate office park in Blauvelt, New York. Bradley is owned in equal percentages by Magee and his brother Patrick.

290. The Debtor transferred a total of $400,000 in gross direct transfers to Bradley, an entity owned by Magee, a schedule of which is annexed hereto as <u>Exhibit N</u>, which is incorporated herein by reference. According to the books and records of the Debtor, $200,000 was transferred to Bradley on account of a loan purportedly made by FKF Holding to the Debtor, and $200,000 was made from Magee's equity account with the Debtor, which is in addition to the Magee Distributions described herein.

291. In addition to the $400,000 in transfers set forth above, Bradley received a payment of $919,736.41 from FKF Holding immediately after the Debtor transferred funds to FKF Holding. Immediately upon FKF Holding's receipt of funds from the Debtor in connection with the December 2008 closing on the loan by Jerry's from Oritani Bank, FKF Holding transferred $919,731.46 to Bradley by check no. 1769, dated December 7, 2008. The $400,000

in direct transfers and $919,736.41 in indirect transfers are collectively referred to herein as the "Bradley Transfers".

**f.** **SF Properties – The Debtor Fraudulently Transferred at Least $1,420,812 to an Insider**

292.    SF Properties is and insider of the Debtor and is owned two (2%) percent by KD Equities, Inc., three and one-half (3 1/2%) percent by Klein, three and one-half (3 1/2%) percent by Alan Feldstein, ten (10%) percent by Dorfman Family Limited Partnership, ten (10%) percent by Kemm Lynch Family Partnership, thirty-five and one-half (35 ½%) percent by Magee, and thirty-five and one-half (35 ½%) percent by Patrick Magee.

293.    The Principals freely transferred funds back and forth between the Debtor and SF Properties, depending upon each entity's financial needs.  Most transfers between the Debtor and SF Properties were credited or debited to Magee's equity account with the Debtor.

294.    The Debtor transferred a total of $1,420,812 in gross direct transfers to SF Properties, and received $1,283,000 from SF Properties in return, leaving a deficit in favor of SF Properties of $137,812.   A schedule of all transfers between the entities is annexed hereto as Exhibit O, which is incorporated herein by reference (the "SF Properties Transfers").

**g.** **TA Group, FKF V and JDJ Holding – The Debtor Fraudulently Transferred over $2.1 to an Insider**

295.    TA Group is an entity owned in equal shares by Klein and Dorfman.  According to its tax returns, TA Group's primary asset is a membership interest in PDQ Forestream Center LLC, a real estate ownership and management company based in Hallandale Beach, Florida.

296.    FKF V and JDJ Holding are unincorporated and unregistered entities that are owned and controlled, in whole or in part, by Klein, Dorfman and Klein's son, Jason Klein.

297.    FKF V filed a proof of claim against the Debtor's estate on October 4, 2010 [Claim No. 25] (the "FKF V Claim"), claiming to be owed $610,000 by the Debtor as of the Petition Date.  The FKF V Claim was signed by Klein.

298.    JDJ Holding filed a proof of claim against the Debtor's estate on September 22, 2010 [Claim No. 17] (the "JDJ Claim"), claiming to be owed $957,000 by the Debtor as of the Petition Date.  The JDJ Claim was signed by Klein's son, Jason Klein.

299.    At the behest of the Principals, the Debtor engaged in a number of undocumented transactions involving TA Group, FKF V and JDJ Holding.

300.    According to the Debtor's books and records, on November 28, 2006, TA Group borrowed $1.5 million from the Debtor, which was contemporaneously transferred to TA Group by the Debtor in cash.  Three days later, on December 1, 2006, the $1.5 million borrowed by TA Group was repaid by the reduction of a purported loan payable to FKF V of $650,000, and to JDJ Holding of $850,000.

301.    The Debtor did not receive any cash on account of the alleged repayment of the $1.5 million loaned to TA Group.  Also, it is unclear whether insiders FKF V and JDJ Holding actually loaned money to the Debtor, and if so, where the money came from.

302.    Outside of the short $1.5 million "lending" relationship outlined above, the Principals freely transferred funds back and forth between the Debtor and TA Group, depending upon each entity's financial needs.  Most transfers between the Debtor and TA Group were credited or debited to Klein and Dorfman's equity accounts with the Debtor.

303.    The Debtor transferred a total of $2,148,816.67 in gross direct transfers to TA Group, and received less than that in return, leaving a deficit in favor of TA Group of not

less than $1,510,150. A schedule of all transfers between the entities is annexed hereto as Exhibit P, which is incorporated herein by reference (the "TA Group Transfers").

304. A review of TA Group's accounts and bank statements further reveals that TA Group routinely transferred funds between and among FKF V, JDJ Holding, Klein, Dorfman and Jason Klein.

### h. Principals' Loan Accounts and Claims

305. As described above, the Principals never paid anything on account of their membership interests in the Debtors. The Principals did, however, maintain "loan accounts" with the Debtors, which they would freely move money into and out of.

306. On November 18, 2010, Magee filed a proof of claim against the Debtor's estate [Claim No. 38] (the "Magee Claim"), asserting a general, unsecured claim against the Debtor's estate in the amount of $609,448.46. The Magee Claim was on account of Magee's "loan account" with the Debtor.

307. An examination of the Magee loan account reveals that it was used more like a personal piggy bank and means of receiving additional unwarranted compensation from the Debtor in the form of interest. In total, the Debtor only received $772,658.50 from Magee on account of his loan account. Other additions to the account were from other sources, like FKF Holding ($450,000) and Rose Glasses ($300,000) on account of the purchase of Magee's interest in Rose Glasses.

308. In exchange for the $772,658.50 in cash received by the Debtor, Magee received significant transfers back, including, among others: $700,000 to his company, Commercial Construction; $310,000 to the United States Treasury on account of his personal income taxes; $65,000 to New York State; $38,858.86 to American Express; and $440,861.62 in interest payments.

309.     In addition, Magee filed a second proof of claim against the Debtor in the amount of $30,000,000 [Claim No. 52] (the "$30 Million Magee Claim").  Magee has yet to offer any theory regarding why he is entitled to a $30 million claim against the Debtor.  Upon information and belief, Magee filed the $30 Million Magee Claim in order to attempt to block confirmation of the Plan by voting against it.

310.     According to the Debtor's books and records, Klein is owed approximately $1,148,818.47 on account of his "loan account."  Unlike Magee, Klein never filed a proof of claim against the Debtor.

311.     A close inspection of the transactions that make up Klein's loan account raise a number of questions, and are inconsistent with the way that the Debtor maintained its loan accounts with any non-insider creditors.  For example, much of the receipts by the Debtor on account of Klein's account did not come from Klein, but from FKF Holding.  Also, much of the cash outlays on account of Klein's loan account went to other places like FKF Holding, Bashert, FKF II Holding, and TA Group.  The Debtor made a total of $255,827.44 in interest payments to Klein on account of the purported borrowings from Klein.

312.     Klein routinely debited and credited his loan account on account of non-cash transfers made by the Debtor with other friends and insiders, including Abraham Goldberger, JDJ Holding, Patrice Magee, DRLLC and TA Group.

313.     Dorfman also maintained a loan account with the Debtor.  Like Magee and Klein, Dorfman's loan account had a number of unexplained inflows and outflows and was not treated like loan accounts with other non-insider creditors.  According to the books and records, Dorfman is owed $25,500 by the Debtor, and he collected $5,535 in interest payments from the Debtor.  Dorfman never filed a proof of claim against the Debtor's estate.

i. **Magee's Children – The Debtor Makes over $1.2 Million in Avoidable Transfers Directly to Magee's Children**

314.    Magee directed the Debtor to make certain of the Magee Distributions directly to his children.  Magee's children were never owners or employees of the Debtor.

315.    The Debtor made the following Magee Distributions directly to Melissa Magee:

| Check Date | Payee | Amount |
|---|---|---|
| **Transfers Over Two Years Prior to Petition Date:** | | |
| 6/13/2006 | Melissa Magee Page | $ 10,000.00 |
| 7/19/2006 | Melissa Magee Page | 10,000.00 |
| 8/14/2006 | Melissa Magee Page | 10,000.00 |
| 9/14/2006 | Melissa Magee Page | 10,000.00 |
| 10/18/2006 | Melissa Magee Page | 10,000.00 |
| 11/16/2006 | Melissa Magee Page | 10,000.00 |
| 12/16/2006 | Melissa Magee Page | 10,000.00 |
| 1/16/2007 | Melissa Magee Page | 10,000.00 |
| 3/2/2007 | Melissa Magee Page | 10,000.00 |
| 3/17/2007 | Melissa Magee Page | 10,000.00 |
| 4/28/2007 | Melissa Magee Page | 10,000.00 |
| 5/18/2007 | Melissa Magee Page | 10,000.00 |
| 6/25/2007 | Melissa Magee Page | 10,000.00 |
| 7/27/2007 | Melissa Magee Page | 10,000.00 |
| 8/24/2007 | Melissa Magee Page | 10,000.00 |
| 9/14/2007 | Melissa Magee Page | 10,000.00 |
| 10/16/2007 | Melissa Magee Page | 10,000.00 |
| 11/21/2007 | Melissa Magee Page | 10,000.00 |
| 12/20/2007 | Melissa Magee Page | 10,000.00 |
| 2/2/2008 | Melissa Magee Page | 10,000.00 |
| 2/21/2008 | Melissa Magee Page | 10,000.00 |
| 3/27/2008 | Melissa Magee Page | 10,000.00 |
| 5/2/2008 | Melissa Magee Page | 10,000.00 |
| 6/13/2008 | Melissa Magee Page | 10,000.00 |
| **Transfers Within Two Years of Petition Date:** | | |
| 7/16/2008 | Melissa Magee Page | 10,000.00 |
| 8/2/2008 | Melissa Magee Page | 10,000.00 |
| 9/1/2008 | Melissa Magee Page | 10,000.00 |
| | **TOTAL:** | $ 270,000.00 |

316.    The Debtor made the following Magee Distributions directly to Patrice Magee:

| Check Date | Payee | Amount |
|---|---|---|
| **Transfers Over Two Years Prior to Petition Date:** | | |
| 11/21/2007 | Patrice Magee | $ 10,000.00 |
| 5/2/2008 | Patrice Magee | 10,000.00 |

| Transfers Within Two Years of Petition Date: | | |
|---|---|---|
| 7/15/2008 | Patrice Magee | 10,000.00 |
| 8/2/2008 | Patrice Magee | 10,000.00 |
| 8/31/2008 | Patrice Magee | 10,000.00 |
| 9/1/2008 | Patrice Magee | 10,000.00 |
| 10/5/2008 | Patrice Magee | 10,000.00 |
| 11/13/2008 | Patrice Magee | 10,000.00 |
| 12/13/2008 | Patrice Magee | 10,000.00 |
| 01/05/2009 | Patrice Magee | 10,000.00 |
| | **TOTAL:** | $ 100,000.00 |

317.   The Debtor made the following Magee Distributions directly to Lizbeth Keefe:

| Check Date | Payee | Amount |
|---|---|---|
| **Transfers Over Two Years Prior to Petition Date:** | | |
| 6/27/2006 | Lizbeth Keefe | $  10,000.00 |
| 7/19/2006 | Lizbeth Keefe | 10,000.00 |
| 8/14/2006 | Lizbeth Keefe | 10,000.00 |
| 9/14/2006 | Lizbeth Keefe | 10,000.00 |
| 10/18/2006 | Lizbeth Keefe | 10,000.00 |
| 11/16/2006 | Lizbeth Keefe | 10,000.00 |
| 12/16/2006 | Lizbeth Keefe | 10,000.00 |
| 1/16/2007 | Lizbeth Keefe | 10,000.00 |
| 3/2/2007 | Lizbeth Keefe | 10,000.00 |
| 3/17/2007 | Lizbeth Keefe | 10,000.00 |
| 4/28/2007 | Lizbeth Keefe | 10,000.00 |
| 5/18/2007 | Lizbeth Keefe | 10,000.00 |
| 6/25/2007 | Lizbeth Keefe | 10,000.00 |
| 7/27/2007 | Lizbeth Keefe | 10,000.00 |
| 8/24/2007 | Lizbeth Keefe | 10,000.00 |
| 9/14/2007 | Lizbeth Keefe | 10,000.00 |
| 10/16/2007 | Lizbeth Keefe | 10,000.00 |
| 11/21/2007 | Lizbeth Keefe | 10,000.00 |
| 12/20/2007 | Lizbeth Keefe | 10,000.00 |
| 2/2/2008 | Lizbeth Keefe | 10,000.00 |
| 2/21/2008 | Lizbeth Keefe | 10,000.00 |
| 3/27/2008 | Lizbeth Keefe | 10,000.00 |
| 5/2/2008 | Lizbeth Keefe | 10,000.00 |
| 6/13/2008 | Lizbeth Keefe | 10,000.00 |
| **Transfers Within Two Years of Petition Date:** | | |
| 7/16/2008 | Lizbeth Keefe | $  10,000.00 |
| 8/2/2008 | Lizbeth Keefe | 10,000.00 |
| 9/1/2008 | Lizbeth Keefe | 10,000.00 |
| 10/5/2008 | Lizbeth Keefe | 10,000.00 |
| 11/13/2008 | Lizbeth Keefe | 10,000.00 |
| 12/13/2008 | Lizbeth Keefe | 10,000.00 |
| 1/5/2009 | Lizbeth Keefe | 10,000.00 |
| | **TOTAL:** | $ 310,000.00 |

318.     The Debtor made the following Magee Distributions directly to Valerie Magee:

| Check Date | Payee | Amount |
|---|---|---|
| **Transfers Over Two Years Prior to Petition Date:** | | |
| 6/25/2007 | Valerie Magee | $   1,000.00 |
| 7/27/2007 | Valerie Magee | 1,000.00 |
| 8/24/2007 | Valerie Magee | 1,000.00 |
| 10/16/2007 | Valerie Magee | 1,000.00 |
| 10/19/2007 | Valerie Magee | 1,000.00 |
| 11/21/2007 | Valerie Magee | 1,000.00 |
| 12/20/2007 | Valerie Magee | 1,000.00 |
| 2/2/2008 | Valerie Magee | 1,000.00 |
| 2/21/2008 | Valerie Magee | 1,000.00 |
| 3/27/2008 | Valerie Magee | 1,000.00 |
| 5/5/2008 | Valerie Magee | 1,000.00 |
| 6/13/2008 | Valerie Magee | 1,000.00 |
| **Transfers Within Two Years of Petition Date:** | | |
| 7/16/2008 | Valerie Magee | $   1,000.00 |
| 8/2/2008 | Valerie Magee | 1,000.00 |
| 9/1/2008 | Valerie Magee | 1,000.00 |
| 10/5/2008 | Valerie Magee | 1,000.00 |
| 11/13/2008 | Valerie Magee | 1,000.00 |
| 12/13/2008 | Valerie Magee | 1,000.00 |
| 1/5/2009 | Valerie Magee | 1,000.00 |
| | **TOTAL:** | $ 19,000.00 |

319.     As detailed above, Magee collected money due the Debtor from DRLLC and Hayden and deposited those funds into his own personal account (collectively, the "Debtor-Magee Funds").

320.     Magee used the Debtor-Magee Funds to, among other things, pay certain preferred creditors, including his children, make gifts to his daughters, invest in various real estate projects, and otherwise convert the funds to his own use.

321.     In addition to receiving some of the Magee Distributions as detailed above, Melissa Magee also loaned money to the Debtor.  Melissa Magee was owed approximately $1,175,000 by the Debtor in or around November 2009 (the "Melissa Magee Loan").  The Defendant received a final monthly interest payment from the Debtor on or around November 3, 2009.

322. Melissa Magee timely filed a proof of claim against the Debtor with respect to the Melissa Magee Loan on October 26, 2010, in the amount of $1,257,250.00 (the "Melissa Magee Claim").

323. In addition to receiving some of the Magee Distributions as detailed above, Patrice Magee also loaned money to the Debtor. Patrice Magee was owed approximately $500,000 by the Debtor at or around the Petition Date (the "Patrice Magee Loan").

324. Patrice Magee timely filed two proofs of claim against the Debtor with respect to the Patrice Magee Loan on October 22, 2010, in the amounts of $42,861.53, and $546,842.64, respectively (collectively, the "Patrice Magee Claims").

325. Jonathan Magee also loaned money to the Debtor and timely field a proof of claim against the Debtor on November 24, 2010, in the amount of $437,474.11 (the "Jonathan Magee Claim").

326. Because of his special relationship with Melissa Magee, in December 2009, Magee began making interest payments to Melissa Magee on account of the Melissa Magee Loan from the Debtor-Magee Funds deposited into his Key Bank account.

327. From December 2009 to the Petition Date, Magee made the following payments to Melissa Magee on account of the Melissa Magee Loan from the Debtor-Magee Funds:

| Check Date | Date Cashed | Payee | Check Issued From | Amount |
|---|---|---|---|---|
| 12/11/2009 | 12/28/2009 | Melissa Page | Magee's Key Bank Account | $ 11,750.00 |
| 01/04/2010 | 01/12/2010 | Melissa Page | Same | 11,750.00 |
| 02/02/2010 | 03/01/2010 | Melissa Page | Same | 11,750.00 |
| 03/01/2010 | 03/17/2010 | Melissa Page | Same | 11,750.00 |
| 03/30/2010 | 04/13/2010 | Melissa Page | Same | 11,750.00 |
| 05/05/2010 | 05/18/2010 | Melissa Page | Same | 11,750.00 |
| 06/28/2010 | 07/07/2010 | Melissa Page | Same | 11,750.00 |
| | | | TOTAL: | $ 82,250.00 |

328.    From January 2009 to December 2009, Magee made the following payments to Lizbeth Keefe and Lawrence Keefe from the Debtor-Magee Funds in the same manner as he had directed the Debtor to make when it was regularly making the Member Distributions:

| Check Date | Date Cashed | Payee | Check Issued From | Amount |
|---|---|---|---|---|
| 02/28/2009 | 03/03/2009 | Lawrence & Lizbeth Keefe | Magee's Key Bank Account | $  10,000.00 |
| 03/23/2009 | 03/27/2009 | Lawrence & Lizbeth Keefe | Same | 10,000.00 |
| 04/20/2009 | 04/27/2009 | Lawrence & Lizbeth Keefe | Same | 10,000.00 |
| 05/19/2009 | 05/26/2009 | Lawrence & Lizbeth Keefe | Same | 10,000.00 |
| 06/22/2009 | 06/26/2009 | Lawrence & Lizbeth Keefe | Same | 10,000.00 |
| 07/20/2009 | 07/28/2009 | Lawrence & Lizbeth Keefe | Same | 10,000.00 |
| 08/24/2009 | 09/04/2009 | Lawrence & Lizbeth Keefe | Same | 10,000.00 |
| 10/20/2009 | 10/26/2009 | Lawrence & Lizbeth Keefe | Same | 10,000.00 |
| 11/16/2009 | 11/24/2009 | Lawrence & Lizbeth Keefe | Same | 10,000.00 |
| 12/18/2009 | 12/28/2009 | Lawrence & Lizbeth Keefe | Same | 10,000.00 |
| | | TOTAL: | | $  100,000.00 |

329.    Magee also directed the Debtor to make certain distributions directly to his children on account of money allegedly loaned to the Debtor by Commercial Construction.

330.    The Debtor made the following distributions to Jonathan Magee purportedly on account of Commercial Constructions loan account:

| Check Date | Payee | Amount |
|---|---|---|
| 9/28/2006 | Jonathan Magee | $   25,000.00 |
| 4/11/2008 | Jonathan Magee | 150,000.00 |
| | TOTAL: | $ 175,000.00 |

331.    The Debtor made the following distributions to Patrice Magee purportedly on account of Commercial Construction loan account:

| Check Date | Payee | Amount |
|---|---|---|
| 4/11/2008 | Patrice Magee | $ 150,000.00 |

332.    Magee used the Debtor as his personal piggy bank by, among other things, freely transferring and distributing funds directly to his children, certain of whom did not even have a purported business relationship with the Debtor.

**COUNT ONE**
**(Breach of Fiduciary Duties and Corporate Waste)**
**(Against Klein, Dorfman and Magee)**

333.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 332 of this Complaint as if fully set forth at length herein.

## I.    THE PRINCIPALS OWED FIDUCIARY DUTIES TO THE DEBTOR

334.    Each of the Principals owed fiduciary duties to the Debtor. By reason of their fiduciary relationship, the Principals owed the Debtor the highest obligations of care, oversight, reasonably inquiry, supervision and informed decision making.

335.    Each of the Principals owed the duty of loyalty to the Debtor. The duty of loyalty required, among other things, that the Principals not engage in self-dealing or otherwise use their position with the Debtor to further personal interests rather than those of the Debtor, and that the Principals act with the highest degree of honesty and loyalty toward the Debtor and in the best interests of the Debtor.

336.    Neither the Debtor nor its Principals purchased any insurance to cover claims against the Debtor and/or its Principals on account of breach of fiduciary duties.

## II.    BREACHES OF FIDUCIARY DUTIES

### a.    Member Distributions and Capital Accounts

337.    The Principals made little or no equity investment in the Debtor upon its formation.

338.    The Principals took over $4.2 million in draws against their capital accounts collectively in the form of the Membership Distributions.

339.    Certain of the Magee Distributions were transferred directly to Magee's children.

340.    The Debtor was insolvent or had insufficient capital to meet its obligations when it made the Membership Distributions.

341.    The Principals were each provided with annual forms K-1 with respect to their membership interest in the Debtor that stated that beginning in 2005, the Debtor was insolvent on a balance sheet basis, that the Principals' respective capital accounts were negative, and that the value of the Debtor's assets was less than the value of its liabilities.

342.    Even though the Principals knew the Debtor was insolvent, they continued to take equity draws routinely until January 2009. Magee even directed that large amounts of his Membership Distributions be distributed to his daughters.

343.    As the recipients and beneficiaries of the Membership Distributions, the Principals were not disinterested in the transactions, and thus, are not entitled to the presumption afforded by the business judgment rule.

344.    The Principals breached their duty of loyalty to the Debtor by taking the Membership Distributions.

345.    The Principals breached their duty of care to the Debtor by taking the Membership Distributions while the Debtor was insolvent and had insufficient capital to meet its obligations.

346.    As a direct and proximate result of the Principals' breach of their fiduciary obligations to the Debtor with respect to the Membership Distributions, the Debtor sustained significant damages of not less than $4,242,199.89.

### b.    Diane Roberts, LLC Transactions

347.    Once the Debtor stopped making the Membership Distributions, Magee took matters into his own hands and began collecting amounts due to the Debtor from DRLLC.

From February 27, 2009, to July 16, 2010, Magee collected the Magee-DRLLC Payments in the total amount of $1,339,000.

348.    Magee deposited the Magee-DRLLC Payments into his personal bank account and converted the money and used it for his own purposes.

349.    Magee executed the DRLLC Mortgage Discharges on behalf of the Debtor after the Petition Date and his receipt of the Magee-DRLLC Payments.

350.    Magee breached his duty of loyalty to the Debtor by taking the Magee-DRLLC Payments.

351.    As the recipient and beneficiary of the Magee-DRLLC Payments, Magee was not disinterested in the transaction, and thus, is not entitled to the presumption afforded by the business judgment rule.

352.    Klein and Dorfman knew or should have known that Magee was taking the Magee-DRLLC Payments.

353.    Klein and Dorfman failed to exercise adequate oversight and control of the Debtor and Magee with respect to the Magee-DRLLC Payments.  Neither Klein nor Dorfman took any action to stop Magee from taking the Magee-DRLLC Payment, to collect the Magee-DRLLC Payments from DRLLC on behalf of the Debtor, or to inform any authorities, creditors or other parties that Magee was taking the Magee-DRLLC Payments.

354.    Klein and Dorfman breached their duties of care to the Debtor by not monitoring Magee's activities and taking steps to prevent Magee from taking the Magee-DRLLC Payments.

355. As a direct and proximate result of the Principals' breach of their fiduciary obligations to the Debtor with respect to the Magee-DRLLC Payments, the Debtor sustained significant damages of not less than $1,339,000.

**c.     Aventine Edgewater/FKF Edgewater Transactions**

356. At the direction of the Principals, the Debtor invested in excess of $6.5 million in the Aventine Edgewater project, exclusive of interest accrued over the last five years.

357. The Principals owned FKF Edgewater, which in turn had a fifteen (15%) percent interest in Aventine Edgewater. In or around October 2008, FKF Edgewater's percentage membership interest in Aventine Edgewater increased to fifty-one (51%) percent.

358. The Principals made little or no individual investment in exchange for their receipt of membership interests in FKF Edgewater. Rather, they received the membership interests on account of arranging for loans and investments by the Debtor as evidenced by the Aventine Note and Revised Aventine Note.

359. The Principals credited their individual capital accounts in FKF Edgewater with equal shares of the money invested by the Debtor in Aventine Edgewater. The Principals were each provided with annual forms K-1 with respect to their membership interest in FKF Edgewater that evidenced that they were being individually credited for the Debtor's investment.

360. If the Aventine Edgewater project worked, the Principals stood to make significant additional money as a result of their membership interests in FKF Edgewater.

361. As owners of FKF Edgewater, the Principals were not disinterested in the Debtor's transactions with FKF Edgewater and Aventine Edgewater, and thus, are not entitled to the presumption afforded by the business judgment rule.

362. The Principals never pursued interest payments from Aventine Edgewater or any other rights of the Debtor in connection with the Aventine Note or Revised Aventine

Note, and instead allowed interest to accrue. By October 1, 2008, the total amount due under the April 21, 2006 Aventine Note had grown from $4.75 million to $6,247,603, and it has continued to accrue since that time.

363.     In addition to the obligations owed to the Debtor under the Revised Aventine Note, the Principals made a number of additional equity investments of over $1.8 million in FKF Edgewater and Aventine Edgewater using the Debtor's funds as evidenced by the FKF Edgewater Transfers.

364.     Under threat of litigation, the Principals assigned the Debtor's rights under the Revised Aventine Note and related mortgages, security interests and rights to the Josephs Family.

365.     The Principals breached their duties of loyalty to the Debtor by, among other things: (i) investing the Debtor's money in their own companies and projects - FKF Edgewater and Aventine Edgewater; (ii) employing Magee's company, Heather Construction of NJ, Inc., as the general contractor for the Aventine Edgewater project in or around October 2008; (iii) employing Klein's then twenty-five year old son, Jason, as the construction manager for the Aventine Edgewater project; (iv) committing to the Josephs Aventine Assignment in order to try to avoid being sued personally; and (v) making additional equity investments in FKF Edgewater and Aventine Edgewater with the Debtor's money in the form of the FKF Edgewater Transfers. By entering into these transactions, the Principals grossly favored their own interests over those of the Debtor, resulting in significant damages to the Debtor.

366.     The Principals breached their duties of care to the Debtor by, among other things: (i) failing to responsibly monitor and enforce the Debtor's rights under the Aventine Note and Revised Aventine Note; (ii) failing to monitor the activities of Roncati while he was

managing the Aventine Edgewater project and take appropriate action in response to mismanagement of the project; (iii) making the Josephs Aventine Assignment; and (iv) failing to document or in any way preserve and protect the Debtor's rights with respect to the FKF Edgewater Transfers.

367. As a direct and proximate result of the Principals' breach of their fiduciary obligations to the Debtor with respect to Aventine Edgewater, the Debtor sustained significant damages including of not less than $9 million on account of the loan and investment evidenced by the Aventine Note and Revised Aventine Note and related transactions including the Josephs Aventine Assignment, and not less than $1.8 million on account of the FKF Edgewater Transfers.

**d.    Aventine Retail Transactions**

368. At the direction of the Principals, the Debtor invested in excess of $2.7 million in the Aventine Retail project.

369. The Principals owned FKF Retail, which in turn had a fifty (50%) percent interest in Aventine Retail.

370. The Principals made little or no individual investment in exchange for their receipt of a membership interest in FKF Retail. Rather, they received the membership interest on account of arranging for loans and investments by the Debtor as evidenced by the FKF Retail Transfers.

371. The Principals credited their individual capital accounts in FKF Retail with equal shares of the money invested by the Debtor in Aventine Retail. The Principals were each provided with annual forms K-1 with respect to their membership interest in FKF Retail that evidenced that they were being individually credited for the Debtor's investment.

372. If the Aventine Retail project worked, the Principals stood to make significant additional money as a result of their membership interests in FKF Retail.

373. As owners of FKF Retail, the Principals were not disinterested in the Debtor's transactions with FKF Retail and Aventine Retail, and thus, are not entitled to the presumption afforded by the business judgment rule.

374. The Principals never documented the Debtor's investment in FKF Retail or Aventine Retail, or took any steps to protect the Debtor's investment in those entities.

375. The Principals indirectly committed even more money to the Aventine Retail project by way of the One Development Loan.

376. The Principals breached their duties of loyalty to the Debtor by, among other things, investing the Debtor's money in their own companies and projects - FKF Retail and Aventine Retail. By entering into these transactions, the Principals grossly favored their own interests over those of the Debtor, resulting in significant damages to the Debtor.

377. The Principals breached their duties of care to the Debtor by, among other things: (i) failing to responsibly monitor and enforce the Debtor's rights under the One Develop Loan; (ii) failing to monitor the activities of Roncati while he was managing the Aventine Retail project and take appropriate action in response to mismanagement of the project; (iii) failing to document or in any way preserve and protect the Debtor's rights with respect to the FKF Retail Transfers.

378. As a direct and proximate result of the Principals' breach of their fiduciary obligations to the Debtor with respect to the Aventine Retail project, the Debtor sustained significant damages of not less than $1.8 million on account of the loan and investment

evidenced by the One Development Loan and related transactions, and not less than $900,000 on account of the FKF Retail Transfers.

e. **One Madison Park Transactions**

379. At the direction of the Principals, the Debtor invested in excess of $29 million in the OMP Project.

380. The Principals owned FKF Madison, which in turn had a six (6%) percent interest in the OMP Project.

381. The Principals made little or no individual investment in exchange for their receipt of membership interests in FKF Madison. Rather, they received the membership interests on account of arranging for loans and investments by the Debtor as evidenced by the OMP Notes and predecessor debt instruments.

382. The Principals credited their individual capital accounts in FKF Madison with equal shares of the money invested by the Debtor in the OMP Project. The Principals were each provided with annual forms K-1 with respect to their membership interest in FKF Madison that evidenced that they were being individually credited for the Debtor's investment.

383. If the OMP Project was successful, the Principals stood to make significant additional money as a result of their membership interests in FKF Madison.

384. As owners of FKF Madison, the Principals were not disinterested in the Debtor's transactions with FKF Madison and the OMP Project, and thus, are not entitled to the presumption afforded by the business judgment rule.

385. The Principals breached their duties of loyalty to the Debtor by, among other things, (i) investing the Debtor's money in their own companies and projects - FKF Madison and the OMP Project; (ii) Dorfman's service as counsel to the OMP Debtors while the OMP Debtors had significant liability to the Debtor that was in default; (iii) Klein's service as

accountant and financial advisor to the OMP Debtors while the OMP Debtors had significant liability to the Debtor; and (iv) Magee's negotiation of a personal $1 million consulting agreement for restructuring the OMP Debtors' obligations to the Debtor, and committing the Debtor to make an additional $1 million investment in the OMP Project in connection with his receipt of the consulting fee agreement. By entering into these transactions, the Principals grossly favored their own interests over those of the Debtor, resulting in significant damages to the Debtor.

386.    The Principals breached their duties of care to the Debtor by, among other things: (i) failing to responsibly monitor and enforce the Debtor's rights under the OMP Note; (ii) failing to perform appropriate due diligence with respect to the experience and abilities of Ira Shapiro and Marc Jacobs, who were managing the OMP Project; (iii) failing to appropriately monitor the activities and expenditures of Ira Shapiro and Marc Jacobs during the course of the OMP Project; (iv) making an additional $1 million investment in the OMP Project in or around August 2008; (v) failing to obtain any collateral, mortgages, security interests or other appropriate protections to reasonably protect the Debtor's interest in the OMP Note and investment acknowledged therein.

387.    As a direct and proximate result of the Principals' breach of their fiduciary obligations to the Debtor with respect to the Debtor's investment in the OMP Project, the Debtor sustained significant damages of not less than $30 million.

**f.      Bashert/Rose Glasses Transactions**

388.    At the direction of the Principals, the Debtor invested in excess of $7.7 million in the Newtown Project as reflected in the Newtown Transfers.

389.     Rose Glasses was initially owned thirty-three (33%) percent by Magee, sixty-six (66%) percent by John Magee Family Partnership II, and one (1%) percent by Klein. Rose Glasses in turn had a fifty (50%) percent interest in Bashert and the Newtown Project.

390.     On July 18, 2005, Rose Glasses and Kevin Romano enter into an agreement pursuant to which Kevin Romano was to acquire a twenty-five (25%) percent interest in Rose Glasses for $1.5 million and according to the K-1s issued by Rose Glasses, Kevin Romano made capital contributions of $1.5 million.

391.     Upon information and belief, the Principals induced Kevin Romano to invest in the project in order to, among other things, provide another guarantor to the lead lender so that Magee could be removed as a guarantor and Magee could be bought out of his interest.

392.     The Principals made little or no individual investment in exchange for their receipt of a membership interest in Rose Glasses.  In fact, Magee received $300,000 on account of his interest.  In contrast, Kevin Romano paid $1.5 million for his twenty-five to thirty-three and one-third (25 to 33 1/3%) percent interest.

393.     If the Newtown Project was successful, Klein and Dorfman stood to make significant additional money as a result of their membership interests in Rose Glasses.

394.     As owners or prior owners of Rose Glasses, the Principals were not disinterested in the Debtor's transactions with Rose Glasses and Bashert, and thus, are not entitled to the presumption afforded by the business judgment rule.

395.     The Principals breached their duties of loyalty to the Debtor by, among other things, (i) investing the Debtor's money in their own companies and projects – Rose Glasses, Bashert and the Newtwon Project; (ii) Klein's service as accountant and financial advisors to Rose Glasses and Bashert while they had significant liability to the Debtor; and (iii)

paying $300,000 to Magee for his membership interest in Rose Glasses when Rose Glasses was insolvent and unable to repay its obligation to the Debtor. By entering into these transactions, the Principals grossly favored their own interests over those of the Debtor, resulting in significant damages to the Debtor.

396. The Principals breached their duties of care to the Debtor by, among other things: (i) failing to negotiate and enter into appropriate contracts or writings that defined the nature of the Debtor's investment in the Newtown Project and protected the Debtor's interests; (iii) failing to enforce the Bashert Note and Rose Glasses Note; and (ii) failing to obtain any collateral, mortgages, security interests, personal guarantees or other appropriate protections to reasonably protect the Debtor's interest in the Newtown Project.

397. As a direct and proximate result of the Principals' breach of their fiduciary obligations to the Debtor with respect to the Newtown Project, the Debtor sustained significant damages including of not less than $7.7 million, the full amount of the Newtown Transfers, plus all contractual interest due on the Bashert Note and Rose Glasses Note.

**g.  Jerry's Self Storage Transactions**

398. Jerry's was initially a legitimate, third-party borrower of the Debtor. The Debtor appropriately negotiated for and received a note confirming its $5 million investment in the project and a mortgage against Jerry's real property and improvements thereon.

399. When it became apparent that Jerry's could not finish construction for the $5 million loaned, the Principals took a number of actions in breach of their duty of loyalty to the Debtor, including:

a) the Principals arranged for the Jerry's Transfers from the Debtor's funds over and above the $5 million agreed to so that construction could be completed and a certificate of occupancy could be given for the Property;

b) the Principals did not obtain any notes, collateral, mortgages, security interests, personal guarantees or other appropriate protections to reasonably protect the Debtor's ability to be repaid for the Jerry's Transfers;

c) the Principals negotiated and received a redistribution of equity in Jerry's where Jerry Sabini's one-hundred (100%) interest was redistributed forty (40%) percent to Magee, and equal twenty (20%) percent interests to Klein, Dorfman and Jerry Sabini;

d) the Principals arranged for a loan from Oritani Bank to Jerry's, $5 million of which was used to pay off the original note of the Debtor, but not the Jerry's Transfers;

e) the Principals executed on behalf of the Debtor a release of the note and mortgage received from Jerry's upon receipt of the $5 million, even though the Jerry's Transfers remained outstanding; and

f) the Principals used the $5 million obtained by the Debtor for releasing its note and mortgage from Jerry's to transfer to insiders and preferred creditors, including: (i) $90,000 to the Kennedy Funding Invitational, (ii) $840,000 to Commercial Construction; and (iii) $1.935 million to FKF Holding, which FKF Holding immediately disbursed to Patrick Magee ($1 million) and Bradley ($919,736.41).

By entering into these transactions, the Principals grossly favored their own interests over those of the Debtor, resulting in significant damages to the Debtor.

400.    As current owners and principals of Jerry's, the Principals were not disinterested in the Debtor's transactions with Jerry's, and thus, are not entitled to the presumption afforded by the business judgment rule with respect to the Jerry's Transfers.

401. As partners and/or principals of FKF Holding, the Principals were not disinterested in the Debtor's transactions with FKF Holding, and thus, are not entitled to the presumption afforded by the business judgment rule with respect to transfers made by the Debtor directly or indirectly to FKF Holding.

402. As an executive director and member of the board of trustees of the Kennedy Funding Invitational, Klein was not disinterested in the Debtor's transfer to Kennedy Funding Invitational, and thus, is not entitled to the presumption afforded by the business judgment rule with respect to the transfer to the Kennedy Funding Invitational.

403. As the principal and owner of Commercial Construction and Bradley, and brother of Patrick Magee, Magee was not disinterested in the Debtor's transfers to Commercial Construction, Bradley and Patrick Magee, and thus is not entitled to the presumption afforded by the business judgment rule with respect to transfers made by the Debtor directly or indirectly to those entities.

404. The Principals breached their duties of care to the Debtor by, among other things: (i) failing to negotiate and enter into an appropriate contract or writing that defined the nature of the Debtor's rights with respect to the Jerry's Transfers; (ii) failing to obtain any collateral, mortgages, security interests, personal guarantees or other appropriate protections to reasonably protect the Debtor's rights of repayment of the Jerry's Transfers; and (iii) failing to take any reasonable steps to secure repayment of the Jerry's Transfers.

405. As a direct and proximate result of the Principals' breach of their fiduciary obligations to the Debtor with respect to the Debtor's investment in Jerry's, the Jerry's Transfers, and the use of the $5 million payment received from Jerry's, the Debtor sustained significant damages of not less than $1,592,541.91, plus interest accruing on and after January 2009.

### h.     Gregory Hayden Transactions

406.    Once the Debtor stopped making the Membership Distributions, Magee took matters into his own hands and began collecting amounts due to the Debtor from various third party sources, including Gregory Hayden.  Between June 28 and June 30, 2010, Magee collected $100,000 from Gregory Hayden on account of money owed by Gregory Hayden to the Debtor (the "Magee-Hayden Payments").

407.    Magee deposited the Magee-Hayden Payments into his personal bank account and converted the money and used it for his own purposes.

408.    Magee breached his duty of loyalty to the Debtor by taking the Magee-Hayden Payments.

409.    As the recipient and beneficiary of the Magee-Hayden Payments, Magee was not disinterested in the transaction, and thus, is not entitled to the presumption afforded by the business judgment rule.

410.    Klein and Dorfman knew or should have known that Magee was taking the Magee-Hayden Payments.

411.    Klein and Dorfman failed to exercise adequate oversight and control of the Debtor and Magee with respect to the Magee-Hayden Payments.  Neither Klein nor Dorfman took any action to stop Magee from taking the Magee-Hayden Payment, to collect the Magee-Hayden Payments from Gregory Hayden on behalf of the Debtor, or to inform any authorities, creditors or other parties that Magee was taking the Magee-Hayden Payments.

412.    Klein and Dorfman breached their duties of care to the Debtor by not monitoring Magee's activities and taking steps to prevent Magee from taking the Magee-Hayden Payments.

413.     As a direct and proximate result of the Principals' breach of their fiduciary obligations to the Debtor with respect to the Magee-Hayden Payments, the Debtor sustained significant damages of not less than $100,000.

**i.     Historic Cars Transactions**

414.     The Debtor loaned $110,000 to Historic Cars, which remains outstanding to this day.

415.     Upon information and belief, Historic Cars is a viable entity that has the financial wherewithal to repay the Historic Car Loan.  However, Magee refuses to repay it.

416.     Magee is the principal and owner of Historic Cars.  As such, Magee was not disinterested in the Debtor's loans to and transaction with Historic Cars, and thus, is not entitled to the presumption afforded by the business judgment rule.

417.     Magee breached his duty of loyalty to the Debtor by borrowing money from the Debtor through Historic Cars and refusing to pay it back.

418.     Klein and Dorfman failed to exercise adequate oversight and control of the Debtor with respect to the Historic Car Loan.  Neither Klein nor Dorfman took appropriate actions to compel Magee and Historic Cars to repay the Historic Car Loan.

419.     Klein and Dorfman breached their duties of care to the Debtor by not monitoring Magee's and Historic Car's activities and taking steps to prevent Magee and Historic Cars from failing to repay the Debtor.

420.     As a direct and proximate result of the Principals' breach of their fiduciary obligations to the Debtor with respect to the Historic Car Loan, the Debtor sustained significant damages of not less than $110,000.

**j.  Magee Mt. Vernon Transactions**

421.   The Debtor loaned $150,000 to Magee on account of the "Vernon Property" in the Vernon Magee Loan, which remains outstanding to this day.

422.   Upon information and belief, Magee has the financial wherewithal to repay the Vernon Magee Loan.  However, Magee refuses to repay it.

423.   Magee and/or some business entity owned and controlled by Magee is the borrower of the Vernon Magee Loan.  As such, Magee was not disinterested with respect to the Vernon Magee Loan, and thus, is not entitled to the presumption afforded by the business judgment rule.

424.   Magee breached his duty of loyalty to the Debtor by borrowing money from the Debtor and refusing to pay it back.

425.   Klein and Dorfman failed to exercise adequate oversight and control of the Debtor and with respect to the Vernon Magee Loan.  Neither Klein nor Dorfman took appropriate action to compel Magee to repay the Vernon Magee Loan.

426.   Klein and Dorfman breached their duties of care to the Debtor by not monitoring Magee's activities and taking steps to prevent Magee from failing to repay the Debtor.

427.   As a direct and proximate result of the Principals' breach of their fiduciary obligations to the Debtor with respect to the Vernon Magee Loan, the Debtor sustained significant damages including of not less than $150,000.

**k.  Rhonda & Michael Conte Transactions**

428.   On or around April 10, 2007, the Debtor loaned $414,085.08 to Rhonda and Michael Conte, Klein's sister and brother-in-law respectively, in the Conte Loan.  At this

time, $114,085.08 in principal of the Conte Loan, plus all interest from the date of inception, remains outstanding to this day.

429.   In addition, the Debtor made a number of other transfers to or for the benefit of Rhonda Conte, including as follows:

- $11,500.00 on September 27, 2006 for "broker fees" according to the Debtor's books and records;

- $3,000.00 on September 27, 2006 to Beth Blecker for the benefit of Rhonda Conte for broker fees according to the Debtor's books and records;

- $20,000.00 on October 12, 2007, which was added to the loan receivable owed by Jerry's to the Debtor; and

- $180,000.00 to FKF Holding on October 12, 2007 with a description in the Debtor's books and records as "Rhonda Conte pd to FKF Holding", which was added to the loan receivable owed by Jerry's to the Debtor;

(collectively, the "Other Conte Transfers").

430.   Conte is Klein's sister.  As such, Klein was not disinterested with respect to the Conte Loan or the Other Conte Transfers, and thus, is not entitled to the presumption afforded by the business judgment rule.

431.   Klein breached his duty of loyalty to the Debtor by loaning money to his sister, failing to obtain a promissory note or other binding instrument with respect to the Conte Loan, not charging interest on the Conte Loan, failing to take appropriate action to collect upon the Conte Loan, and making the Other Conte Transfers.

432.    Magee and Dorfman failed to exercise adequate oversight and control of the Debtor with respect to the Conte Loan and Other Conte Transfers.  Neither Magee nor Dorfman took appropriate action to compel Rhonda Conte to repay the Conte Loan.

433.    Magee and Dorfman breached their duties of care to the Debtor by not monitoring Rhonda Conte's activities and taking steps to prevent Rhonda Conte from failing to repay the Debtor.

434.    As a direct and proximate result of the Principals' breach of their fiduciary obligations to the Debtor with respect to the Conte Loan, and the Other Conte Transfers, the Debtor sustained significant damages of not less than $338,585, plus interest.

**l.    Dorfman Loan**

435.    The Debtor loaned $211,222 to Dorfman, which remains outstanding to this day.

436.    Dorfman is the borrower of the Dorfman Loan and recipient of the proceeds of the loan, or the benefit of the proceeds of the loan.  As such, Dorfman was not disinterested with respect to the Dorfman Loan, and thus, is not entitled to the presumption afforded by the business judgment rule.

437.    Dorfman breached his duty of loyalty to the Debtor by borrowing money from the Debtor and not paying it back.

438.    Dorfman acknowledges liability under the Dorfman Loan, and has been attempting to repay it by making $2,500 monthly payments to the Debtor and Trustee.

439.    Klein and Magee failed to exercise adequate oversight and control of the Debtor and with respect to the Dorfman Loan.  Neither Klein nor Magee took appropriate action to compel Dorfman to repay the Dorfman Loan.

440. Klein and Magee breached their duties of care to the Debtor by not monitoring Dorfman's activities and taking steps to prevent Dorfman from failing to repay the Debtor.

441. As a result of the Dorfman Loan, the Debtor was damaged in an amount not less than $211,222, the full amount of the outstanding principal on the loan, less any amounts already paid by Dorfman that are not attributable to appropriate interest.

**m.    Route 9W Transactions**

442. At the direction of the Principals, the Debtor invested in excess of $189,489 in Route 9W, which was owned in equal parts by the Principals.

443. As owners of Route 9W, the Principals were not disinterested in the Debtor's transactions with Route 9W, and thus, are not entitled to the presumption afforded by the business judgment rule.

444. The Principals breached their duties of loyalty to the Debtor by, among other things, investing the Debtor's money in their own company, Route 9W.

445. At all relevant times Route 9W was insolvent. Accordingly, after the Petition Date and Day Seckler's take over as manager of the Debtor, the Principals still owed fiduciary duties to the Debtor, a creditor of Route 9W, in their capacity as members, officers and principals of Route 9W.

446. After the Petition Date, the Principals arranged for Route 9W's sale of its real property to Villas, an entity owned by Jesse Dorfman, Dorfman's son, in exchange for an assumption of the Route 9W Loan and Route 9W's liability to Provident Bank. As part of the transaction, Provident Bank was granted a first mortgage in the real property and the Principals were each released from their personal guarantees of Route 9W's indebtedness to Provident Bank.

447. To date, neither Route 9W nor Villas has repaid any portion of the Route 9W Loan.

448. In their capacity as owners and principals of Route 9W, the Principals breached their fiduciary duties to the Debtor, a creditor of Route 9W, by, among other things: (i) transferring Route 9W's property that could have been used for a repayment of the Route 9W Loan to Jesse Dorfman; (ii) allowing Provident Bank to obtain a first priority mortgage in the real property transferred to Villas; and (iii) committing to the foregoing transactions in order to get themselves released from their personal guarantees of Route 9W's obligations to Provident Bank.

449. By entering into these transactions, the Principals grossly favored their own interests over those of the Debtor, resulting in significant damages to the Debtor.

450. The Principals breached their duties of care to the Debtor by, among other things: (i) failing to negotiate and enter into an appropriate contract or writing that defined the nature of the Debtor's investment in Route 9W and protected the Debtor's interests; and (ii) failing to obtain any collateral, mortgages, security interests, personal guarantees or other appropriate protections to reasonably protect the Debtor's interest in Route 9W.

451. As a direct and proximate result of the Principals' breach of their fiduciary obligations to the Debtor with respect to the Route 9W Loan, the Debtor sustained significant damages of not less than $277,222.

n. **The Caulfield Loan Transactions**

452. At the direction of the Principals, the Debtor invested $2,200,000 to Essex pursuant to the FKF Essex Note.

453. The FKF Essex Note was an unsecured loan to Essex for the purpose of developing the Essex Property. At the time the Debtor made the advances under the FKF Essex

Note, the Essex Property was fully encumbered by the BofA Essex Note and mortgage granted to BofA.

454. The Principals failed to secure reasonable and appropriate protections for the Debtor on account of the FKF Essex Obligations. As is customary for loans like the FKF Essex Obligation, the Principals should have secured one or more of the following: (i) a second mortgage on the Essex Property, or other form of collateral; and (ii) personal guarantees of the FKF Essex Obligation from the Caulfields. The Principals failed to obtain either of these things.

455. The Principals breached their fiduciary duties by failing to exercise their duties of good faith, in the best interests of the Debtor, and with the care that an ordinarily prudent person in a like position would have used under the circumstances.

456. At the direction of the Principals, the Debtor invested $4,000,000 to FTD pursuant to the FKF FTD Note.

457. The FKF FTD Note was an unsecured loan to FTD for the purpose of developing the FTD Property. At the time the Debtor made the advances under the FKF FTD Note, the FTD Property was significantly encumbered by the BofA FTD Note and mortgage granted to BofA.

458. The Principals failed to secure reasonable and appropriate protections for the Debtor on account of the FKF FTD Obligations. As is customary for loans like the FKF FTD Obligation, the Principals should have secured one or more of the following: (i) a second mortgage on the FTD Property, or other form of collateral; and (ii) personal guarantees of the FKF FTD Obligation from the Caulfields. The Principals failed to obtain either of these things.

459.    The Principals breached their fiduciary duties by failing to exercise their duties of good faith, in the best interests of the Debtor, and with the care that an ordinarily prudent person in a like position would have used under the circumstances.

460.    As a direct and proximate result of the Principals' breach of their fiduciary obligations to the Debtor with respect to the FKF Essex Obligation and FKF FTD Obligation, the Debtor sustained significant damages including of not less than $4,706,020.00.

**o.    Use of Legal and Accounting Services**

461.    The Principals never sought the use of independent attorneys, accountants, advisors or consultants, to give advice with respect to the Debtor's solicitation of loans and investments, the Debtor's loans, corporate governance, compliance with the Securities Act, general accounting for the Debtor's funds, compensation of Principals, tax accounting, or other matters important to the proper operation of the Debtor's business.

462.    The Principals only used the FKF Firm and Dorfman Firm for all general professional services.  At the same time, the FKF Firm and Dorfman Firm represented most of the Debtors' borrowers, including Bashert, Rose Glasses, Aventine Edgewater, FKF Edgewater, Aventine Retail, FKF Retail, Route 9W, and the OMP Debtors.

463.    In total, the Debtor paid over $384,200 to the FKF Firm for accounting services.  Upon information and belief, the FKF Firm also collected significant fees from many of the Debtor's borrowers.

464.    In total, the Debtor directly paid over $57,356 to the Dorfman Firm for legal services.  Upon information and belief, the Dorfman Firm also collected significant fees from many of the Debtor's borrowers.

465.    By failing to employ competent, independent professionals to render necessary advice to the Debtor, the Principals breached their fiduciary duties by failing to

exercise their duties of good faith, in the best interests of the Debtor, and with the care that an ordinarily prudent person in a like position would have used under the circumstances.

466.    In addition, Klein and Dorfman were partners in the FKF Firm and Dorfman Firm respectively, and thus, were beneficiaries of the Principals' decision to only use the FKF Firm and Dorfman Firm for professional services.  Accordingly, neither Klein nor Dorfman were disinterested with respect to the choice of professional firm, and thus, are not entitled to the presumption afforded by the business judgment rule.

467.    As a direct and proximate result of the Principals' breach of their fiduciary obligations to the Debtor with respect to the employment of independent and competent professionals, the Debtor sustained significant damages in an amount to be determined at trial.

**p.    Kennedy Funding Invitational Transactions**

468.    The Kennedy Funding Invitational is a charity tennis tournament run by Klein.  Klein had complete control over the books, records and bank accounts of the Kennedy Funding Invitational.

469.    While the Debtor was insolvent, it made significant donations to the Kennedy Funding Invitational.  Also, Klein freely transferred money back and forth between the Kennedy Funding Invitational and Debtor depending on the cash needs of the entities.

470.    The Kennedy Funding Invitational was the ultimate beneficiary of the transactions between the Debtor and the Kennedy Funding Invitational, receiving a net amount of approximately $103,500 in contributions from the Debtor.

471.    Klein took credit for the donations and contributions made by the Debtor and enjoyed the positive attention that he received as a result of the financial contributions.

472.    Klein breached his fiduciary duties to the Debtor by making significant donations to the Kennedy Funding Invitational while the Debtor was insolvent, freely

transferring funds between the Debtor and the Kennedy Funding Invitational, and committing to transactions with the Kennedy Funding Invitational for the purpose of receiving personal accolades and positive attention.

473. As a direct and proximate cause of the Klein's breach of his fiduciary obligations to the Debtor with respect to transfers to the Kennedy Funding Invitational, the Debtor sustained significant damages in an amount not less than $103,500.

### q. The FKF Holding Transactions

474. FKF Holding was the test model for the Debtor's business. The Debtor was formed in part so that the Principals could cut out Dennis Lynch, Dorfman's former law partner, and Patrick Magee, Magee's estranged brother, from their interests in the fund, and so that Klein could get an equity interest that he did not have in FKF Holding.

475. Klein controlled the books, records and bank accounts of both FKF Holding and the Debtor. The Principals freely transferred funds and assets between the two entities to accommodate the needs of the Principals.

476. In total, the Debtor transferred $8,088,030 in gross transfers to FKF Holding and only received $6,924,300 in return, leaving a deficit due to the Debtor of not less than $1,163,729.78. Money coming in and out of the Debtor's account from FKF Holding was frequently debited or credited to Magee's equity account with the Debtor.

477. As partners of FKF Holding, Magee and Dorfman were not disinterested in the Debtor's transactions with FKF Holding, and thus, are not entitled to the presumption afforded by the business judgment rule. Similarly, as manager of FKF Holding, Klein was not disinterested in the Debtor's transactions with FKF Holding, and thus, is not entitled to the presumption afforded by the business judgment rule.

478.     The Principals breached their duties of loyalty to the Debtor by, among other things, transferring over $1,163,729.78 in net transfers to FKF Holding for the benefit of the Principals, and freely transferring funds between the Debtor and FKF Holding for the benefit of the Principals.  By comingling the assets of the Debtor and FKF Holding, the Principals grossly favored their own interests over those of the Debtor, resulting in significant damages to the Debtor.

479.     The Principals breached their duties of care to the Debtor by, among other things, failing to properly document and account for the financial relationship between the Debtor and FKF Holding.

480.     As a direct and proximate result of the Principals' breach of their fiduciary obligations to the Debtor with respect to FKF Holding, the Debtor sustained significant damages of not less than $1,163,729.78.

**r.     Commercial Construction Transactions**

481.     Commercial Construction is an entity wholly-owned and operated by Magee.  Commercial Construction was officially dissolved by proclamation from June 25, 2003 to 2011.

482.     Upon information and belief, Commercial Construction is not operating any business and continues to exist solely for the purpose of holding, disbursing and receiving money intended for Magee.

483.     Commercial Construction purportedly maintained the Commercial Construction Loan Account with the Debtor.  The balance on the Commercial Construction Loan Account according to the Debtor's books and records is currently $1,592,724.85, exclusive of accrued interest.

484. On November 24, 2010, Commercial Construction filed the Commercial Construction Claim on account of amounts allegedly owed on the Commercial Construction Loan Account.

485. The Commercial Construction Loan Account was not treated anything like a traditional loan account. Among other things, the promissory note issued by the Debtor to Commercial Construction did not accurately reflect what was in the Debtor's books and records. Also, Commercial Construction was permitted to freely move money in and out of the Commercial Construction Loan Account. Magee's children, Jonathan Magee and Patrice Magee, received disbursements from the Commercial Construction Loan Account for no known reason in the amounts of $175,000 and $150,000, respectively. Also, Magee's personal tax bills were paid by the Debtor and subtracted from the Commercial Construction Loan Account, including a payment of $158,582 to the Internal Revenue Service and a payment of $34,309 to New York State on April 14, 2008.

486. For all intents and purposes, the Commercial Construction Loan Account was used as an additional equity account of Magee.

487. During the entire existence of the Commercial Construction Loan Account, Commercial Construction was a defunct business with no known business of its own.

488. Separate and apart from deposits and repayments of principal in the Commercial Construction Loan Account, the Debtor made the Commercial Construction Transfers totaling $954,551.72 without consideration in return.

489. After almost eight years of operating a dissolved company, in or around February 2011, Magee reinstated Commercial Construction by filing required tax returns and re-registering with the Department of State.

490.     As the owner of Commercial Construction, Magee was not disinterested in the Debtor's transactions with Commercial Construction, and thus, is not entitled to the presumption afforded by the business judgment rule.

491.     Magee breached his duty of loyalty to the Debtor by, among other things, favoring Commercial Construction over the Debtor and transferring to Commercial Construction $954,551.72 from the Debtor separate and apart from activity in the Commercial Construction Loan Account, and lending money to the Debtor at twelve (12%) percent interest without traditional restrictions that were imposed upon other creditors.  By committing to the transactions between the Debtor and Commercial Construction, Magee grossly favored his own interests over those of the Debtor, resulting in significant damages to the Debtor.

492.     Klein and Dorfman failed to exercise adequate oversight and control of the Debtor and Magee with respect to the Debtor's relationship with Commercial Construction. Neither Klein nor Dorfman took any action to stop Magee from taking advantage and accepting transfers of the Debtor's money through Commercial Construction.  Further, Klein directly participated in the inappropriate relationship between the Debtor and Commercial Construction by directing the transfers from the Debtor to Commercial Construction, and the transactions from Commercial Construction's loan account with the Debtor to Patrice Magee and Jonathan Magee.

493.     Klein and Dorfman breached their duties of care to the Debtor by not monitoring Magee's activities and taking steps to prevent Magee from taking advantage of his position with the Debtor through Commercial Construction.

494.     As a direct and proximate result of the Principals' breach of their fiduciary obligations to the Debtor with respect to the Commercial Construction transactions, the Debtor sustained significant damages of not less than $954,551.72.

s.       **Bradley Corporate Park Transactions**

495.    Bradley is an entity owned by Magee and his brother, Patrick Magee. Bradley owns and operates a corporate office park in Blauvelt, New York.

496.    In total, the Debtor transferred $400,000 directly to Bradley, and $919,736.41 to Bradley through FKF Holding, without consideration.

497.    As the one-half owner and manager of Bradley, Magee was not disinterested in the Debtor's transactions with Bradley, and thus, is not entitled to the presumption afforded by the business judgment rule.

498.    Magee breached his duty of loyalty to the Debtor by, among other things, favoring Bradley over the Debtor and transferring the Debtor's funds to Bradley without consideration.  By committing to the transactions between the Debtor and Bradley, Magee grossly favored his own interests over those of the Debtor, resulting in significant damages to the Debtor.

499.    Klein and Dorfman failed to exercise adequate oversight and control of the Debtor and Magee with respect to the Debtor's relationship with Bradley.  Neither Klein nor Dorfman took any action to stop Magee from taking advantage and accepting transfers of the Debtor's money through Bradley.  Further, Klein directly participated in the inappropriate relationship between the Debtor and Bradley by directing the transfers from the Debtor to Bradley, and the transactions from the Debtor to FKF Holding to Bradley.

500.    Klein and Dorfman breached their duties of care to the Debtor by not monitoring Magee's activities and taking steps to prevent Magee from taking advantage of his position with the Debtor through Bradley.

501.     As a direct and proximate result of the Principals' breach of their fiduciary obligations to the Debtor with respect to the Bradley Transfers, the Debtor sustained significant damages including of not less than $1,319,736.46.

**t.     SF Properties Transactions**

502.     SF Properties is owned two (2%) percent by KD Equities, Inc., three and one-half (3 1/2%) percent by Klein, three and one-half (3 1/2%) percent by Alan Feldstein, ten (10%) percent by Dorfman Family Limited Partnership , ten (10%) percent by Kemm Lynch Family Partnership, thirty-five and one-half (35 ½%) percent by Magee, and thirty-five and one-half (35 ½%) percent by Patrick Magee.

503.     Klein controlled the books, records and bank accounts of both SF Properties and the Debtor.  The Principals freely transferred funds and assets between the two entities to accommodate the needs of the Principals.

504.     In total, the Debtor transferred $1,420,812 in gross direct transfers to SF Properties and only received $1,283,000 in return.

505.     As direct or indirect members of SF Properties, the Principals were not disinterested in the Debtor's transactions with SF Properties, and thus, are not entitled to the presumption afforded by the business judgment rule.

506.     The Principals breached their duties of loyalty to the Debtor by, among other things, transferring over $137,812 in net transfers to SF Properties for the benefit of the Principals, and freely transferring funds between the Debtor and SF Properties for the benefit of the Principals.  By comingling the assets of the Debtor and SF Properties, the Principals grossly favored their own interests over those of the Debtor, resulting in significant damages to the Debtor.

507. The Principals breached their duties of care to the Debtor by, among other things, failing to properly document and account for the financial relationship between the Debtor and SF Properties.

508. As a direct and proximate result of the Principals' breach of their fiduciary obligations to the Debtor with respect to SF Properties, the Debtor sustained significant damages of not less than $137,812.

u. **TA Group, FKF V and JDJ Holding Transactions**

509. Upon information and belief, TA Group is owned directly or indirectly by Klein and Dorfman.

510. FKF V and JDJ Holding are unincorporated and unregistered entities that are, upon information and belief, owned and controlled, in whole or in part, by Klein, Dorfman and Klein's son, Jason Klein.

511. At the behest of the Principals, the Debtor engaged in a number of undocumented transactions involving TA Group, FKF V and JDJ Holding.

512. According to the Debtor's books and records, on November 28, 2006, TA Group borrowed $1.5 million from the Debtor, which was contemporaneously transferred to TA Group by the Debtor in cash. Three days later, on December 1, 2006, the $1.5 million borrowed by TA Group was repaid by the reduction of a purported loan payable due to FKF V of $650,000, and to JDJ Holding of $850,000.

513. The Debtor did not receive any cash on account of the alleged repayment of the $1.5 million loaned to TA Group. Also, it is unclear whether insiders FKF V and JDJ Holding actually loaned money to the Debtor, and if so, where the money came from.

514. Outside of the short $1.5 million "lending" relationship outlined above, the Principals freely transferred funds back and forth between the Debtor and TA Group,

depending upon each entity's financial needs. Most transfers between the Debtor and TA Group were credited or debited to Klein and Dorfman's equity accounts with the Debtor.

515. The Debtor transferred a total of $2,148,816.67 in the TA Group Transfers, and received less than that in return, leaving a deficit in favor of TA Group of not less than $1,510,150.

516. A review of TA Group's accounts and bank statements further reveals that TA Group routinely transferred funds between and among FKF V, JDJ Holding, Klein, Dorfman and Jason Klein.

517. Klein controlled the books, records and bank accounts of TA Group, FKF V, JDJ Holding and the Debtor. The Principals freely transferred funds and assets from the Debtor to TA Group, FKF V and JDJ Holding, or to third parties on account of TA Group. In the Debtor's books and records, many of the TA Group Transfers are marked "due to Klein and Dorfman".

518. As members of TA Group, Dorfman and Klein were not disinterested in the Debtor's transactions with TA Group, and thus, are not entitled to the presumption afforded by the business judgment rule.

519. Dorfman and Klein breached their duties of loyalty to the Debtor by, among other things transferring over $2,148,8163.67 to TA Group for their benefit, and crediting FKF V and JDJ Holding with undocumented loans and investments and the repayment of $1.5 million of the TA Group loan three days after it was transferred by the Debtor. By comingling the assets of the Debtor, TA Group, FKF V and JDJ Holding, the Principals grossly favored their own interests over those of the Debtor, resulting in significant damages to the Debtor.

520. The Principals breached their duties of care to the Debtor by, among other things, failing to properly document and account for the financial relationship between the Debtor and TA Group, FKF V and JDJ Holding.

521. As a direct and proximate result of the Principals' breach of their fiduciary obligations to the Debtor with respect to TA Group, the Debtor sustained significant damages of not less than $1,510,150.

## III. DAMAGES

522. Based upon the foregoing, the Trustee is entitled to a judgment against each of the Principals holding them jointly and severally liable for the myriad breaches of fiduciary duties cited herein, in an amount to be determined at trial but estimated to be not less than $75 million, plus an award of pre-judgment interest pursuant to section 5001(a) of New York's Civil Practice Law & Rules.

523. The breaches of the duty of loyalty committed by the Principals were (i) intentional and deliberate, (ii) under outrageous circumstances, (iii) done for a fraudulent motive, and (iv) conscious acts that willfully and wantonly disregarded the rights of the Debtor and its creditors. Accordingly, the Trustee should be awarded punitive damages sufficient enough to allow the Trustee to make creditors whole.

### COUNT TWO
**(Turnover of Property of the Estate – 11 U.S.C. § 542(a) and (b))**
**(Against Klein, Magee, Bashert, Rose Glasses, Jerry's)**

524. Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through _____ of this Complaint as if fully set forth at length herein.

## I. PROPERTY IN POSSESSION OF KLEIN

525. Upon information and belief, Klein continues to be in possession of certain original books and records of the Debtor, stored both in physical and electronic form.

526. The books and records of the Debtor are property of the Debtor's estate.

527. Based upon the foregoing, this Court should enter an order and judgment in favor of Trustee, and against Klein compelling him to turn over any and all of the Debtor's property under his custody and control.

## II. PROPERTY IN POSSESSION OF MAGEE

528. Magee is in possession of some of the Debtor-Magee Funds that he collected from DRLLC and Gregory Hayden on account of amounts due the Debtor from DRLLC and Gregory Hayden, respectively.

529. The Debtor-Magee Funds are property of the Debtor's estate.

530. Magee owes $150,000, plus interest, to the Debtor on account of the Vernon Magee Loan.

531. The Vernon Magee Loan is property of the estate, is matured and is payable on demand.

532. Based upon the foregoing, this Court should enter an order and judgment in favor of Trustee, and against Magee compelling him to turn over any and all of the Debtor's property under his custody and control.

## III. BASHERT – MATURE DEBT DUE AND OWING

533. Bashert owes $4,700,000 plus interest at twelve (12%) percent from November 1, 2008 onward, in an amount not less than $1,551,000, on account of the Bashert Note.

534. Bashert has never made a single payment to the Debtor on or after August 1, 2008, the date of the Bashert Note, and has been in default of the Bashert Note since on or around November 1, 2008, the date the first monthly interest payment was due. Accordingly, all

obligations under the Bashert Note are accelerated and currently due and payable. Even without a default, the maturity date of the Bashert Note is November 30, 2011.

535. The Bashert Note is property of the Debtor's estate, is matured and is payable on demand.

536. Based upon the foregoing, this Court should enter an order and judgment in favor of Trustee, and against Bashert, compelling it to pay all debts owed to the Debtor's estate that are matured and payable on demand in a principal amount of $4,700,000, plus interest in an amount not less than $1,551,000 as of the date of this Complaint.

## IV. ROSE GLASSES – MATURE DEBT DUE AND OWING

537. Rose Glasses owes $322,500, plus interest at twelve (12%) percent from November 1, 2008 onward, in an amount not less than $106,425.00, on account of the Rose Glasses Note.

538. Rose Glasses has never made a single payment to the Debtor on or after August 1, 2008, the date of the Rose Glasses Note, and has been in default of the Rose Glasses Note since on or around November 1, 2008, the date the first monthly interest payment was due. Accordingly, all obligations under the Rose Glasses Note are accelerated and currently due and payable. Even without a default, the Rose Glasses Note matures and becomes fully due and payable on October 30, 2011.

539. The Rose Glasses Note is property of the Debtor's estate, is matured and is payable on demand.

540. Based upon the foregoing, this Court should enter an order and judgment in favor of Trustee, and against Rose Glasses, compelling it to pay all debts owed to the Debtor's estate that are matured and payable on demand in a principal amount of $322,500, plus interest in an amount not less than $106,425 as of the date of this Complaint.

114

## V. JERRY'S – MATURE DEBT DUE AND OWING

541. Jerry's owes $1,592,541.91, plus interest at fourteen (14%) percent, on account of the Jerry's Transfers.

542. The loan evidenced by the Jerry's Transfers is property of the estate, is matured and is payable on demand.

543. Based upon the foregoing, this Court should enter an order and judgment in favor of Trustee, and against Jerry's, compelling it to all debts owed to the Debtor's estate that are matured and payable on demand in a principal amount of $1,592,541.91, plus interest in an amount not less than $558,780 as of the date of this Complaint.

<strong><u>COUNT THREE</u></strong><br>
<strong>(Fraudulent Conveyance – Actual Fraud – 11 U.S.C. §§ 548(a)(1)(A) and 550)</strong><br>
<strong>(Against Magee, Klein, Dorfman, Melissa Magee, Patrice Magee, Lizbeth Keefe, Lawrence Keefe, Valerie Magee, Jonathan Magee, FKF Holding, Aventine Edgewater, FKF Edgewater, Aventine Retail, FKF Retail, Bashert, Rose Glasses, Jerry's, the FKF Firm, the Dorfman Firm, Commercial Construction, Bradley, SF Properties, the TA Group, FKF V, JDJ Holding and Lawrence Keefe)</strong>

544. Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 543 of this Complaint as if fully set forth at length herein.

## I. THE MEMBER DISTRIBUTIONS

### a. The Magee Distributions

545. Each of the Magee Distributions was to or for the benefit of Magee, in addition to any other party who may have been the recipient of the transfers.

546. Certain of the Magee Distributions were made within two (2) years of the Petition Date, in the total cumulative amount of $258,083 (the "548 Magee Distributions").

547. Certain of the 548 Magee Distributions were made directly to Magee's children, as follows:

    a) $80,000 to Patrice Magee;

b) $30,000 to Melissa Page Magee;

c) $70,000 to Lizbeth Keefe; and

d) $7,000 to Valerie Magee.

548.     The 548 Magee Distributions were made while the Debtor was insolvent or had insufficient capital to operate its business.

549.     The 548 Magee Distributions were made by the Debtor and Principals with actual intent to hinder, delay, and/or defraud the Debtor's existing creditors, and individuals and entities to which the Debtor would become obligated.

550.     Based upon the foregoing, the Trustee is entitled to an order and judgment against Magee avoiding the 548 Magee Distributions, and against Patrice Magee, Melissa Page Magee, Lizbeth Keefe, and Valerie Magee, finding each jointly and severally liable for the return of the 548 Magee Distributions made to each.

**b.      The Klein Distributions**

551.     Each of the Klein Distributions was to or for the benefit of Klein.

552.     Certain of the Klein Distributions were made within two (2) years of the Petition Date, in the total cumulative amount of $175,000 (the "548 Klein Distributions").

553.     The 548 Klein Distributions were made while the Debtor was insolvent or had insufficient capital to operate its business.

554.     The 548 Klein Distributions were made by the Debtor and Principals with actual intent to hinder, delay, and/or defraud the Debtor's existing creditors, and individuals and entities to which the Debtor would become obligated.

555.     Based upon the foregoing, the Trustee is entitled to an order and judgment against Klein avoiding the 548 Klein Distributions.

### c.    The Dorfman Distributions

556.    Each of the Dorfman Distributions was to or for the benefit of Dorfman.

557.    Certain of the Dorfman Distributions were made within two (2) years of the Petition Date, in the total cumulative amount of $196,943.89 (the "548 Dorfman Distributions").

558.    The 548 Dorfman Distributions were made while the Debtor was insolvent or had insufficient capital to operate its business.

559.    The 548 Dorfman Distributions were made by the Debtor and Principals with actual intent to hinder, delay, and/or defraud the Debtor's existing creditors, and individuals and entities to which the Debtor would become obligated.

560.     Based upon the foregoing, the Trustee is entitled to an order and judgment against Dorfman avoiding the 548 Dorfman Distributions in an amount not less than $196,943.89.

## II.    THE AVENTINE EDGEWATER & FKF EDGEWATER TRANSFERS

561.    Each of the FKF Edgewater Transfers was made to or for the benefit of Aventine Edgewater and FKF Edgewater.

562.    Each of the FKF Edgewater Transfers was also made to or for the direct benefit of Magee, Klein and Dorfman, who owned FKF Edgewater, which owned between fifteen and fifty-one (15 to 51%) percent of Aventine Edgewater.

563.    The FKF Edgewater Transfers were made by the Principals at least in part to attempt to avoid personal liability on the personal guarantees they had given in favor of TD Bank, which holds a senior secured lien against Aventine Edgewater's property.

564.    Certain of the FKF Edgewater Transfers were made within two (2) years of the Petition Date, in the gross amount of $2,390,189.32 (the "548 FKF Edgewater Transfers").

565. The 548 FKF Edgewater Transfers were made so, among other reasons: (i) the Principals could try to finish the failing Aventine Edgewater project and avoid liability on their personal guarantees to TD Bank, the senior lender on the project; and (ii) the Principals could potentially benefit as individual owners of equity in the project.

566. The 548 FKF Edgewater Transfers were made without receiving any promissory note or other contract defining the relationship between the Debtor and FKF Edgewater and/or Aventine Edgewater.

567. At least $323,000 of the 548 FKF Edgewater Transfers were made after the Debtor stopped making monthly interest payments to its creditors.

568. The 548 FKF Edgewater Transfers were made by the Debtor and Principals with actual intent to hinder, delay, and/or defraud the Debtor's existing creditors, and individuals and entities to which the Debtor would become obligated.

569. Based upon the foregoing, the Trustee is entitled to an order and judgment against FKF Edgewater and Aventine Edgewater avoiding the 548 FKF Edgewater Transfers in an amount not less than $1,576,189.32, the net amount of the 548 FKF Edgewater Transfers, and finding that FKF Edgewater, Aventine Edgewater, Magee, Klein and Dorfman are each jointly and severally liable for the return of the 548 FKF Edgewater Transfers.

## III.   THE AVENTINE RETAIL & FKF RETAIL TRANSFERS

570. Each of the FKF Retail Transfers was made to or for the benefit of Aventine Retail and FKF Retail.

571. Each of the FKF Retail Transfers was also made to or for the direct benefit of Magee, Klein and Dorfman, who owned FKF Retail, which owned not less than fifty (50%) percent of Aventine Retail.

572.     Certain of the FKF Retail Transfers were made within two (2) years of the Petition Date, in the amount of $320,250 (the "548 FKF Retail Transfers").

573.     The 548 FKF Retail Transfers were made so, among other reasons: (i) the Principals could try to finish the failing FKF Retail project and avoid liability on their personal guarantees to Oritani Bank, the senior lender on the project; and (ii) the Principals could potentially benefit as individual owners of equity in the project.

574.     The 548 FKF Retail Transfers were made without receiving any promissory note or other contract defining the relationship between the Debtor and FKF Retail and/or Aventine Retail.

575.     At least $40,250 of the 548 FKF Retail Transfers were made after the Debtor stopped making monthly interest payments to its creditors.

576.     The 548 FKF Retail Transfers were made by the Debtor and Principals with actual intent to hinder, delay, and/or defraud the Debtor's existing creditors, and individuals and entities to which the Debtor would become obligated.

577.     Based upon the foregoing, the Trustee is entitled to an order and judgment against FKF Retail and Aventine Retail avoiding the 548 FKF Retail Transfers, and finding that FKF Retail, Aventine Retail, Magee, Klein and Dorfman are each jointly and severally liable for the return of the 548 FKF Retail Transfers.

## IV.     THE ONE MADISON PARK TRANSFERS

578.     The Principals were owners of FKF Madison, a partial owner of the OMP Project. The Principals did not invest their own money in exchange for their ownership interest in FKF Madison. Instead, they received their ownership interest in FKF Madison in exchange for arranging for the Debtor to make the OMP Transfers. The Principals credited their own

capital accounts in FKF Madison with over $21 million of the OMP Transfers. Accordingly, each of the OMP Transfers was made to or for the benefit of Magee, Klein and Dorfman.

579. Certain of the OMP Transfers were made within two (2) years of the Petition Date, in the amount of $1,000,000 (the "548 OMP Transfers").

580. The 548 OMP Transfers were made so, among other things, Magee could receive the agreement to be paid a $1 million consulting fee.

581. The 548 OMP Transfers were made by the Debtor and Principals with actual intent to hinder, delay, and/or defraud the Debtor's existing creditors, and individuals and entities to which the Debtor would become obligated.

582. Based upon the foregoing, the Trustee is entitled to an order and judgment against Magee, Klein and Dorfman avoiding the 548 OMP Transfers, and finding that Magee, Klein and Dorfman are each jointly and severally liable for the return of the 548 OMP Transfers.

## V. THE BASHERT & ROSE GLASSES TRANSFERS

583. Each of the Newtown Transfers was made to or for the benefit of Bashert and Rose Glasses.

584. Each of the Newtown Transfers was also made to or for the direct benefit of Klein and Dorfman, who had an equity interest in Rose Glasses.

585. Certain of the Newtown Transfers were made within two (2) years of the Petition Date, in the amount of $876,164.92 (the "548 Newtown Transfers").

586. The 548 Newtown Transfers were made so, among other reasons: (i) the Principals could try to finish the failing Newtown Project and avoid liability on their personal guarantees to TD Bank, the senior lender on the project; and (ii) the Principals could potentially benefit as individual owners of equity in the project.

587. The 548 Newtown Transfers were made by the Debtor and Principals with actual intent to hinder, delay, and/or defraud the Debtor's existing creditors, and individuals and entities to which the Debtor would become obligated.

588. Based upon the foregoing, the Trustee is entitled to an order and judgment against Bashert and Rose Glasses avoiding the 548 Newtown Transfers, and finding that Bashert, Rose Glasses, Klein and Dorfman are each jointly and severally liable for the return of the 548 Newtown Transfers.

## VI. THE JERRY'S TRANSFERS

589. Each of the Jerry's Transfers was made to or for the benefit of Jerry's.

590. Each of the Jerry's Transfers was also made to or for the direct benefit of Magee, Klein and Dorfman, who received a distribution of twenty-five (25%) of the equity in Jerry's on account of the Jerry's Transfers.

591. Each of the Jerry's Transfers was made within two (2) years of the Petition Date.

592. The Jerry's Transfers were made so, among other reasons: (i) the Principals could receive individual equity interests in Jerry's; and (ii) Jerry's could obtain financing from Oritani Bank and repay $5 million of its obligations to the Debtor, which could be redistributed by the Principals to preferred creditors and insiders.

593. Further, the Principals released Jerry's from the obligations under the Jerry's Note and the Debtor's mortgage on the Storage Unit, without satisfying partial assignments of the Jerry's Note previously granted to the Josephs Family, without satisfying the related obligations to the Josephs Family, and without informing the Josephs Family.

594. The Jerry's Transfers were made by the Debtor and Principals with actual intent to hinder, delay, and/or defraud the Debtor's existing creditors including the Josephs Family, and individuals and entities to which the Debtor would become obligated.

595. Based upon the foregoing, the Trustee is entitled to an order and judgment against Jerry's avoiding the Jerry's Transfers, and finding that Jerry's, Magee, Klein and Dorfman are each jointly and severally liable for the return of the Jerry's Transfers.

## VII.   THE FKF FIRM TRANSFERS

596. Each of the FKF Firm Transfers was made to or for the benefit of the FKF Firm.

597. Each of the FKF Firm Transfers was also made to or for the direct benefit of Klein, a partner of the FKF Firm.

598. Certain of the FKF Firm Transfers were made within two (2) years of the Petition Date, in the amount of $86,000 (the "548 FKF Firm Transfers").

599. The 548 FKF Firm Transfers were made by the Debtor and Principals with actual intent to hinder, delay, and/or defraud the Debtor's existing creditors, and individuals and entities to which the Debtor would become obligated.

600. Based upon the foregoing, the Trustee is entitled to an order and judgment against the FKF Firm avoiding the 548 FKF Firm Transfers, and finding that the FKF Firm and Klein are each jointly and severally liable for the return of the 548 FKF Firm Transfers.

## VIII.   THE FKF HOLDING TRANSFERS

601. Each of the FKF Holding Transfers was made to or for the benefit of FKF Holding.

602. Each of the FKF Holding Transfers was also made to or for the direct benefit of Magee and Dorfman, each of which had an ownership interest in FKF Holding.

603. The relationship between FKF Holding and the Debtor was completely undefined by the Principals, who freely transferred money between the two entities to satisfy the cash needs of each, and allow the Principals to pull even more money out of the Debtor.

604. FKF Holding in turn distributed significant amounts of money to insiders Magee, Dorfman, Klein, Bradley, JDJ Holding, the FKF Firm and SF Properties.

605. Certain of the FKF Holding Transfers were made within two (2) years of the Petition Date, in the gross amount of $2,089,000 (the "<u>548 FKF Holding Transfers</u>").

606. The 548 FKF Holding Transfers were made by the Debtor with actual intent to hinder, delay, and/or defraud the Debtor's existing creditors, and individuals and entities to which the Debtor would become obligated.

607. Based upon the foregoing, the Trustee is entitled to an order and judgment against the FKF Holding avoiding the 548 FKF Holding Transfers, and finding that FKF Holding, Magee and Dorfman are each jointly and severally liable for the return of the 548 FKF Holding Transfers.

## IX. THE COMMERCIAL CONSTRUCTION TRANSFERS

608. Each of the Commercial Construction Transfers was made to or for the benefit of the Commercial Construction.

609. Each of the Commercial Construction Transfers was also made to or for the direct benefit of Magee, the owner of Commercial Construction.

610. Certain of the Commercial Construction Transfers were made within two (2) years of the Petition Date, in the amount of $883,549.19 (the "<u>548 Commercial Construction Transfers</u>").

611. The 548 Commercial Construction Transfers were made by the Debtor and Principals with actual intent to hinder, delay, and/or defraud the Debtor's existing creditors, and individuals and entities to which the Debtor would become obligated.

612. Based upon the foregoing, the Trustee is entitled to an order and judgment against Commercial Construction avoiding the 548 Commercial Construction Transfers, and finding that Commercial Construction and Magee are each jointly and severally liable for the return of the 548 Commercial Construction Transfers.

## X. THE BRADLEY TRANSFERS

613. Each of the Bradley Transfers was made to or for the benefit of Bradley.

614. Each of the Bradley Transfers was also made to or for the direct benefit of Magee, who has a fifty (50%) percent interest in Bradley and runs Bradley's commercial property.

615. Certain of the Bradley Transfers were made within two (2) years of the Petition Date, in the amount of $919,731.46 (the "548 Bradley Transfers").

616. The 548 Bradley Transfers were made by the Debtor with actual intent to hinder, delay, and/or defraud the Debtor's existing creditors, and individuals and entities to which the Debtor would become obligated.

617. Based upon the foregoing, the Trustee is entitled to an order and judgment against Bradley avoiding the 548 Bradley Transfers, and finding that Bradley and Magee are each jointly and severally liable for the return of the 548 Bradley Transfers.

## XI. THE TA GROUP TRANSFERS

618. Each of the TA Group Transfers was made to or for the benefit of TA Group.

619.     Each of the TA Group Transfers was also made to or for the direct benefit of Klein, Dorfman, FKF V and JDJ Holding, each of which had a direct or indirect interest in TA Group.

620.     Certain of the TA Group Transfers were made within two (2) years of the Petition Date, in the amount of $210,150 (the "548 TA Group Transfers").

621.     The 548 TA Group Transfers were made by the Debtor with actual intent to hinder, delay, and/or defraud the Debtor's existing creditors, and individuals and entities to which the Debtor would become obligated.

622.     Based upon the foregoing, the Trustee is entitled to an order and judgment against the TA Group avoiding the 548 TA Group Transfers, and finding that the TA Group, Klein, Dorfman, FKF V and JDJ Holding are each jointly and severally liable for the return of the 548 TA Group Transfers.

## XII.    THE LAWRENCE & LIZBETH KEEFE TRANSFERS

623.     Magee collected money due the Debtor from DRLLC and Hayden and deposited those Debtor-Magee Funds into his own personal account.

624.     The Debtor had an interest in the Debtor-Magee Funds.

625.     Magee used the Debtor-Magee Funds to, among other things, pay certain preferred creditors, including his children, make gifts to his daughters, invest in various real estate projects, and otherwise convert the funds to his own use.

626.     From January 2009 to December 2009, Magee made the following payments to Lizbeth Keefe and Lawrence Keefe from the Debtor-Magee Funds in the same manner as he had directed the Debtor to make when it was regularly making the Member Distributions:

| Check Date | Date Cashed | Payee | Check Issued From | Amount |
|------------|-------------|-------|-------------------|--------|

| | | | | |
|---|---|---|---|---|
| 02/28/2009 | 03/03/2009 | Lawrence & Lizbeth Keefe | Magee's Key Bank Account | $ 10,000.00 |
| 03/23/2009 | 03/27/2009 | Lawrence & Lizbeth Keefe | Same | 10,000.00 |
| 04/20/2009 | 04/27/2009 | Lawrence & Lizbeth Keefe | Same | 10,000.00 |
| 05/19/2009 | 05/26/2009 | Lawrence & Lizbeth Keefe | Same | 10,000.00 |
| 06/22/2009 | 06/26/2009 | Lawrence & Lizbeth Keefe | Same | 10,000.00 |
| 07/20/2009 | 07/28/2009 | Lawrence & Lizbeth Keefe | Same | 10,000.00 |
| 08/24/2009 | 09/04/2009 | Lawrence & Lizbeth Keefe | Same | 10,000.00 |
| 10/20/2009 | 10/26/2009 | Lawrence & Lizbeth Keefe | Same | 10,000.00 |
| 11/16/2009 | 11/24/2009 | Lawrence & Lizbeth Keefe | Same | 10,000.00 |
| 12/18/2009 | 12/28/2009 | Lawrence & Lizbeth Keefe | Same | 10,000.00 |
| | | **TOTAL:** | | $ 100,000.00 |

(collectively, the "Lawrence & Lizbeth Keefe Transfers"). The Lawrence & Lizbeth Keefe Transfers are in addition to the Magee Distributions transferred directly to Lizbeth Keefe.

627. Each of the Lawrence & Lizbeth Keefe Transfers was made within two (2) years of the Petition Date.

628. The Lawrence & Lizbeth Keefe Transfers were made by Magee with actual intent to hinder, delay, and/or defraud the Debtor's existing creditors, and individuals and entities to which the Debtor would become obligated.

629. Based upon the foregoing, the Trustee is entitled to an order and judgment against Lawrence and Lizbeth Keefe avoiding the Lawrence & Lizbeth Keefe Transfers, and finding that Lawrence Keefe and Lizbeth Keefe are each jointly and severally liable for the return of the Lawrence & Lizbeth Keefe Transfers.

## COUNT FOUR
**(Fraudulent Conveyance – Constructive Fraud – 11 U.S.C. §§ 548(a)(1)(B) and 550) (Against Magee, Klein, Dorfman, Melissa Magee, Patrice Magee, Lizbeth Keefe, Valerie Magee, Jonathan Magee, Aventine Edgewater, FKF Edgewater, Aventine Retail, FKF Retail, Bashert, Rose Glasses, Jerry's, the FKF Firm, FKF Holding, Commercial Construction, Bradley, the TA Group, FKF V, JDJ Holding and Lawrence Keefe)**

630. Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 629 of this Complaint as if fully set forth at length herein.

# I. THE MEMBER DISTRIBUTIONS

### a. The Magee Distributions

631.    Each of the Magee Distributions was to or for the benefit of Magee, in addition to any other party who may have been the recipient of the transfers

632.    The 548 Magee Distributions were made within two (2) years of the Petition Date.

633.    Certain of the 548 Magee Distributions were made directly to Magee's children, as follows:

a) $80,000 to Patrice Magee;

b) $30,000 to Melissa Page Magee;

c) $70,000 to Lizbeth Keefe; and

d) $7,000 to Valerie Magee.

634.    The Debtor received less than a reasonably equivalent value in exchange for the 548 Magee Distributions.

635.    At the time that it made each of the 548 Magee Distributions, the Debtor: (i) was insolvent or became insolvent as a result of the 548 Magee Distributions; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; and/or (iii) intended to incur, or believed that the Debtor would incur debts that would be beyond the Debtor's ability to pay as such debts matured.

636.    Based upon the foregoing, the Trustee is entitled to an order and judgment against Magee avoiding the $258,083 in 548 Magee Distributions, and against Patrice Magee, Melissa Page Magee, Lizbeth Keefe, and Valerie Magee, finding each jointly and severally liable for the return of the 548 Magee Distributions made to each.

**b. The Klein Distributions**

637. Each of the Klein Distributions was to or for the benefit of Klein.

638. The 548 Klein Distributions were made within two (2) years of the Petition Date.

639. The Debtor received less than a reasonably equivalent value in exchange for the 548 Klein Distributions.

640. At the time that it made each of the 548 Klein Distributions, the Debtor: (i) was insolvent or became insolvent as a result of the 548 Klein Distributions; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; and/or (iii) intended to incur, or believed that the Debtor would incur debts that would be beyond the Debtor's ability to pay as such debts matured.

641. Based upon the foregoing, the Trustee is entitled to an order and judgment against Klein in an amount not less than $175,000, avoiding the 548 Klein Distributions.

**c. The Dorfman Distributions**

642. Each of the Dorfman Distributions was to or for the benefit of Dorfman.

643. The 548 Dorfman Distributions were made within two (2) years of the Petition Date.

644. The Debtor received less than a reasonably equivalent value in exchange for the 548 Dorfman Distributions.

645. At the time that it made each of the 548 Dorfman Distributions, the Debtor: (i) was insolvent or became insolvent as a result of the 548 Dorfman Distributions; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; and/or (iii)

intended to incur, or believed that the Debtor would incur debts that would be beyond the Debtor's ability to pay as such debts matured.

646.     Based upon the foregoing, the Trustee is entitled to an order and judgment against Dorfman in an amount not less than $196,943.89, avoiding the 548 Dorfman Distributions.

## II.     THE AVENTINE EDGEWATER & FKF EDGEWATER TRANSFERS

647.     Each of the FKF Edgewater Transfers was made to or for the benefit of Aventine Edgewater and FKF Edgewater.

648.     Each of the FKF Edgewater Transfers was also made to or for the direct benefit of Magee, Klein and Dorfman, who owned FKF Edgewater, which owned between fifteen and fifty-one (15 to 51%) percent of Aventine Edgewater.

649.     The FKF Edgewater Transfers were made by the Principals at least in part to attempt to avoid personal liability on the personal guarantees they had given in favor of TD Bank, which holds a senior secured lien against Aventine Edgewater's property.

650.     The 548 FKF Edgewater Transfers were made within two (2) years of the Petition Date, in the gross amount of $2,390,189.32.

651.     The 548 FKF Edgewater Transfers were made without receiving any promissory note or other contract defining the relationship between the Debtor and FKF Edgewater and/or Aventine Edgewater.

652.     The Debtor received less than a reasonably equivalent value in exchange for the 548 FKF Edgewater Transfers.

653.     At the time that it made each of the 548 FKF Edgewater Transfers, the Debtor: (i) was insolvent or became insolvent as a result of the 548 FKF Edgewater Transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction,

for which any property remaining with the Debtor was an unreasonably small capital; and/or (iii) intended to incur, or believed that the Debtor would incur debts that would be beyond the Debtor's ability to pay as such debts matured.

654. Based upon the foregoing, the Trustee is entitled to an order and judgment against FKF Edgewater and Aventine Edgewater avoiding the 548 FKF Edgewater Transfers in an amount not less than $1,576,189.32, the net amount of the 548 FKF Edgewater Transfers, and finding that FKF Edgewater, Aventine Edgewater, Magee, Klein and Dorfman are each jointly and severally liable for the return of the 548 FKF Edgewater Transfers.

## III. THE AVENTINE RETAIL & FKF RETAIL TRANSFERS

655. Each of the FKF Retail Transfers was made to or for the benefit of Aventine Retail and FKF Retail.

656. Each of the FKF Retail Transfers was also made to or for the direct benefit of Magee, Klein and Dorfman, who owned FKF Retail, which had a fifty (50%) percent interest in Aventine Retail.

657. The 548 FKF Retail Transfers were made within two (2) years of the Petition Date.

658. The Debtor received less than a reasonably equivalent value in exchange for the 548 FKF Retail Transfers.

659. At the time that it made each of the 548 FKF Retail Transfers, the Debtor: (i) was insolvent or became insolvent as a result of the 548 FKF Retail Transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; and/or (iii) intended to incur, or believed that the Debtor would incur debts that would be beyond the Debtor's ability to pay as such debts matured.

660.     Based upon the foregoing, the Trustee is entitled to an order and judgment against Aventine Retail and FKF Retail avoiding the 548 FKF Retail Transfers, and finding that Aventine Retail, FKF Retail, Magee, Klein and Dorfman are each jointly and severally liable for the return of the 548 FKF Retail Transfers.

## IV.     THE ONE MADISON PARK TRANSFERS

661.     The Principals were owners of FKF Madison, a partial owner of the OMP Project.  The Principals did not invest their own money in exchange for their ownership interest in FKF Madison.  Instead, they received their ownership interest in FKF Madison in exchange for arranging for the Debtor to make the OMP Transfers.  The Principals credited their own capital accounts in FKF Madison with over $21 million of the OMP Transfers.  Accordingly, each of the OMP Transfers was made to or for the benefit of Magee, Klein and Dorfman.

662.     The 548 OMP Transfers were made within two (2) years of the Petition Date.

663.     The 548 OMP Transfers were made so, among other things, Magee could receive the agreement to be paid a $1 million consulting fee.

664.     The Debtor received less than a reasonably equivalent value in exchange for the 548 OMP Transfers.

665.     At the time that it made each of the 548 OMP Transfers, the Debtor: (i) was insolvent or became insolvent as a result of the 548 OMP Transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; and/or (iii) intended to incur, or believed that the Debtor would incur debts that would be beyond the Debtor's ability to pay as such debts matured.

666.     Based upon the foregoing, the Trustee is entitled to an order and judgment against Magee, Klein and Dorfman avoiding the 548 OMP Transfers, and finding that Magee, Klein and Dorfman are each jointly and severally liable for the return of the 548 OMP Transfers.

## V.     THE BASHERT & ROSE GLASSES TRANSFERS

667.     Each of the Newtown Transfers was made to or for the benefit of Bashert and Rose Glasses.

668.     Each of the Newtown Transfers was also made to or for the direct benefit of Klein and Dorfman, who had an equity interest in Rose Glasses.

669.     The 548 Newtown Transfers were made within two (2) years of the Petition Date.

670.     The Debtor received less than a reasonably equivalent value in exchange for the 548 Newtown Transfers.

671.     At the time that it made each of the 548 Newtown Transfers, the Debtor: (i) was insolvent or became insolvent as a result of the 548 Newtown Transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; and/or (iii) intended to incur, or believed that the Debtor would incur debts that would be beyond the Debtor's ability to pay as such debts matured.

672.     Based upon the foregoing, the Trustee is entitled to an order and judgment against Bashert and Rose Glasses avoiding the 548 Newtown Transfers, and finding that Bashert, Rose Glasses, Klein and Dorfman are each jointly and severally liable for the return of the 548 Newtown Transfers.

## VI.     THE JERRY'S TRANSFERS

673.     Each of the Jerry's Transfers was made to or for the benefit of Jerry's.

132

674.     Each of the Jerry's Transfers was also made to or for the direct benefit of Magee, Klein and Dorfman, who received a distribution of twenty-five (25%) of the equity in Jerry's on account of the Jerry's Transfers.

675.     Each of the Jerry's Transfers was made within two (2) years of the Petition Date.

676.     The Debtor received less than a reasonably equivalent value in exchange for the Jerry's Transfers.

677.     At the time that it made each of the Jerry's Transfers, the Debtor: (i) was insolvent or became insolvent as a result of the Jerry's Transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; and/or (iii) intended to incur, or believed that the Debtor would incur debts that would be beyond the Debtor's ability to pay as such debts matured.

678.     Based upon the foregoing, the Trustee is entitled to an order and judgment against Jerry's avoiding the Jerry's Transfers, and finding that Jerry's, Magee, Klein and Dorfman are each jointly and severally liable for the return of the Jerry's Transfers.

## VII.     THE FKF FIRM TRANSFERS

679.     Each of the FKF Firm Transfers was made to or for the benefit of the FKF Firm.

680.     Each of the FKF Firm Transfers was also made to or for the direct benefit of Klein, a partner of the FKF Firm.

681.     The 548 FKF Firm Transfers were made within two (2) years of the Petition Date.

682.     Based upon the FKF Firm's failure to exercise that degree of care, skill, and diligence commonly possessed and exercised by a member of the accounting community, the Debtor, which was insolvent on the dates of each of the 548 FKF Firm Transfers, received less than a reasonably equivalent value in exchange for each and every one of the 548 FKF Firm Transfers.

683.     At the time that it made each of the 548 FKF Firm Transfers, the Debtor: (i) was insolvent or became insolvent as a result of the 548 FKF Firm Transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; and/or (iii) intended to incur, or believed that the Debtor would incur debts that would be beyond the Debtor's ability to pay as such debts matured.

684.     Based upon the foregoing, the Trustee is entitled to an order and judgment against the FKF Firm avoiding the 548 FKF Firm Transfers, and finding that the FKF Firm and Klein are each jointly and severally liable for the return of the 548 FKF Firm Transfers.

## VIII.   THE FKF HOLDING TRANSFERS

685.     Each of the FKF Holding Transfers was made to or for the benefit of FKF Holding.

686.     Each of the FKF Holding Transfers was also made to or for the direct benefit of Magee and Dorfman, each of which had an ownership interest in FKF Holding.

687.     The relationship between FKF Holding and the Debtor was completely undefined by the Principals, who freely transferred money between the two entities to satisfy the cash needs of each, and allow the Principals to pull even more money out of the Debtor.

688.     FKF Holding in turn distributed significant amounts of money to insiders Magee, Dorfman, Klein, Bradley, JDJ Holding, the FKF Firm and SF Properties.

689. The 548 FKF Holding Transfers were made within two (2) years of the Petition Date, in the gross amount of $2,089,000.

690. The Debtor received less than a reasonably equivalent value in exchange for the 548 FKF Holding Transfers.

691. At the time that it made each of the 548 FKF Holding Transfers, the Debtor: (i) was insolvent or became insolvent as a result of the 548 FKF Holding Transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; and/or (iii) intended to incur, or believed that the Debtor would incur debts that would be beyond the Debtor's ability to pay as such debts matured.

692. Based upon the foregoing, the Trustee is entitled to an order and judgment against FKF Holding avoiding the 548 FKF Holding Transfers, and finding that FKF Holding, Magee and Dorfman are each jointly and severally liable for the return of the 548 FKF Holding Transfers.

## IX. THE COMMERCIAL CONSTRUCTION TRANSFERS

693. Each of the Commercial Construction Transfers was made to or for the benefit of the Commercial Construction.

694. Each of the Commercial Construction Transfers was also made to or for the direct benefit of Magee, the owner of Commercial Construction.

695. The 548 Commercial Construction Transfers were made within two (2) years of the Petition Date, in the amount of $883,549.19.

696. The Debtor received less than a reasonably equivalent value in exchange for each and every one of the 548 Commercial Construction Transfers.

697.    At the time that it made each of the 548 Commercial Construction Transfers, the Debtor: (i) was insolvent or became insolvent as a result of the 548 Commercial Construction Transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; and/or (iii) intended to incur, or believed that the Debtor would incur debts that would be beyond the Debtor's ability to pay as such debts matured.

698.    Based upon the foregoing, the Trustee is entitled to an order and judgment against Commercial Construction avoiding the 548 Commercial Construction Transfers, and finding that Commercial Construction and Magee are each jointly and severally liable for the return of the 548 Commercial Construction Transfers.

## X.    THE BRADLEY TRANSFERS

699.    Each of the Bradley Transfers was made to or for the benefit of Bradley.

700.    Each of the Bradley Transfers was also made to or for the direct benefit of Magee, who has a fifty (50%) percent interest in Bradley and runs Bradley's commercial property.

701.    The 548 Bradley Transfers were made within two (2) years of the Petition Date.

702.    The Debtor received less than a reasonably equivalent value in exchange for the 548 Bradley Transfers.

703.    At the time that it made each of the 548 Bradley Transfers, the Debtor: (i) was insolvent or became insolvent as a result of the 548 Bradley Transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; and/or (iii) intended to

incur, or believed that the Debtor would incur debts that would be beyond the Debtor's ability to pay as such debts matured.

704.    Based upon the foregoing, the Trustee is entitled to an order and judgment against Bradley avoiding the 548 Bradley Transfers, and finding that Bradley and Magee are each jointly and severally liable for the return of the 548 Bradley Transfers.

## XI.    THE TA GROUP TRANSFERS

705.    Each of the TA Group Transfers was made to or for the benefit of TA Group.

706.    Each of the TA Group Transfers was also made to or for the direct benefit of Klein, Dorfman, FKF V and JDJ Holding, each of which had a direct or indirect interest in TA Group.

707.    The 548 TA Group Transfers were made within two (2) years of the Petition Date.

708.    The Debtor received less than a reasonably equivalent value in exchange for the 548 TA Group Transfers.

709.    At the time that it made each of the TA Group Transfers, the Debtor: (i) was insolvent or became insolvent as a result of the TA Group Transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; and/or (iii) intended to incur, or believed that the Debtor would incur debts that would be beyond the Debtor's ability to pay as such debts matured.

710.    Based upon the foregoing, the Trustee is entitled to an order and judgment against the TA Group avoiding the 548 TA Group Transfers, and finding that the TA Group,

Klein, Dorfman, FKF V and JDJ Holding are each jointly and severally liable for the return of the 548 TA Group Transfers.

## XII.    THE LAWRENCE & LIZBETH KEEFE TRANSFERS

711.    Magee collected money due the Debtor from DRLLC and Hayden and deposited those Debtor-Magee Funds into his own personal account.

712.    The Debtor had an interest in the Debtor-Magee Funds.

713.    Magee used the Debtor-Magee Funds to, among other things, pay certain preferred creditors, including his children, make gifts to his daughters, invest in various real estate projects, and otherwise convert the funds to his own use.

714.    From January 2009 to December 2009, Magee made the Lawrence & Lizbeth Keefe Transfers from the Debtor-Magee Funds in the same manner as he had directed the Debtor to make when it was regularly making the Member Distributions.  The Lawrence & Lizbeth Keefe Transfers are in addition to the Magee Distributions transferred directly to Lizbeth Keefe.

715.     Each of the Lawrence & Lizbeth Keefe Transfers was made within two (2) years of the Petition Date.

716.    The Debtor received less than a reasonably equivalent value in exchange for the Lawrence & Lizbeth Keefe Transfers.

717.    At the time that it made each of the Lawrence & Lizbeth Keefe Transfers, the Debtor: (i) was insolvent or became insolvent as a result of the Lawrence & Lizbeth Keefe Transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; and/or (iii) intended to incur, or believed that the Debtor would incur debts that would be beyond the Debtor's ability to pay as such debts matured.

718. Based upon the foregoing, the Trustee is entitled to an order and judgment against Lawrence and Lizbeth Keefe avoiding the Lawrence & Lizbeth Keefe Transfers, and finding that Lawrence Keefe and Lizbeth Keefe are each jointly and severally liable for the return of the Lawrence & Lizbeth Keefe Transfers.

**COUNT FIVE**
**(Fraudulent Conveyance by Insolvent –**
**11 U.S.C. §§ 544(b) and 550, and N.Y. Debtor and Creditor Law § 273)**
**(Against Magee, Klein, Dorfman, Melissa Magee, Patrice Magee, Lizbeth Keefe, Valerie Magee, Jonathan Magee, Aventine Edgewater, FKF Edgewater, Aventine Retail, FKF Retail, Bashert, Rose Glasses, Jerry's, the FKF Firm, the Dorfman Firm, FKF Holding, Commercial Construction, Bradley, SF Properties, TA Group, FKF V, JDJ Holding and Lawrence Keefe)**

719. Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 718 of this Complaint as if fully set forth at length herein.

I. **THE MEMBER DISTRIBUTIONS**

a. **The Magee Distributions**

720. Each of the Magee Distributions was to or for the benefit of Magee, in addition to any other party who may have been the recipient of the transfers

721. The Magee Distributions were made within six (6) years of the Petition Date.

722. Certain of the Magee Distributions were made directly to Magee's children, as follows:

a) $100,000 to Patrice Magee;

b) $270,000 to Melissa Page Magee;

c) $310,000 to Lizbeth Keefe; and

d) $19,000 to Valerie Magee.

723.     The Debtor received less than fair consideration in exchange for the Magee Distributions.

724.     There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Magee Distributions.

725.     At the time that it made each of the Magee Distributions, the Debtor was insolvent or became insolvent as a result of the Magee Distributions.

726.     Based upon the foregoing, the Trustee is entitled to an order and judgment against Magee avoiding the $1,488,227.50 in Magee Distributions, and against Patrice Magee, Melissa Page Magee, Lizbeth Keefe, and Valerie Magee, finding each jointly and severally liable for the return of the Magee Distributions made to each.

**b.     The Klein Distributions**

727.     Each of the Klein Distributions was to or for the benefit of Klein.

728.     The Klein Distributions were made within six (6) years of the Petition Date.

729.     The Debtor received less than fair consideration in exchange for the Klein Distributions.

730.     There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Klein Distributions.

731.     At the time that it made each of the Klein Distributions, the Debtor was insolvent or became insolvent as a result of the Klein Distributions.

732.     Based upon the foregoing, the Trustee is entitled to an order and judgment against Klein in an amount not less than $1,418,394.50, avoiding the Klein Distributions.

### c. The Dorfman Distributions

733.     Each of the Dorfman Distributions was to or for the benefit of Dorfman.

734.     The Dorfman Distributions were made within six (6) years of the Petition Date.

735.     The Debtor received less than fair consideration in exchange for the Dorfman Distributions.

736.     There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Dorfman Distributions.

737.     At the time that it made each of the Dorfman Distributions, the Debtor was insolvent or became insolvent as a result of the Dorfman Distributions.

738.     Based upon the foregoing, the Trustee is entitled to an order and judgment against Dorfman in an amount not less than $1,398,180.39, avoiding the Dorfman Distributions.

## II.     THE AVENTINE EDGEWATER & FKF EDGEWATER TRANSFERS

739.     Each of the FKF Edgewater Transfers was made to or for the benefit of Aventine Edgewater and FKF Edgewater.

740.     Each of the FKF Edgewater Transfers was also made to or for the direct benefit of Magee, Klein and Dorfman, who owned FKF Edgewater, which owned between fifteen and fifty-one (15 to 51%) percent of Aventine Edgewater.

741.     The FKF Edgewater Transfers were made by the Principals at least in part to attempt to avoid personal liability on the personal guarantees they had given in favor of TD Bank, which holds a senior secured lien against Aventine Edgewater's property.

742.     The FKF Edgewater Transfers were made within six (6) years of the Petition Date.

743. The FKF Edgewater Transfers were made without receiving any promissory note or other contract defining the relationship between the Debtor and FKF Edgewater and/or Aventine Edgewater.

744. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the FKF Edgewater Transfers.

745. The Debtor received less than fair consideration in exchange for the FKF Edgewater Transfers.

746. At the time that it made each of the FKF Edgewater Transfers, the Debtor was insolvent or became insolvent as a result of the FKF Edgewater Transfers.

747. Based upon the foregoing, the Trustee is entitled to an order and judgment against FKF Edgewater and Aventine Edgewater avoiding the FKF Edgewater Transfers in an amount not less than $1,862,196.77, the net amount of the FKF Edgewater Transfers, and finding that FKF Edgewater, Aventine Edgewater, Magee, Klein and Dorfman are each jointly and severally liable for the return of the FKF Edgewater Transfers.

III.     **THE AVENTINE RETAIL & FKF RETAIL TRANSFERS**

748. Each of the FKF Retail Transfers was made to or for the benefit of Aventine Retail and FKF Retail.

749. Each of the FKF Retail Transfers was also made to or for the direct benefit of Magee, Klein and Dorfman, who owned FKF Retail, which had a fifty (50%) percent equity interest in Aventine Retail.

750. The FKF Retail Transfers were made within six (6) years of the Petition Date.

751. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the FKF Retail Transfers.

752. The Debtor received less than fair consideration in exchange for the FKF Retail Transfers.

753. At the time that it made each of the FKF Retail Transfers, the Debtor was insolvent or became insolvent as a result of the FKF Retail Transfers.

754. Based upon the foregoing, the Trustee is entitled to an order and judgment against Aventine Retail and FKF Retail avoiding the FKF Retail Transfers in a net amount of not less than $977,411.33, and finding that Aventine Retail, FKF Retail, Magee, Klein and Dorfman are each jointly and severally liable for the return of the FKF Retail Transfers.

## IV. THE ONE MADISON PARK TRANSFERS

755. The Principals were owners of FKF Madison, a partial owner of the OMP Project. The Principals did not invest their own money in exchange for their ownership interest in FKF Madison. Instead, they received their ownership interest in FKF Madison in exchange for arranging for the Debtor to make the OMP Transfers. The Principals credited their own capital accounts in FKF Madison with over $21 million of the OMP Transfers. Accordingly, each of the OMP Transfers was made to or for the benefit of Magee, Klein and Dorfman.

756. The OMP Transfers were made within six (6) years of the Petition Date.

757. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the OMP Transfers.

758. The OMP Transfers were made so, among other things: (i) the Principals could receive their equity interest in the OMP Project through FKF Madison; and (ii) Magee

could receive the agreement to be paid a $1 million consulting fee for restricting the OMP Loan Account.

759. The Debtor received less than fair consideration in exchange for the OMP Transfers.

760. At the time that it made each of the OMP Transfers, the Debtor was insolvent or became insolvent as a result of the OMP Transfers.

761. Based upon the foregoing, the Trustee is entitled to an order and judgment against Magee, Klein and Dorfman avoiding the OMP Transfers, and finding that Magee, Klein and Dorfman are each jointly and severally liable for the return of the OMP Transfers.

## V. THE BASHERT & ROSE GLASSES TRANSFERS

762. Each of the Newtown Transfers was made to or for the benefit of Bashert and Rose Glasses.

763. Each of the Newtown Transfers was also made to or for the direct benefit of Klein and Dorfman, who had an equity interest in Rose Glasses.

764. Each of the Newtown Transfers made prior to in or around January 2006, was also made to or for the direct benefit of Magee, who had until that time an equity interest in Rose Glasses. Further, Magee received $300,000 of the Newtown Transfers on account of the January 2006 sale of his membership interest in Rose Glasses.

765. The Newtown Transfers were made within six (6) years of the Petition Date.

766. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Newtown Transfers.

767. The Debtor received less than fair consideration in exchange for the Newtown Transfers.

768. At the time that it made each of the Newtown Transfers, the Debtor was insolvent or became insolvent as a result of the Newtown Transfers.

769. Based upon the foregoing, the Trustee is entitled to an order and judgment against Bashert and Rose Glasses avoiding the Newtown Transfers, and finding that Bashert, Rose Glasses, Klein and Dorfman are each jointly and severally liable for the return of the Newtown Transfers, and finding that Magee is jointly and severally liable for the return of the Newtown Transfers that occurred prior to January 2006.

## VI.    THE JERRY'S TRANSFERS

770. Each of the Jerry's Transfers was made to or for the benefit of Jerry's.

771. Each of the Jerry's Transfers was also made to or for the direct benefit of Magee, Klein and Dorfman, who received a distribution of twenty-five (25%) of the equity in Jerry's on account of the Jerry's Transfers.

772. Each of the Jerry's Transfers was made within six (6) years of the Petition Date.

773. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Jerry's Transfers.

774. The Debtor received less than fair consideration in exchange for the Jerry's Transfers.

775. At the time that it made each of the Jerry's Transfers, the Debtor was insolvent or became insolvent as a result of the Jerry's Transfers

776. Based upon the foregoing, the Trustee is entitled to an order and judgment against Jerry's avoiding the Jerry's Transfers, and finding that Jerry's, Magee, Klein and Dorfman are each jointly and severally liable for the return of the Jerry's Transfers.

## VII. THE FKF FIRM TRANSFERS

777. Each of the FKF Firm Transfers was made to or for the benefit of the FKF Firm.

778. Each of the FKF Firm Transfers was also made to or for the direct benefit of Klein, a partner of the FKF Firm.

779. The FKF Firm Transfers were made within six (6) years of the Petition Date.

780. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the FKF Firm Transfers.

781. Based upon the FKF Firm's failure to exercise that degree of care, skill, and diligence commonly possessed and exercised by a member of the accounting community, the Debtor, received less than fair consideration in exchange for each and every one of the FKF Firm Transfers.

782. At the time that it made each of the FKF Firm Transfers, the Debtor was insolvent or became insolvent as a result of the FKF Firm Transfers.

783. Based upon the foregoing, the Trustee is entitled to an order and judgment against the FKF Firm avoiding the FKF Firm Transfers to the extent of not less than $406,104, and finding that the FKF Firm and Klein are each jointly and severally liable for the return of the FKF Firm Transfers.

## VIII.   THE DORFMAN FIRM TRANSFERS

784.    Each of the Dorfman Firm Transfers was made to or for the benefit of the Dorfman Firm.

785.    Each of the Dorfman Firm Transfers was also made to or for the direct benefit of Dorfman, a partner of the Dorfman Firm.

786.    The Dorfman Firm Transfers were made within six (6) years of the Petition Date.

787.    There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Dorfman Firm Transfers.

788.    Based upon the Dorfman Firm's failure to exercise that degree of care, skill, and diligence commonly possessed and exercised by a member of the legal community, the Debtor, received less than fair consideration in exchange for each and every one of the Dorfman Firm Transfers.

789.     At the time that it made each of the Dorfman Firm Transfers, the Debtor was insolvent or became insolvent as a result of the Dorfman Firm Transfers.

790.    Based upon the foregoing, the Trustee is entitled to an order and judgment against the Dorfman Firm avoiding the Dorfman Firm Transfers to the extent of not less than $57,356.75, and finding that the Dorfman Firm and Dorfman are each jointly and severally liable for the return of the Dorfman Firm Transfers.

## IX.    THE FKF HOLDING TRANSFERS

791.    Each of the FKF Holding Transfers was made to or for the benefit of FKF Holding.

792.    Each of the FKF Holding Transfers was also made to or for the direct benefit of Magee and Dorfman, each of which had an ownership interest in FKF Holding.

793.    The FKF Holding Transfers were made within six (6) years of the Petition Date.

794.    There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the FKF Holding Transfers.

795.    The Debtor received less than fair consideration in exchange for the FKF Holding Transfers.

796.    At the time that it made each of the FKF Holding Transfers, the Debtor was insolvent or became insolvent as a result of the FKF Holding Transfers.

797.    Based upon the foregoing, the Trustee is entitled to an order and judgment against FKF Holding avoiding the FKF Holding Transfers, and finding that FKF Holding, Magee and Dorfman are each jointly and severally liable for the return of the FKF Holding Transfers in an amount of not less than $1,163,729.78.

## X.    THE COMMERCIAL CONSTRUCTION TRANSFERS

798.    Each of the Commercial Construction Transfers was made to or for the benefit of the Commercial Construction.

799.    Each of the Commercial Construction Transfers was also made to or for the direct benefit of Magee, the owner of Commercial Construction.

800.    The Commercial Construction Transfers were made within six (6) years of the Petition Date, in the amount of $954,551.72.

801. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Commercial Construction Transfers.

802. The Debtor received less than fair consideration in exchange for each and every one of the Commercial Construction Transfers.

803. At the time that it made each of the Commercial Construction Transfers, the Debtor was insolvent or became insolvent as a result of the Commercial Construction Transfers.

804. Based upon the foregoing, the Trustee is entitled to an order and judgment against Commercial Construction avoiding the Commercial Construction Transfers, and finding that Commercial Construction and Magee are each jointly and severally liable for the return of the Commercial Construction Transfers in an amount not less than $954,551.72.

## XI.    THE BRADLEY TRANSFERS

805. Each of the Bradley Transfers was made to or for the benefit of Bradley.

806. Each of the Bradley Transfers was also made to or for the direct benefit of Magee, who has a fifty (50%) percent interest in Bradley and runs Bradley's commercial property.

807. The Bradley Transfers were made within six (6) years of the Petition Date.

808. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Bradley Transfers.

809. The Debtor received less than fair consideration in exchange for the Bradley Transfers.

810. At the time that it made each of the Bradley Transfers, the Debtor was insolvent or became insolvent as a result of the Bradley Transfers.

811. Based upon the foregoing, the Trustee is entitled to an order and judgment against Bradley avoiding the Bradley Transfers in an amount not less than $1,319,734.46, and finding that Bradley and Magee are each jointly and severally liable for the return of the Bradley Transfers.

## XII.   THE SF PROPERTIES TRANSFERS

812. Each of the SF Properties Transfers was made to or for the benefit of SF Properties.

813. Each of the SF Properties Transfers was also made to or for the direct benefit of Magee, Klein and Dorfman, who each held an equity interest in SF Properties.

814. Each of the SF Properties Transfers was made within six (6) years of the Petition Date.

815. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the SF Properties Transfers.

816. The Debtor received less than fair consideration in exchange for the SF Properties Transfers.

817. At the time that it made each of the SF Properties Transfers, the Debtor was insolvent or became insolvent as a result of the SF Properties Transfers.

818. Based upon the foregoing, the Trustee is entitled to an order and judgment against SF Properties avoiding the SF Properties Transfers to the extent of not less than $137,812, and finding that SF Properties, Magee, Klein and Dorfman are each jointly and severally liable for the return of the SF Properties Transfers.

## XIII.   THE TA GROUP TRANSFERS

819.    Each of the TA Group Transfers was made to or for the benefit of TA Group.

820.    Each of the TA Group Transfers was also made to or for the direct benefit of Klein, Dorfman, FKF V and JDJ Holding, each of which had a direct or indirect interest in TA Group.

821.    The TA Group Transfers were made within six (6) years of the Petition Date.

822.    There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the TA Group Transfers.

823.    The Debtor received less than fair consideration in exchange for the TA Group Transfers.

824.    At the time that it made each of the TA Group Transfers, the Debtor was insolvent or became insolvent as a result of the TA Group Transfers.

825.    Based upon the foregoing, the Trustee is entitled to an order and judgment against the TA Group avoiding the TA Group Transfers in an amount not less than $1,510,150, and finding that the TA Group, Klein, Dorfman, FKF V and JDJ Holding are each jointly and severally liable for the return of the 548 TA Group Transfers.

## XIV.   THE LAWRENCE & LIZBETH KEEFE TRANSFERS

826.    Magee collected money due the Debtor from DRLLC and Hayden and deposited those Debtor-Magee Funds into his own personal account.

827.    The Debtor had an interest in the Debtor-Magee Funds.

828. Magee used the Debtor-Magee Funds to, among other things, pay certain preferred creditors, including his children, make gifts to his daughters, invest in various real estate projects, and otherwise convert the funds to his own use.

829. From January 2009 to December 2009, Magee made the Lawrence & Lizbeth Keefe Transfers from the Debtor-Magee Funds in the same manner as he had directed the Debtor to make when it was regularly making the Member Distributions. The Lawrence & Lizbeth Keefe Transfers are in addition to the Magee Distributions transferred directly to Lizbeth Keefe.

830. Each of the Lawrence & Lizbeth Keefe Transfers was made within six (6) years of the Petition Date.

831. The Debtor received less than fair consideration in exchange for the Lawrence & Lizbeth Keefe Transfers.

832. At the time that it made each of the Lawrence & Lizbeth Keefe Transfers, the Debtor was insolvent or became insolvent as a result of the Lawrence & Lizbeth Keefe Transfers.

833. Based upon the foregoing, the Trustee is entitled to an order and judgment against Lawrence and Lizbeth Keefe avoiding the Lawrence & Lizbeth Keefe Transfers in an amount not less than $100,000, and finding that Lawrence Keefe and Lizbeth Keefe are each jointly and severally liable for the return of the Lawrence & Lizbeth Keefe Transfers.

## XV. THE ADDITIONAL PATRICE MAGEE & JONATHAN MAGEE TRANSFERS

834. The Debtor made the following transfers to Jonathan Magee and Patrice Magee separate and apart from those other transfers and transactions for which recovery is sought from Jonathan Magee and Patrice Magee herein:

| Check Date | Payee | Amount |
| --- | --- | --- |

| 09/28/2006 | Jonathan Magee | $ 25,000.00 |
| 04/11/2008 | Jonathan Magee | 150,000.00 |
| 04/11/2008 | Patrice Magee | 150,000.00 |
| | **TOTAL:** | $ 325,000.00 |

(collectively, the "Additional Jonathan & Patrice Transfers").

835. The Additional Jonathan & Patrice Transfers were attributed by the Debtor to a purported lending relationship between the Debtor and Magee's company, Commercial Construction. However, neither Jonathan Magee nor Patrice Magee provided any consideration to the Debtor on account of their respective Additional Jonathan & Patrice Transfers.

836. The Additional Jonathan & Patrice Transfers were made within six (6) years of the Petition Date.

837. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Additional Jonathan & Patrice Transfers.

838. The Debtor received less than fair consideration in exchange for the Additional Jonathan & Patrice Transfers.

839. At the time that it made each of the Additional Jonathan & Patrice Transfers, the Debtor was insolvent or became insolvent as a result of the Additional Jonathan & Patrice Transfers.

840. Based upon the foregoing, the Trustee is entitled to an order and judgment against avoiding the Additional Jonathan & Patrice Transfers, and finding Jonathan Magee and Patrice Magee liable for the return of the full value of the Additional Jonathan & Patrice Transfers received by each in amounts not less than $175,000.00 and $150,000.00, respectively.

**COUNT SIX**

**(Fraudulent Conveyance by One Engaged in Business with Unreasonably Small Capital –**
**11 U.S.C. §§ 544(b) and 550, and N.Y. Debtor and Creditor Law § 274)**
**(Against Magee, Dorfman, Klein, Melissa Magee, Patrice Magee, Lizbeth Keefe, Valerie**
**Magee, Jonathan Magee, Aventine Edgewater, FKF Edgewater, Aventine Retail, FKF**
**Retail, Bashert, Rose Glasses, Jerry's, the FKF Firm, the Dorfman Firm, FKF Holding,**
**Commercial Construction, Bradley, SF Properties, TA Group, FKF V, JDJ Holding and**
**Lawrence Keefe)**

841.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through ____ of this Complaint as if fully set forth at length herein.

**I.      THE MEMBER DISTRIBUTIONS**

    **a.      The Magee Distributions**

842.    Each of the Magee Distributions was to or for the benefit of Magee, in addition to any other party who may have been the recipient of the transfers

843.    The Magee Distributions were made within six (6) years of the Petition Date.

844.    Certain of the Magee Distributions were made directly to Magee's children, as follows:

        a) $100,000 to Patrice Magee;

        b) $270,000 to Melissa Page Magee;

        c) $310,000 to Lizbeth Keefe; and

        d) $19,000 to Valerie Magee.

845.    The Debtor received less than fair consideration in exchange for the Magee Distributions.

846.    There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Magee Distributions.

847.     At the time that it made each of the Magee Distributions, the Debtor was engaged or was about to engage in a business or transaction for which the property remaining in its hands after the Magee Distributions was an unreasonably small capital.

848.     Based upon the foregoing, the Trustee is entitled to an order and judgment against Magee avoiding the $1,488,227.50 in Magee Distributions, and against Patrice Magee, Melissa Page Magee, Lizbeth Keefe, and Valerie Magee, finding each jointly and severally liable for the return of the Magee Distributions made to each.

**b.     The Klein Distributions**

849.     Each of the Klein Distributions was to or for the benefit of Klein.

850.     The Klein Distributions were made within six (6) years of the Petition Date.

851.     The Debtor received less than fair consideration in exchange for the Klein Distributions.

852.     There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Klein Distributions.

853.     At the time that it made each of the Klein Distributions, the Debtor was engaged or was about to engage in a business or transaction for which the property remaining in its hands after the Klein Distributions was an unreasonably small capital.

854.     Based upon the foregoing, the Trustee is entitled to an order and judgment against Klein in an amount not less than $1,418,394.50, avoiding the Klein Distributions.

**c.     The Dorfman Distributions**

855.     Each of the Dorfman Distributions was to or for the benefit of Dorfman.

856.     The Dorfman Distributions were made within six (6) years of the Petition Date.

857.     The Debtor received less than fair consideration in exchange for the Dorfman Distributions.

858.     There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Dorfman Distributions.

859.     At the time that it made each of the Dorfman Distributions, the Debtor was engaged or was about to engage in a business or transaction for which the property remaining in its hands after the Dorfman Distributions was an unreasonably small capital.

860.     Based upon the foregoing, the Trustee is entitled to an order and judgment against Dorfman in an amount not less than $1,398,180.39, avoiding the Dorfman Distributions.

## II.     THE AVENTINE EDGEWATER & FKF EDGEWATER TRANSFERS

861.     Each of the FKF Edgewater Transfers was made to or for the benefit of Aventine Edgewater and FKF Edgewater.

862.     Each of the FKF Edgewater Transfers was also made to or for the direct benefit of Magee, Klein and Dorfman, who owned FKF Edgewater, which owned between fifteen and fifty-one (15 to 51%) percent of Aventine Edgewater.

863.     The FKF Edgewater Transfers were made by the Principals at least in part to attempt to avoid personal liability on the personal guarantees they had given in favor of TD Bank, which holds a senior secured lien against Aventine Edgewater's property.

864.     The FKF Edgewater Transfers were made within six (6) years of the Petition Date.

865. The FKF Edgewater Transfers were made without receiving any promissory note or other contract defining the relationship between the Debtor and FKF Edgewater and/or Aventine Edgewater.

866. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the FKF Edgewater Transfers.

867. The Debtor received less than fair consideration in exchange for the FKF Edgewater Transfers.

868. At the time that it made each of the FKF Edgewater Transfers, the Debtor was engaged or was about to engage in a business or transaction for which the property remaining in its hands after the FKF Edgewater Transfers was an unreasonably small capital.

869. Based upon the foregoing, the Trustee is entitled to an order and judgment against FKF Edgewater and Aventine Edgewater avoiding the FKF Edgewater Transfers in an amount not less than $1,862,196.77, the net amount of the FKF Edgewater Transfers, and finding that FKF Edgewater, Aventine Edgewater, Magee, Klein and Dorfman are each jointly and severally liable for the return of the FKF Edgewater Transfers.

## III. THE AVENTINE RETAIL & FKF RETAIL TRANSFERS

870. Each of the FKF Retail Transfers was made to or for the benefit of Aventine Retail and FKF Retail.

871. Each of the FKF Retail Transfers was also made to or for the direct benefit of Magee, Klein and Dorfman, who owned FKF Retail, which had a fifty (50%) percent equity interest in Aventine Retail.

872. The FKF Retail Transfers were made within six (6) years of the Petition Date.

873. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the FKF Retail Transfers.

874. The Debtor received less than fair consideration in exchange for the FKF Retail Transfers.

875. At the time that it made each of the FKF Retail Transfers, the Debtor was engaged or was about to engage in a business or transaction for which the property remaining in its hands after the FKF Retail Transfers was an unreasonably small capital.

876. Based upon the foregoing, the Trustee is entitled to an order and judgment against Aventine Retail and FKF Retail avoiding the FKF Retail Transfers in a net amount of not less than $977,411.33, and finding that Aventine Retail, FKF Retail, Magee, Klein and Dorfman are each jointly and severally liable for the return of the FKF Retail Transfers.

## IV. THE ONE MADISON PARK TRANSFERS

877. The Principals were owners of FKF Madison, a partial owner of the OMP Project. The Principals did not invest their own money in exchange for their ownership interest in FKF Madison. Instead, they received their ownership interest in FKF Madison in exchange for arranging for the Debtor to make the OMP Transfers. The Principals credited their own capital accounts in FKF Madison with over $21 million of the OMP Transfers. Accordingly, each of the OMP Transfers was made to or for the benefit of Magee, Klein and Dorfman.

878. The OMP Transfers were made within six (6) years of the Petition Date.

879. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the OMP Transfers.

880.     The OMP Transfers were made so, among other things: (i) the Principals could receive their equity interest in the OMP Project through FKF Madison; and (ii) Magee could receive the agreement to be paid a $1 million consulting fee for restricting the OMP Loan Account.

881.     The Debtor received less than fair consideration in exchange for the OMP Transfers.

882.     At the time that it made each of the OMP Transfers, the Debtor was engaged or was about to engage in a business or transaction for which the property remaining in its hands after the OMP Transfers was an unreasonably small capital.

883.     Based upon the foregoing, the Trustee is entitled to an order and judgment against Magee, Klein and Dorfman avoiding the OMP Transfers, and finding that Magee, Klein and Dorfman are each jointly and severally liable for the return of the OMP Transfers.

## V.     THE BASHERT & ROSE GLASSES TRANSFERS

884.     Each of the Newtown Transfers was made to or for the benefit of Bashert and Rose Glasses.

885.     Each of the Newtown Transfers was also made to or for the direct benefit of Klein and Dorfman, who had an equity interest in Rose Glasses.

886.     Each of the Newtown Transfers made prior to in or around January 2006, was also made to or for the direct benefit of Magee, who had until that time an equity interest in Rose Glasses.  Further, Magee received $300,000 of the Newtown Transfers on account of the January 2006 sale of his membership interest in Rose Glasses.

887.     The Newtown Transfers were made within six (6) years of the Petition Date.

888. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Newtown Transfers.

889. The Debtor received less than fair consideration in exchange for the Newtown Transfers.

890. At the time that it made each of the Newtown Transfers, the Debtor was engaged or was about to engage in a business or transaction for which the property remaining in its hands after the Newtown Transfers was an unreasonably small capital.

891. Based upon the foregoing, the Trustee is entitled to an order and judgment against Bashert and Rose Glasses avoiding the Newtown Transfers, and finding that Bashert, Rose Glasses, Klein and Dorfman are each jointly and severally liable for the return of the Newtown Transfers, and finding that Magee is jointly and severally liable for the return of the Newtown Transfers that occurred prior to January 2006.

## VI. THE JERRY'S TRANSFERS

892. Each of the Jerry's Transfers was made to or for the benefit of Jerry's.

893. Each of the Jerry's Transfers was also made to or for the direct benefit of Magee, Klein and Dorfman, who received a distribution of twenty-five (25%) of the equity in Jerry's on account of the Jerry's Transfers.

894. Each of the Jerry's Transfers was made within six (6) years of the Petition Date.

895. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Jerry's Transfers.

896. The Debtor received less than fair consideration in exchange for the Jerry's Transfers.

897. At the time that it made each of the Jerry's Transfers, the Debtor was engaged or was about to engage in a business or transaction for which the property remaining in its hands after the Jerry's Transfers was an unreasonably small capital.

898. Based upon the foregoing, the Trustee is entitled to an order and judgment against Jerry's avoiding the Jerry's Transfers, and finding that Jerry's, Magee, Klein and Dorfman are each jointly and severally liable for the return of the Jerry's Transfers.

## VII. THE FKF FIRM TRANSFERS

899. Each of the FKF Firm Transfers was made to or for the benefit of the FKF Firm.

900. Each of the FKF Firm Transfers was also made to or for the direct benefit of Klein, a partner of the FKF Firm.

901. The FKF Firm Transfers were made within six (6) years of the Petition Date.

902. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the FKF Firm Transfers.

903. Based upon the FKF Firm's failure to exercise that degree of care, skill, and diligence commonly possessed and exercised by a member of the accounting community, the Debtor, received less than fair consideration in exchange for each and every one of the FKF Firm Transfers.

904. At the time that it made each of the FKF Firm Transfers, the Debtor was engaged or was about to engage in a business or transaction for which the property remaining in its hands after the FKF Firm Transfers was an unreasonably small capital.

905. Based upon the foregoing, the Trustee is entitled to an order and judgment against the FKF Firm avoiding the FKF Firm Transfers to the extent of not less than $406,104, and finding that the FKF Firm and Klein are each jointly and severally liable for the return of the FKF Firm Transfers.

## VIII. THE DORFMAN FIRM TRANSFERS

906. Each of the Dorfman Firm Transfers was made to or for the benefit of the Dorfman Firm.

907. Each of the Dorfman Firm Transfers was also made to or for the direct benefit of Dorfman, a partner of the Dorfman Firm.

908. The Dorfman Firm Transfers were made within six (6) years of the Petition Date.

909. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Dorfman Firm Transfers.

910. Based upon the Dorfman Firm's failure to exercise that degree of care, skill, and diligence commonly possessed and exercised by a member of the legal community, the Debtor, received less than fair consideration in exchange for each and every one of the Dorfman Firm Transfers.

911. At the time that it made each of the Dorfman Transfers, the Debtor was engaged or was about to engage in a business or transaction for which the property remaining in its hands after the Dorfman Transfers was an unreasonably small capital.

912. Based upon the foregoing, the Trustee is entitled to an order and judgment against the Dorfman Firm avoiding the Dorfman Firm Transfers to the extent of not less than $57,356.75, and finding that the Dorfman Firm and Dorfman are each jointly and severally liable for the return of the Dorfman Firm Transfers.

## IX. THE FKF HOLDING TRANSFERS

913. Each of the FKF Holding Transfers was made to or for the benefit of FKF Holding.

914. Each of the FKF Holding Transfers was also made to or for the direct benefit of Magee and Dorfman, each of which had an ownership interest in FKF Holding.

915. The FKF Holding Transfers were made within six (6) years of the Petition Date.

916. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the FKF Holding Transfers.

917. The Debtor received less than fair consideration in exchange for the FKF Holding Transfers.

918. At the time that it made each of the FKF Holding Transfers, the Debtor was engaged or was about to engage in a business or transaction for which the property remaining in its hands after the FKF Holding Transfers was an unreasonably small capital.

919. Based upon the foregoing, the Trustee is entitled to an order and judgment against FKF Holding avoiding the FKF Holding Transfers, and finding that FKF Holding, Magee and Dorfman are each jointly and severally liable for the return of the FKF Holding Transfers in an amount of not less than $1,163,729.78.

## X.     THE COMMERCIAL CONSTRUCTION TRANSFERS

920.     Each of the Commercial Construction Transfers was made to or for the benefit of the Commercial Construction.

921.     Each of the Commercial Construction Transfers was also made to or for the direct benefit of Magee, the owner of Commercial Construction.

922.     The Commercial Construction Transfers were made within six (6) years of the Petition Date, in the amount of $954,551.72.

923.     There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Commercial Construction Transfers.

924.     The Debtor received less than fair consideration in exchange for each and every one of the Commercial Construction Transfers.

925.     At the time that it made each of the Commercial Construction Transfers, the Debtor was engaged or was about to engage in a business or transaction for which the property remaining in its hands after the Commercial Construction Transfers was an unreasonably small capital.

926.     Based upon the foregoing, the Trustee is entitled to an order and judgment against Commercial Construction avoiding the Commercial Construction Transfers, and finding that Commercial Construction and Magee are each jointly and severally liable for the return of the Commercial Construction Transfers in an amount not less than $954,551.72.

## XI.     THE BRADLEY TRANSFERS

927.     Each of the Bradley Transfers was made to or for the benefit of Bradley.

928.    Each of the Bradley Transfers was also made to or for the direct benefit of Magee, who has a fifty (50%) percent interest in Bradley and runs Bradley's commercial property.

929.    The Bradley Transfers were made within six (6) years of the Petition Date.

930.    There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Bradley Transfers.

931.    The Debtor received less than fair consideration in exchange for the Bradley Transfers.

932.    At the time that it made each of the Bradley Transfers, the Debtor was engaged or was about to engage in a business or transaction for which the property remaining in its hands after the Bradley Transfers was an unreasonably small capital.

933.    Based upon the foregoing, the Trustee is entitled to an order and judgment against Bradley avoiding the Bradley Transfers in an amount not less than $1,319,734.46, and finding that Bradley and Magee are each jointly and severally liable for the return of the Bradley Transfers.

## XII.    THE SF PROPERTIES TRANSFERS

934.    Each of the SF Properties Transfers was made to or for the benefit of SF Properties.

935.    Each of the SF Properties Transfers was also made to or for the direct benefit of Magee, Klein and Dorfman, who held an equity interest in SF Properties.

936.    Each of the SF Properties Transfers was made within six (6) years of the Petition Date.

937. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the SF Properties Transfers.

938. The Debtor received less than fair consideration in exchange for the SF Properties Transfers.

939. At the time that it made each of the SF Properties Transfers, the Debtor was engaged or was about to engage in a business or transaction for which the property remaining in its hands after the SF Properties Transfers was an unreasonably small capital.

940. Based upon the foregoing, the Trustee is entitled to an order and judgment against SF Properties avoiding the SF Properties Transfers to the extent of not less than $137,812, and finding that SF Properties, Magee, Klein and Dorfman are each jointly and severally liable for the return of the SF Properties Transfers.

## XIII. THE TA GROUP TRANSFERS

941. Each of the TA Group Transfers was made to or for the benefit of TA Group.

942. Each of the TA Group Transfers was also made to or for the direct benefit of Klein, Dorfman, FKF V and JDJ Holding, each of which had a direct or indirect interest in TA Group.

943. The TA Group Transfers were made within six (6) years of the Petition Date.

944. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the TA Group Transfers.

945. The Debtor received less than fair consideration in exchange for the TA Group Transfers.

946. At the time that it made each of the TA Group Transfers, the Debtor was engaged or was about to engage in a business or transaction for which the property remaining in its hands after the TA Group Transfers was an unreasonably small capital.

947. Based upon the foregoing, the Trustee is entitled to an order and judgment against the TA Group avoiding the TA Group Transfers in an amount not less than $1,510,150, and finding that the TA Group, Klein, Dorfman, FKF V and JDJ Holding are each jointly and severally liable for the return of the 548 TA Group Transfers.

## XIV. THE LAWRENCE & LIZBETH KEEFE TRANSFERS

948. Magee collected money due the Debtor from DRLLC and Hayden and deposited those Debtor-Magee Funds into his own personal account.

949. The Debtor had an interest in the Debtor-Magee Funds.

950. Magee used the Debtor-Magee Funds to, among other things, pay certain preferred creditors, including his children, make gifts to his daughters, invest in various real estate projects, and otherwise convert the funds to his own use.

951. From January 2009 to December 2009, Magee made the Lawrence & Lizbeth Keefe Transfers from the Debtor-Magee Funds in the same manner as he had directed the Debtor to make when it was regularly making the Member Distributions. The Lawrence & Lizbeth Keefe Transfers are in addition to the Magee Distributions transferred directly to Lizbeth Keefe.

952. Each of the Lawrence & Lizbeth Keefe Transfers was made within six (6) years of the Petition Date.

953.    The Debtor received less than fair consideration in exchange for the Lawrence & Lizbeth Keefe Transfers.

954.    At the time that it made each of the Lawrence & Lizbeth Keefe Transfers, the Debtor was engaged or was about to engage in a business or transaction for which the property remaining in its hands after the Lawrence & Lizbeth Keefe Transfers was an unreasonably small capital.

955.    Based upon the foregoing, the Trustee is entitled to an order and judgment against Lawrence and Lizbeth Keefe avoiding the Lawrence & Lizbeth Keefe Transfers in an amount not less than $100,000, and finding that Lawrence Keefe and Lizbeth Keefe are each jointly and severally liable for the return of the Lawrence & Lizbeth Keefe Transfers.

## XV.    THE ADDITIONAL PATRICE MAGEE & JONATHAN MAGEE TRANSFERS

956.    The Debtor made the Additional Jonathan & Patrice Transfers from its property separate and apart from those other transfers and transactions for which recovery is sought from Jonathan Magee and Patrice Magee herein.

957.    The Additional Jonathan & Patrice Transfers were attributed by the Debtor to a purported lending relationship between the Debtor and Magee's company, Commercial Construction.   However, neither Jonathan Magee nor Patrice Magee provided any consideration to the Debtor on account of their respective Additional Jonathan & Patrice Transfers.

958.    The Additional Jonathan & Patrice Transfers were made within six (6) years of the Petition Date.

959.    There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Additional Jonathan & Patrice Transfers.

960. The Debtor received less than fair consideration in exchange for the Additional Jonathan & Patrice Transfers.

961. At the time that it made each of the Additional Jonathan & Patrice Transfers, the Debtor was engaged or was about to engage in a business or transaction for which the property remaining in its hands after the Additional Jonathan & Patrice Transfers was an unreasonably small capital.

962. Based upon the foregoing, the Trustee is entitled to an order and judgment against avoiding the Additional Jonathan & Patrice Transfers, and finding Jonathan Magee and Patrice Magee liable for the return of the full value of the Additional Jonathan & Patrice Transfers received by each in amounts not less than $175,000.00 and $150,000.00, respectively.

<u>**COUNT SEVEN**</u>
**(Fraudulent Conveyance by One Incurring Debts Beyond Ability to Pay –
11 U.S.C. §§ 544(b) and 550, and N.Y. Debtor and Creditor Law § 275)
(Against Magee, Klein, Dorfman, Melissa Magee, Patrice Magee, Lizbeth Keefe, Valerie
Magee, Jonathan Magee, Aventine Edgewater, FKF Edgewater, Aventine Retail, FKF
Retail, Bashert, Rose Glasses, Jerry's, the FKF Firm, the Dorfman Firm, FKF Holding,
Commercial Construction, Bradley, SF Properties, TA Group, FKF V, JDJ Holding and
Lawrence Keefe)**

963. Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 962 of this Complaint as if fully set forth at length herein.

I. **THE MEMBER DISTRIBUTIONS**

a. **The Magee Distributions**

964. Each of the Magee Distributions was to or for the benefit of Magee, in addition to any other party who may have been the recipient of the transfers

965. The Magee Distributions were made within six (6) years of the Petition Date.

966. Certain of the Magee Distributions were made directly to Magee's children, as follows:

a) $100,000 to Patrice Magee;

b) $270,000 to Melissa Page Magee;

c) $310,000 to Lizbeth Keefe; and

d) $19,000 to Valerie Magee.

967. The Debtor received less than fair consideration in exchange for the Magee Distributions.

968. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Magee Distributions.

969. At the time that it made each of the Magee Distributions, the Debtor intended or believed that it would incur debts beyond its ability to pay as they matured.

970. Based upon the foregoing, the Trustee is entitled to an order and judgment against Magee avoiding the $1,488,227.50 in Magee Distributions, and against Patrice Magee, Melissa Page Magee, Lizbeth Keefe, and Valerie Magee, finding each jointly and severally liable for the return of the Magee Distributions made to each.

**b.** **The Klein Distributions**

971. Each of the Klein Distributions was to or for the benefit of Klein.

972. The Klein Distributions were made within six (6) years of the Petition Date.

973. The Debtor received less than fair consideration in exchange for the Klein Distributions.

974. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Klein Distributions.

975. At the time that it made each of the Klein Distributions, the Debtor intended or believed that it would incur debts beyond its ability to pay as they matured.

976. Based upon the foregoing, the Trustee is entitled to an order and judgment against Klein in an amount not less than $1,418,394.50, avoiding the Klein Distributions.

    **c.**    **The Dorfman Distributions**

977. Each of the Dorfman Distributions was to or for the benefit of Dorfman.

978. The Dorfman Distributions were made within six (6) years of the Petition Date.

979. The Debtor received less than fair consideration in exchange for the Dorfman Distributions.

980. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Dorfman Distributions.

981. At the time that it made each of the Dorfman Distributions, the Debtor intended or believed that it would incur debts beyond its ability to pay as they matured.

982. Based upon the foregoing, the Trustee is entitled to an order and judgment against Dorfman in an amount not less than $1,398,180.39, avoiding the Dorfman Distributions.

**II.**    **THE AVENTINE EDGEWATER & FKF EDGEWATER TRANSFERS**

983. Each of the FKF Edgewater Transfers was made to or for the benefit of Aventine Edgewater and FKF Edgewater.

984. Each of the FKF Edgewater Transfers was also made to or for the direct benefit of Magee, Klein and Dorfman, who owned FKF Edgewater, which owned between fifteen and fifty-one (15 to 51%) percent of Aventine Edgewater.

985. The FKF Edgewater Transfers were made by the Principals at least in part to attempt to avoid personal liability on the personal guarantees they had given in favor of TD Bank, which holds a senior secured lien against Aventine Edgewater's property.

986. The FKF Edgewater Transfers were made within six (6) years of the Petition Date.

987. The FKF Edgewater Transfers were made without receiving any promissory note or other contract defining the relationship between the Debtor and FKF Edgewater and/or Aventine Edgewater.

988. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the FKF Edgewater Transfers.

989. The Debtor received less than fair consideration in exchange for the FKF Edgewater Transfers.

990. At the time that it made each of the FKF Edgewater Transfers, the Debtor intended or believed that it would incur debts beyond its ability to pay as they matured.

991. Based upon the foregoing, the Trustee is entitled to an order and judgment against FKF Edgewater and Aventine Edgewater avoiding the FKF Edgewater Transfers in an amount not less than $1,862,196.77, the net amount of the FKF Edgewater Transfers, and finding that FKF Edgewater, Aventine Edgewater, Magee, Klein and Dorfman are each jointly and severally liable for the return of the FKF Edgewater Transfers.

## III. THE AVENTINE RETAIL & FKF RETAIL TRANSFERS

992.   Each of the FKF Retail Transfers was made to or for the benefit of Aventine Retail and FKF Retail.

993.   Each of the FKF Retail Transfers was also made to or for the direct benefit of Magee, Klein and Dorfman, who owned FKF Retail, which had a fifty (50%) percent equity interest in Aventine Retail.

994.   The FKF Retail Transfers were made within six (6) years of the Petition Date.

995.   There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the FKF Retail Transfers.

996.   The Debtor received less than fair consideration in exchange for the FKF Retail Transfers.

997.   At the time that it made each of the FKF Retail Transfers, the Debtor intended or believed that it would incur debts beyond its ability to pay as they matured.

998.   Based upon the foregoing, the Trustee is entitled to an order and judgment against Aventine Retail and FKF Retail avoiding the FKF Retail Transfers in a net amount of not less than $977,411.33, and finding that Aventine Retail, FKF Retail, Magee, Klein and Dorfman are each jointly and severally liable for the return of the FKF Retail Transfers.

## IV. THE ONE MADISON PARK TRANSFERS

999.   The Principals were owners of FKF Madison, a partial owner of the OMP Project.  The Principals did not invest their own money in exchange for their ownership interest in FKF Madison.  Instead, they received their ownership interest in FKF Madison in exchange for arranging for the Debtor to make the OMP Transfers.  The Principals credited their own

capital accounts in FKF Madison with over $21 million of the OMP Transfers. Accordingly, each of the OMP Transfers was made to or for the benefit of Magee, Klein and Dorfman.

1000. The OMP Transfers were made within six (6) years of the Petition Date.

1001. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the OMP Transfers.

1002. The OMP Transfers were made so, among other things: (i) the Principals could receive their equity interest in the OMP Project through FKF Madison; and (ii) Magee could receive the agreement to be paid a $1 million consulting fee for restricting the OMP Loan Account.

1003. The Debtor received less than fair consideration in exchange for the OMP Transfers.

1004. At the time that it made each of the FKF Retail Transfers, the Debtor intended or believed that it would incur debts beyond its ability to pay as they matured.

1005. Based upon the foregoing, the Trustee is entitled to an order and judgment against Magee, Klein and Dorfman avoiding the OMP Transfers, and finding that Magee, Klein and Dorfman are each jointly and severally liable for the return of the OMP Transfers.

## V.     THE BASHERT & ROSE GLASSES TRANSFERS

1006. Each of the Newtown Transfers was made to or for the benefit of Bashert and Rose Glasses.

1007. Each of the Newtown Transfers was also made to or for the direct benefit of Klein and Dorfman, who had an equity interest in Rose Glasses.

1008. Each of the Newtown Transfers made prior to in or around January 2006, was also made to or for the direct benefit of Magee, who had until that time an equity interest in

Rose Glasses. Further, Magee received $300,000 of the Newtown Transfers on account of the January 2006 sale of his membership interest in Rose Glasses.

1009. The Newtown Transfers were made within six (6) years of the Petition Date.

1010. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Newtown Transfers.

1011. The Debtor received less than fair consideration in exchange for the Newtown Transfers.

1012. At the time that it made each of the Newtown Transfers, the Debtor intended or believed that it would incur debts beyond its ability to pay as they matured.

1013. Based upon the foregoing, the Trustee is entitled to an order and judgment against Bashert and Rose Glasses avoiding the Newtown Transfers, and finding that Bashert, Rose Glasses, Klein and Dorfman are each jointly and severally liable for the return of the Newtown Transfers, and finding that Magee is jointly and severally liable for the return of the Newtown Transfers that occurred prior to January 2006.

## VI.     THE JERRY'S TRANSFERS

1014. Each of the Jerry's Transfers was made to or for the benefit of Jerry's.

1015. Each of the Jerry's Transfers was also made to or for the direct benefit of Magee, Klein and Dorfman, who received a distribution of twenty-five (25%) of the equity in Jerry's on account of the Jerry's Transfers.

1016. Each of the Jerry's Transfers was made within six (6) years of the Petition Date.

1017. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Jerry's Transfers.

1018. The Debtor received less than fair consideration in exchange for the Jerry's Transfers.

1019. At the time that it made each of the Jerry's Transfers, the Debtor intended or believed that it would incur debts beyond its ability to pay as they matured.

1020. Based upon the foregoing, the Trustee is entitled to an order and judgment against Jerry's avoiding the Jerry's Transfers, and finding that Jerry's, Magee, Klein and Dorfman are each jointly and severally liable for the return of the Jerry's Transfers.

## VII.   THE FKF FIRM TRANSFERS

1021. Each of the FKF Firm Transfers was made to or for the benefit of the FKF Firm.

1022. Each of the FKF Firm Transfers was also made to or for the direct benefit of Klein, a partner of the FKF Firm.

1023. The FKF Firm Transfers were made within six (6) years of the Petition Date.

1024. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the FKF Firm Transfers.

1025. Based upon the FKF Firm's failure to exercise that degree of care, skill, and diligence commonly possessed and exercised by a member of the accounting community, the Debtor, received less than fair consideration in exchange for each and every one of the FKF Firm Transfers.

1026. At the time that it made each of the FKF Firm Transfers, the Debtor intended or believed that it would incur debts beyond its ability to pay as they matured.

1027. Based upon the foregoing, the Trustee is entitled to an order and judgment against the FKF Firm avoiding the FKF Firm Transfers to the extent of not less than $406,104, and finding that the FKF Firm and Klein are each jointly and severally liable for the return of the FKF Firm Transfers.

## VIII. THE DORFMAN FIRM TRANSFERS

1028. Each of the Dorfman Firm Transfers was made to or for the benefit of the Dorfman Firm.

1029. Each of the Dorfman Firm Transfers was also made to or for the direct benefit of Dorfman, a partner of the Dorfman Firm.

1030. The Dorfman Firm Transfers were made within six (6) years of the Petition Date.

1031. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Dorfman Firm Transfers.

1032. Based upon the Dorfman Firm's failure to exercise that degree of care, skill, and diligence commonly possessed and exercised by a member of the legal community, the Debtor, received less than fair consideration in exchange for each and every one of the Dorfman Firm Transfers.

1033. At the time that it made each of the Dorfman Firm Transfers, the Debtor intended or believed that it would incur debts beyond its ability to pay as they matured.

1034. Based upon the foregoing, the Trustee is entitled to an order and judgment against the Dorfman Firm avoiding the Dorfman Firm Transfers to the extent of not less than

$57,356.75, and finding that the Dorfman Firm and Dorfman are each jointly and severally liable for the return of the Dorfman Firm Transfers.

## IX.    THE FKF HOLDING TRANSFERS

1035.   Each of the FKF Holding Transfers was made to or for the benefit of FKF Holding.

1036.   Each of the FKF Holding Transfers was also made to or for the direct benefit of Magee and Dorfman, each of which had an ownership interest in FKF Holding.

1037.   The FKF Holding Transfers were made within six (6) years of the Petition Date.

1038.   There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the FKF Holding Transfers.

1039.   The Debtor received less than fair consideration in exchange for the FKF Holding Transfers.

1040.   At the time that it made each of the FKF Holding Transfers, the Debtor intended or believed that it would incur debts beyond its ability to pay as they matured.

1041.   Based upon the foregoing, the Trustee is entitled to an order and judgment against FKF Holding avoiding the FKF Holding Transfers, and finding that FKF Holding, Magee and Dorfman are each jointly and severally liable for the return of the FKF Holding Transfers in an amount of not less than $1,163,729.78.

## X.    THE COMMERCIAL CONSTRUCTION TRANSFERS

1042.   Each of the Commercial Construction Transfers was made to or for the benefit of the Commercial Construction.

1043. Each of the Commercial Construction Transfers was also made to or for the direct benefit of Magee, the owner of Commercial Construction.

1044. The Commercial Construction Transfers were made within six (6) years of the Petition Date, in the amount of $954,551.72.

1045. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Commercial Construction Transfers.

1046. The Debtor received less than fair consideration in exchange for each and every one of the Commercial Construction Transfers.

1047. At the time that it made each of the Commercial Construction Transfers, the Debtor intended or believed that it would incur debts beyond its ability to pay as they matured.

1048. Based upon the foregoing, the Trustee is entitled to an order and judgment against Commercial Construction avoiding the Commercial Construction Transfers, and finding that Commercial Construction and Magee are each jointly and severally liable for the return of the Commercial Construction Transfers in an amount not less than $954,551.72.

## XI. THE BRADLEY TRANSFERS

1049. Each of the Bradley Transfers was made to or for the benefit of Bradley.

1050. Each of the Bradley Transfers was also made to or for the direct benefit of Magee, who has a fifty (50%) percent interest in Bradley and runs Bradley's commercial property.

1051. The Bradley Transfers were made within six (6) years of the Petition Date.

1052.  There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Bradley Transfers.

1053.  The Debtor received less than fair consideration in exchange for the Bradley Transfers.

1054.  At the time that it made each of the Bradley Transfers, the Debtor intended or believed that it would incur debts beyond its ability to pay as they matured.

1055.  Based upon the foregoing, the Trustee is entitled to an order and judgment against Bradley avoiding the Bradley Transfers in an amount not less than $1,319,734.46, and finding that Bradley and Magee are each jointly and severally liable for the return of the Bradley Transfers.

## XII.  THE SF PROPERTIES TRANSFERS

1056.  Each of the SF Properties Transfers was made to or for the benefit of SF Properties.

1057.  Each of the SF Properties Transfers was also made to or for the direct benefit of Magee, Klein and Dorfman, who owned equity interests in SF Properties.

1058.  Each of the SF Properties Transfers was made within six (6) years of the Petition Date.

1059.  There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the SF Properties Transfers.

1060.  The Debtor received less than fair consideration in exchange for the SF Properties Transfers.

1061. At the time that it made each of the SF Properties Transfers, the Debtor intended or believed that it would incur debts beyond its ability to pay as they matured.

1062. Based upon the foregoing, the Trustee is entitled to an order and judgment against SF Properties avoiding the SF Properties Transfers to the extent of not less than $137,812, and finding that SF Properties, Magee, Klein and Dorfman are each jointly and severally liable for the return of the SF Properties Transfers.

## XIII. THE TA GROUP TRANSFERS

1063. Each of the TA Group Transfers was made to or for the benefit of TA Group.

1064. Each of the TA Group Transfers was also made to or for the direct benefit of Klein, Dorfman, FKF V and JDJ Holding, each of which had a direct or indirect interest in TA Group.

1065. The TA Group Transfers were made within six (6) years of the Petition Date.

1066. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the TA Group Transfers.

1067. The Debtor received less than fair consideration in exchange for the TA Group Transfers.

1068. At the time that it made each of the TA Group Transfers, the Debtor intended or believed that it would incur debts beyond its ability to pay as they matured.

1069. Based upon the foregoing, the Trustee is entitled to an order and judgment against the TA Group avoiding the TA Group Transfers in an amount not less than $1,510,150,

and finding that the TA Group, Klein, Dorfman, FKF V and JDJ Holding are each jointly and severally liable for the return of the 548 TA Group Transfers.

## XIV.  THE LAWRENCE & LIZBETH KEEFE TRANSFERS

1070.   Magee collected money due the Debtor from DRLLC and Hayden and deposited those Debtor-Magee Funds into his own personal account.

1071.   The Debtor had an interest in the Debtor-Magee Funds.

1072.   Magee used the Debtor-Magee Funds to, among other things, pay certain preferred creditors, including his children, make gifts to his daughters, invest in various real estate projects, and otherwise convert the funds to his own use.

1073.   From January 2009 to December 2009, Magee made the Lawrence & Lizbeth Keefe Transfers from the Debtor-Magee Funds in the same manner as he had directed the Debtor to make when it was regularly making the Member Distributions.  The Lawrence & Lizbeth Keefe Transfers are in addition to the Magee Distributions transferred directly to Lizbeth Keefe.

1074.    Each of the Lawrence & Lizbeth Keefe Transfers was made within six (6) years of the Petition Date.

1075.   The Debtor received less than fair consideration in exchange for the Lawrence & Lizbeth Keefe Transfers.

1076.   At the time that it made each of the Lawrence & Lizbeth Keefe Transfers, the Debtor intended or believed that it would incur debts beyond its ability to pay as they matured.

1077.    Based upon the foregoing, the Trustee is entitled to an order and judgment against Lawrence and Lizbeth Keefe avoiding the Lawrence & Lizbeth Keefe Transfers in an

amount not less than $100,000, and finding that Lawrence Keefe and Lizbeth Keefe are each jointly and severally liable for the return of the Lawrence & Lizbeth Keefe Transfers.

## XV.    THE ADDITIONAL PATRICE MAGEE & JONATHAN MAGEE TRANSFERS

1078.   The Debtor made the Additional Jonathan & Patrice Transfers from its property separate and apart from those other transfers and transactions for which recovery is sought from Jonathan Magee and Patrice Magee herein.

1079.   The Additional Jonathan & Patrice Transfers were attributed by the Debtor to a purported lending relationship between the Debtor and Magee's company, Commercial Construction.   However, neither Jonathan Magee nor Patrice Magee provided any consideration to the Debtor on account of their respective Additional Jonathan & Patrice Transfers.

1080.   The Additional Jonathan & Patrice Transfers were made within six (6) years of the Petition Date.

1081.   There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Additional Jonathan & Patrice Transfers.

1082.   The Debtor received less than fair consideration in exchange for the Additional Jonathan & Patrice Transfers.

1083.   At the time that it made each of the Additional Jonathan & Patrice Transfers, the Debtor intended or believed that it would incur debts beyond its ability to pay as they matured.

1084.   Based upon the foregoing, the Trustee is entitled to an order and judgment against avoiding the Additional Jonathan & Patrice Transfers, and finding Jonathan Magee and Patrice Magee liable for the return of the full value of the Additional Jonathan & Patrice Transfers received by each in amounts not less than $175,000.00 and $150,000.00, respectively.

**COUNT EIGHT**
**(Conveyance Made With Intent to Defraud–**
**11 U.S.C. §§ 544(b) and 550, and N.Y. Debtor and Creditor Law § 276)**
**(Against Magee, Klein, Dorfman, Melissa Magee, Patrice Magee, Lizbeth Keefe, Valerie**
**Magee, Jonathan Magee, Aventine Edgewater, FKF Edgewater, Aventine Retail, FKF**
**Retail, Bashert, Rose Glasses, Jerry's, the FKF Firm, the Dorfman Firm, FKF Holding,**
**Commercial Construction, Bradley, SF Properties, TA Group, FKF V, JDJ Holding and**
**Lawrence Keefe)**

1085.  Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 1084 of this Complaint as if fully set forth at length herein.

**I.      THE MEMBER DISTRIBUTIONS**

**a.      The Magee Distributions**

1086.  Each of the Magee Distributions was to or for the benefit of Magee, in addition to any other party who may have been the recipient of the transfers

1087.  The Magee Distributions were made within six (6) years of the Petition Date.

1088.  Certain of the Magee Distributions were made directly to Magee's children, as follows:

    a)  $100,000 to Patrice Magee;

    b)  $270,000 to Melissa Page Magee;

    c)  $310,000 to Lizbeth Keefe; and

    d)  $19,000 to Valerie Magee.

1089.  The Debtor received less than fair consideration in exchange for the Magee Distributions, and while the Debtor was insolvent.

1090.  There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Magee Distributions.

1091.   The Magee Distributions were made by the Debtor and Principals with actual intent to hinder, delay, and/or defraud the Debtor's existing creditors, and individuals and entities to which the Debtor would become obligated.

1092.   Based upon the foregoing, the Trustee is entitled to an order and judgment against Magee avoiding the $1,488,277.50 in Magee Distributions, and against Patrice Magee, Melissa Page Magee, Lizbeth Keefe, and Valerie Magee, finding each jointly and severally liable for the return of the Magee Distributions made to each.

**b.      The Klein Distributions**

1093.   Each of the Klein Distributions was to or for the benefit of Klein.

1094.   The Klein Distributions were made within six (6) years of the Petition Date.

1095.   The Debtor received less than fair consideration in exchange for the Klein Distributions.

1096.   There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Klein Distributions.

1097.   The Klein Distributions were made by the Debtor and Principals with actual intent to hinder, delay, and/or defraud the Debtor's existing creditors, and individuals and entities to which the Debtor would become obligated.

1098.   Based upon the foregoing, the Trustee is entitled to an order and judgment against Klein in an amount not less than $1,418,394.50, avoiding the Klein Distributions.

**c.      The Dorfman Distributions**

1099.   Each of the Dorfman Distributions was to or for the benefit of Dorfman.

1100.   The Dorfman Distributions were made within six (6) years of the Petition Date.

1101.   The Debtor received less than fair consideration in exchange for the Dorfman Distributions.

1102.   There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Dorfman Distributions.

1103.   The Dorfman Distributions were made by the Debtor and Principals with actual intent to hinder, delay, and/or defraud the Debtor's existing creditors, and individuals and entities to which the Debtor would become obligated.

1104.   Based upon the foregoing, the Trustee is entitled to an order and judgment against Dorfman in an amount not less than $1,398,180.39, avoiding the Dorfman Distributions.

II.     **THE AVENTINE EDGEWATER & FKF EDGEWATER TRANSFERS**

1105.   Each of the FKF Edgewater Transfers was made to or for the benefit of Aventine Edgewater and FKF Edgewater.

1106.   Each of the FKF Edgewater Transfers was also made to or for the direct benefit of Magee, Klein and Dorfman, who owned FKF Edgewater, which owned between fifteen and fifty-one (15 to 51%) percent of Aventine Edgewater.

1107.   The FKF Edgewater Transfers were made by the Principals at least in part to attempt to avoid personal liability on the personal guarantees they had given in favor of TD Bank, which holds a senior secured lien against Aventine Edgewater's property.

1108.   The FKF Edgewater Transfers were made within six (6) years of the Petition Date.

1109. The FKF Edgewater Transfers were made without receiving any promissory note or other contract defining the relationship between the Debtor and FKF Edgewater and/or Aventine Edgewater.

1110. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the FKF Edgewater Transfers.

1111. The Debtor received less than fair consideration in exchange for the FKF Edgewater Transfers.

1112. The FKF Edgewater Transfers were made by the Debtor and Principals with actual intent to hinder, delay, and/or defraud the Debtor's existing creditors, and individuals and entities to which the Debtor would become obligated.

1113. Based upon the foregoing, the Trustee is entitled to an order and judgment against FKF Edgewater and Aventine Edgewater avoiding the FKF Edgewater Transfers in an amount not less than $1,862,196.77, the net amount of the FKF Edgewater Transfers, and finding that FKF Edgewater, Aventine Edgewater, Magee, Klein and Dorfman are each jointly and severally liable for the return of the FKF Edgewater Transfers.

## III.    THE AVENTINE RETAIL & FKF RETAIL TRANSFERS

1114. Each of the FKF Retail Transfers was made to or for the benefit of Aventine Retail and FKF Retail.

1115. Each of the FKF Retail Transfers was also made to or for the direct benefit of Magee, Klein and Dorfman, who owned FKF Retail, which had a fifty (50%) percent equity interest in Aventine Retail.

1116. The FKF Retail Transfers were made within six (6) years of the Petition Date.

1117. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the FKF Retail Transfers.

1118. The Debtor received less than fair consideration in exchange for the FKF Retail Transfers.

1119. At least $40,250 of the FKF Retail Transfers were made after the Debtor defaulted and stopped making monthly interest payments to its creditors.

1120. Upon information and belief, the Debtor never secured a promissory note or entered into any contract or agreement securing its right to the return of the FKF Retail Transfers, or defining the relationship between the entities.

1121. The FKF Retail Transfers were made by the Debtor and Principals with actual intent to hinder, delay, and/or defraud the Debtor's existing creditors, and individuals and entities to which the Debtor would become obligated.

1122. Based upon the foregoing, the Trustee is entitled to an order and judgment against Aventine Retail and FKF Retail avoiding the FKF Retail Transfers in a net amount of not less than $977,411.33, and finding that Aventine Retail, FKF Retail, Magee, Klein and Dorfman are each jointly and severally liable for the return of the FKF Retail Transfers.

## IV.    THE ONE MADISON PARK TRANSFERS

1123. The Principals were owners of FKF Madison, a partial owner of the OMP Project. The Principals did not invest their own money in exchange for their ownership interest in FKF Madison. Instead, they received their ownership interest in FKF Madison in exchange for arranging for the Debtor to make the OMP Transfers. The Principals credited their own capital accounts in FKF Madison with over $21 million of the OMP Transfers. Accordingly, each of the OMP Transfers was made to or for the benefit of Magee, Klein and Dorfman.

1124.   The OMP Transfers were made within six (6) years of the Petition Date.

1125.   There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the OMP Transfers.

1126.   The OMP Transfers were made so, among other things: (i) the Principals could receive their equity interest in the OMP Project through FKF Madison; and (ii) Magee could receive the agreement to be paid a $1 million consulting fee for restricting the OMP Loan Account.

1127.   The Debtor received less than fair consideration in exchange for the OMP Transfers.

1128.   The OMP Transfers were made by the Debtor and Principals with actual intent to hinder, delay, and/or defraud the Debtor's existing creditors, and individuals and entities to which the Debtor would become obligated.

1129.   Based upon the foregoing, the Trustee is entitled to an order and judgment against Magee, Klein and Dorfman avoiding the OMP Transfers, and finding that Magee, Klein and Dorfman are each jointly and severally liable for the return of the OMP Transfers.

## V.      THE BASHERT & ROSE GLASSES TRANSFERS

1130.   Each of the Newtown Transfers was made to or for the benefit of Bashert and Rose Glasses.

1131.   Each of the Newtown Transfers was also made to or for the direct benefit of Klein and Dorfman, who had an equity interest in Rose Glasses.

1132.   Each of the Newtown Transfers made prior to in or around January 2006, was also made to or for the direct benefit of Magee, who had until that time an equity interest in

Rose Glasses. Further, Magee received $300,000 of the Newtown Transfers on account of the January 2006 sale of his membership interest in Rose Glasses.

1133. The Newtown Transfers were made within six (6) years of the Petition Date.

1134. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Newtown Transfers.

1135. The Principals induced Kevin Romano to become an equity owner in Rose Glasses to, among other things: (i) obtain the use of $1.5 million of Mr. Romano's money without having to pay interest; (ii) further capitalize Rose Glasses, an entity then-owned by Magee, Klein and Dorfman, none of which had made any individual capital contribution; and (iii) pay Magee $300,000 for his membership interest in Rose Glasses, which he had paid nothing for, and get Magee released from his personal guaranty of Bashert's obligations to TD Bank.

1136. The Newtown Transfers were made by the Debtor and Principals with actual intent to hinder, delay, and/or defraud the Debtor's existing creditors including Kevin Romano, and individuals and entities to which the Debtor would become obligated.

1137. Based upon the foregoing, the Trustee is entitled to an order and judgment against Bashert and Rose Glasses avoiding the Newtown Transfers, and finding that Bashert, Rose Glasses, Klein and Dorfman are each jointly and severally liable for the return of the Newtown Transfers, and finding that Magee is jointly and severally liable for the return of the Newtown Transfers that occurred prior to January 2006.

## VI.    THE JERRY'S TRANSFERS

1138. Each of the Jerry's Transfers was made to or for the benefit of Jerry's.

1139.   Each of the Jerry's Transfers was also made to or for the direct benefit of Magee, Klein and Dorfman, who received a distribution of twenty-five (25%) of the equity in Jerry's on account of the Jerry's Transfers.

1140.   Each of the Jerry's Transfers was made within six (6) years of the Petition Date.

1141.   There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Jerry's Transfers.

1142.   The Jerry's Transfers were made so, among other reasons: (i) the Principals could receive individual equity interests in Jerry's; and (ii) Jerry's could obtain financing from Oritani Bank and repay $5 million of its obligations to the Debtor, which could be redistributed by the Principals to preferred creditors and insiders.

1143.   Further, the Principals released Jerry's from the obligations under the Jerry's Note and the Debtor's mortgage on the Storage Unit, without satisfying partial assignments of the Jerry's Note previously granted to the Josephs Family, without satisfying the related obligations to the Josephs Family, and without informing the Josephs Family.

1144.   The Jerry's Transfers were made by the Debtor and Principals with actual intent to hinder, delay, and/or defraud the Debtor's existing creditors including the Josephs Family, and individuals and entities to which the Debtor would become obligated.

1145.   Based upon the foregoing, the Trustee is entitled to an order and judgment against Jerry's avoiding the Jerry's Transfers, and finding that Jerry's, Magee, Klein and Dorfman are each jointly and severally liable for the return of the Jerry's Transfers.

## VII.    THE FKF FIRM TRANSFERS

1146.    Each of the FKF Firm Transfers was made to or for the benefit of the FKF Firm.

1147.    Each of the FKF Firm Transfers was also made to or for the direct benefit of Klein, a partner of the FKF Firm.

1148.    The FKF Firm Transfers were made within six (6) years of the Petition Date.

1149.    There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the FKF Firm Transfers.

1150.    Based upon the FKF Firm's failure to exercise that degree of care, skill, and diligence commonly possessed and exercised by a member of the accounting community, the Debtor, received less than fair consideration in exchange for each and every one of the FKF Firm Transfers.

1151.    The FKF Firm Transfers were made by the Debtor and Klein with actual intent to hinder, delay, and/or defraud the Debtor's existing creditors, and individuals and entities to which the Debtor would become obligated.

1152.    Based upon the foregoing, the Trustee is entitled to an order and judgment against the FKF Firm avoiding the FKF Firm Transfers to the extent of not less than $406,104, and finding that the FKF Firm and Klein are each jointly and severally liable for the return of the FKF Firm Transfers.

## VIII.   THE DORFMAN FIRM TRANSFERS

1153.    Each of the Dorfman Firm Transfers was made to or for the benefit of the Dorfman Firm.

1154. Each of the Dorfman Firm Transfers was also made to or for the direct benefit of Dorfman, a partner of the Dorfman Firm.

1155. The Dorfman Firm Transfers were made within six (6) years of the Petition Date.

1156. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Dorfman Firm Transfers.

1157. Based upon the Dorfman Firm's failure to exercise that degree of care, skill, and diligence commonly possessed and exercised by a member of the legal community, the Debtor, received less than fair consideration in exchange for each and every one of the Dorfman Firm Transfers.

1158. The Dorfman Firm Transfers were made by the Debtor with actual intent to hinder, delay, and/or defraud the Debtor's existing creditors, and individuals and entities to which the Debtor would become obligated.

1159. Based upon the foregoing, the Trustee is entitled to an order and judgment against the Dorfman Firm avoiding the Dorfman Firm Transfers to the extent of not less than $57,356.75, and finding that the Dorfman Firm and Dorfman are each jointly and severally liable for the return of the Dorfman Firm Transfers.

IX.    **THE FKF HOLDING TRANSFERS**

1160. Each of the FKF Holding Transfers was made to or for the benefit of FKF Holding.

1161. Each of the FKF Holding Transfers was also made to or for the direct benefit of Magee and Dorfman, each of which had an ownership interest in FKF Holding.

1162. The FKF Holding Transfers were made within six (6) years of the Petition Date.

1163. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the FKF Holding Transfers.

1164. The FKF Holding Transfers were made by the Debtor with actual intent to hinder, delay, and/or defraud the Debtor's existing creditors, and individuals and entities to which the Debtor would become obligated.

1165. Based upon the foregoing, the Trustee is entitled to an order and judgment against FKF Holding avoiding the FKF Holding Transfers, and finding that FKF Holding, Magee and Dorfman are each jointly and severally liable for the return of the FKF Holding Transfers in an amount of not less than $1,163,729.78.

## X.    THE COMMERCIAL CONSTRUCTION TRANSFERS

1166. Each of the Commercial Construction Transfers was made to or for the benefit of the Commercial Construction.

1167. Each of the Commercial Construction Transfers was also made to or for the direct benefit of Magee, the owner of Commercial Construction.

1168. The Commercial Construction Transfers were made within six (6) years of the Petition Date, in the amount of $954,551.72.

1169. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Commercial Construction Transfers.

1170.    The Commercial Construction Transfers were made by the Debtor with actual intent to hinder, delay, and/or defraud the Debtor's existing creditors, and individuals and entities to which the Debtor would become obligated.

1171.    Based upon the foregoing, the Trustee is entitled to an order and judgment against Commercial Construction avoiding the Commercial Construction Transfers, and finding that Commercial Construction and Magee are each jointly and severally liable for the return of the Commercial Construction Transfers in an amount not less than $954,551.72.

## XI.    THE BRADLEY TRANSFERS

1172.    Each of the Bradley Transfers was made to or for the benefit of Bradley.

1173.    Each of the Bradley Transfers was also made to or for the direct benefit of Magee, who has a fifty (50%) percent interest in Bradley and runs Bradley's commercial property.

1174.    The Bradley Transfers were made within six (6) years of the Petition Date.

1175.    There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Bradley Transfers.

1176.    The Debtor received less than fair consideration in exchange for the Bradley Transfers.

1177.    The Bradley Transfers were made by the Debtor and Principals with actual intent to hinder, delay, and/or defraud the Debtor's existing creditors, and individuals and entities to which the Debtor would become obligated.

1178.    Based upon the foregoing, the Trustee is entitled to an order and judgment against Bradley avoiding the Bradley Transfers in an amount not less than $1,319,734.46, and

finding that Bradley and Magee are each jointly and severally liable for the return of the Bradley Transfers,

## XII. THE SF PROPERTIES TRANSFERS

1179.   Each of the SF Properties Transfers was made to or for the benefit of SF Properties.

1180.   Each of the SF Properties Transfers was also made to or for the direct benefit of Magee, Klein and Dorfman, who owned equity interests in SF Properties.

1181.   Each of the SF Properties Transfers was made within six (6) years of the Petition Date.

1182.   There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the SF Properties Transfers.

1183.   The SF Properties Transfers were made by the Debtor and Principals with actual intent to hinder, delay, and/or defraud the Debtor's existing creditors, and individuals and entities to which the Debtor would become obligated.

1184.   Based upon the foregoing, the Trustee is entitled to an order and judgment against Jerry's avoiding the SF Properties Transfers to the extent of not less than $137,812, and finding that SF Properties, Magee, Klein and Dorfman are each jointly and severally liable for the return of the SF Properties Transfers.

## XIII  THE TA GROUP TRANSFERS

1185.   Each of the TA Group Transfers was made to or for the benefit of TA Group.

1186.   Each of the TA Group Transfers was also made to or for the direct benefit of Klein, Dorfman, FKF V and JDJ Holding, each of which had a direct or indirect interest in TA Group.

1187.   The TA Group Transfers were made within six (6) years of the Petition Date.

1188.   There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the TA Group Transfers.

1189.   The TA Group Transfers were made by the Debtor with actual intent to hinder, delay, and/or defraud the Debtor's existing creditors, and individuals and entities to which the Debtor would become obligated.

1190.   Based upon the foregoing, the Trustee is entitled to an order and judgment against the TA Group avoiding the TA Group Transfers in an amount not less than $1,510,150, and finding that the TA Group, Klein, Dorfman, FKF V and JDJ Holding are each jointly and severally liable for the return of the 548 TA Group Transfers.

## XIV.   THE LAWRENCE & LIZBETH KEEFE TRANSFERS

1191.   Magee collected money due the Debtor from DRLLC and Hayden and deposited those Debtor-Magee Funds into his own personal account.

1192.   The Debtor had an interest in the Debtor-Magee Funds.

1193.   Magee used the Debtor-Magee Funds to, among other things, pay certain preferred creditors, including his children, make gifts to his daughters, invest in various real estate projects, and otherwise convert the funds to his own use.

1194.   From January 2009 to December 2009, Magee made the Lawrence & Lizbeth Keefe Transfers from the Debtor-Magee Funds in the same manner as he had directed

the Debtor to make when it was regularly making the Member Distributions. The Lawrence & Lizbeth Keefe Transfers are in addition to the Magee Distributions transferred directly to Lizbeth Keefe.

1195. Each of the Lawrence & Lizbeth Keefe Transfers was made within six (6) years of the Petition Date.

1196. The Debtor received less than fair consideration in exchange for the Lawrence & Lizbeth Keefe Transfers.

1197. The Lawrence & Lizbeth Keefe Transfers were made by Magee with actual intent to hinder, delay, and/or defraud the Debtor's existing creditors, and individuals and entities to which the Debtor would become obligated.

1198. Based upon the foregoing, the Trustee is entitled to an order and judgment against Lawrence and Lizbeth Keefe avoiding the Lawrence & Lizbeth Keefe Transfers in an amount not less than $100,000, and finding that Lawrence Keefe and Lizbeth Keefe are each jointly and severally liable for the return of the Lawrence & Lizbeth Keefe Transfers.

## XV. THE ADDITIONAL PATRICE MAGEE & JONATHAN MAGEE TRANSFERS

1199. The Debtor made the Additional Jonathan & Patrice Transfers from its property separate and apart from those other transfers and transactions for which recovery is sought from Jonathan Magee and Patrice Magee herein.

1200. The Additional Jonathan & Patrice Transfers were attributed by the Debtor to a purported lending relationship between the Debtor and Magee's company, Commercial Construction. However, neither Jonathan Magee nor Patrice Magee provided any consideration to the Debtor on account of their respective Additional Jonathan & Patrice Transfers.

1201. The Additional Jonathan & Patrice Transfers were made within six (6) years of the Petition Date.

1202. There are creditors that hold unsecured claims against the Debtor allowable under section 502 of the Bankruptcy Code, that were creditors at the time the Debtor made the Additional Jonathan & Patrice Transfers.

1203. The Debtor received less than fair consideration in exchange for the Additional Jonathan & Patrice Transfers.

1204. The Additional Jonathan & Patrice Transfers were made by the Debtor and Magee with actual intent to hinder, delay, and/or defraud the Debtor's existing creditors, and individuals and entities to which the Debtor would become obligated.

1205. Based upon the foregoing, the Trustee is entitled to an order and judgment against avoiding the Additional Jonathan & Patrice Transfers, and finding Jonathan Magee and Patrice Magee liable for the return of the full value of the Additional Jonathan & Patrice Transfers received by each in amounts not less than $175,000.00 and $150,000.00, respectively.

## COUNT NINE
**(Attorneys' Fees for Avoidance of Conveyance Made With Intent to Defraud– 11 U.S.C. §§ 544(b) and 550, and N.Y. Debtor and Creditor Law § 276-a) (Against Magee, Klein, Dorfman, Patrice Magee, Melissa Page Magee, Lizbeth Keefe, Valerie Magee, Jonathan Magee, Aventine Edgewater, FKF Edgewater, Aventine Retail, FKF Retail, Bashert, Rose Glasses, Jerry's, the FKF Firm, the Dorfman Firm, FKF Holding, Commercial Construction, Bradley, SF Properties, TA Group, FKF V, JDJ Holding and Lawrence Keefe)**

1206. Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 1205 of this Complaint as if fully set forth at length herein.

1207. The following transfers are avoidable because they were made with actual intent to hinder, delay and/or defraud creditors of the Debtor: the Magee Distributions, the Klein Distributions, the Dorfman Distributions, the FKF Edgewater Transfers, the FKF Retail Transfers, the OMP Transfers, the Newtown Transfers, the Jerry's Transfers, the FKF Firm Transfers, the Dorfman Firm Transfers, the FKF Holding Transfers, the Commercial

Construction Transfers, the Bradley Transfers, the SF Properties Transfers, the TA Group Transfers, the Lawrence & Lizbeth Keefe Transfers, and the Additional Jonathan & Patrice Transfers.

1208.   Based upon the foregoing, the Trustee is entitled to an order and judgment against Magee, Klein, Dorfman, Patrice Magee, Melissa Page Magee, Lizbeth Keefe, Valerie Magee, Jonathan Magee, Aventine Edgewater, FKF Edgewater, Aventine Retail, FKF Retail, Bashert, Rose Glasses, Jerry's, the FKF Firm, the Dorfman firm, FKF Holding, Commercial Construction, Bradley, SF Properties, the TA Group, FKF V, JDJ Holding, and Lawrence Keefe, for the full amount of the reasonable attorneys' fees incurred by Trustee in connection with obtaining the orders and judgments avoiding the transfers at issue.

### COUNT TEN
**(Preferential Transfer – 11 U.S.C. §§ 547(b) and 550)**
**(Against Melissa Magee)**

1209.   Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 1208 of this Complaint as if fully set forth at length herein.

1210.   Magee collected money due the Debtor from DRLLC and Hayden and deposited those Debtor-Magee Funds into his own personal account.

1211.   Magee used the Debtor-Magee Funds to, among other things, pay certain preferred creditors, including his children, make gifts to his daughters, invest in various real estate projects, and otherwise convert the funds to his own use.

1212.   Melissa Magee was owed approximately $1,175,000.00 by the Debtor in or around November 2009 on account of the Melissa Magee Loan, and she received a final monthly interest payment from the Debtor on or around November 3, 2009.

1213.  Because of his special relationship with Melissa Magee, in December 2009, Magee began making interest payments to Melissa Magee on account of the Melissa Magee Loan from the Debtor-Magee Funds deposited into his Key Bank account.

1214.  From December 2009 to the Petition Date, Magee made the following payments to Melissa Magee on account of the Melissa Magee Loan from the Debtor-Magee Funds:

| Check Date | Date Cashed | Payee | Check Issued From | Amount |
|---|---|---|---|---|
| 12/11/2009 | 12/28/2009 | Melissa Page | Magee's Key Bank Account | $    11,750.00 |
| 01/04/2010 | 01/12/2010 | Melissa Page | Same | 11,750.00 |
| 02/02/2010 | 03/01/2010 | Melissa Page | Same | 11,750.00 |
| 03/01/2010 | 03/17/2010 | Melissa Page | Same | 11,750.00 |
| 03/30/2010 | 04/13/2010 | Melissa Page | Same | 11,750.00 |
| 05/05/2010 | 05/18/2010 | Melissa Page | Same | 11,750.00 |
| 06/28/2010 | 07/07/2010 | Melissa Page | Same | 11,750.00 |
| | | | **TOTAL:** | $    82,250.00 |

(the "Melissa Magee Preferential Transfers").

1215.  The Debtor had an interest in the Debtor-Magee Funds that were transferred in part to Melissa Magee in the Melissa Magee Preferential Transfers.

1216.  The Melissa Magee Preferential Transfers were made to or for the benefit of Melissa Magee on account of an antecedent debt owed by the Debtor before the transfers were made.

1217.  The Melissa Magee Preferential Transfers were made while the Debtor was insolvent.

1218.  At the time she received the Melissa Magee Preferential Transfers, Melissa Magee was an insider of the Debtor.

1219.  The Melissa Magee Preferential Transfers were made within one (1) year of the Petition Date.

1220.   As a result of the Melissa Magee Preferential Transfers, Melissa Magee received more than she would receive if (i) the Debtor's case were a case under chapter 7 of the Bankruptcy Code, (ii) the Melissa Magee Preferential Transfers had not been made; and (iii) Melissa Magee received payment on account of her claims against the Debtor to the extent provided under the Bankruptcy Code.

1221.   Based upon the foregoing, Trustee is entitled to an order and judgment against Melissa Magee in an amount not less than $82,250.00, avoiding the Melissa Magee Preferential Transfers.

## COUNT ELEVEN
### (Conversion)
### (Against Magee)

1222.   Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 1221 of this Complaint as if fully set forth at length herein.

1223.   The Debtor owned the Amended DRLLC Note and was entitled to the money due from DRLLC thereunder.

1224.   Magee intercepted and collected from DRLLC amounts due under the Amended DRLLC Note in the total amount of $1,339,000, deposited those funds into his personal bank account, and converted those funds to his own use and enjoyment.

1225.   After taking, stealing and converting the Magee-DRLLC Payment, Magee issued the DRLLC Mortgage Discharges on behalf of the Debtor after the Petition Date and backdated those discharges to prior to the Petition Date.

1226.   Magee was assisted by his associate Daniel F. Mellin, who notarized Magee's signature on the backdated DRLLC Mortgage Discharges.

1227. The Debtor loaned approximately $100,000 to Gregory Hayden and consequently, was entitled to the repayment of that amount from Gregory Hayden.

1228. Magee intercepted and collected from Gregory Hayden $100,000 on account of what Gregory Hayden owed to the Debtor, and deposited those funds into his personal bank account, and took, stole and converted those funds for his own purposes.

1229. Based upon the foregoing, the Trustee is entitled to a judgment against Magee on account of the Debtor's property that he took, stole and converted, in an amount not less than $1,439,000, plus applicable pre-judgment interest.

## COUNT TWELVE
### (Accounting Malpractice and Professional Negligence)
### (Against Klein and the FKF Firm)

1230. Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 1229 of this Complaint as if fully set forth at length herein.

1231. Klein was an owner of both the Debtor and the FKF Firm. The FKF Firm simultaneously served as the accountant and advisor to the Debtor, a vast majority of the Debtor's creditors, and several of the Debtor's borrowers and recipients of transfers from the Debtor, including: (i) FKF Madison Group LLC; (ii) SF Properties; (iii) Aventine Edgewater; (iv) FKF Edgewater; (v) Aventine Retail; (vi) FKF Retail; (vii) Bashert; (viii) Rose Glasses; (ix) the Kennedy Funding Invitational; (x) Marc Jacobs; (xi) Ira Shapiro; (xii) Slazer Enterprises LLC; (xiii) Slazer Enterprises Owner LLC; (xiv) Madison Park Group Owner LLC; (xv) FKF Holding; (xvi) Route 9W; (xvii) Magee; and (xviii) Bradley.

1232. The FKF Firm was paid in excess of $384,200 by the Debtor for accounting and advisory services.

1233.   The FKF Firm made numerous errors in the performance of services to the Debtor.  Among other things, the FKF Firm kept inconsistent books for its clients.  For example, the FKF Firm booked loans from the Debtor to Bashert and the OMP Borrowers, as equity contributions by the Principals to Rose Glasses and FKF Madison, respectively.

1234.   The FKF Firm knew or should have known that the notes and agreements entered into between the Debtor and its creditors constitute securities under the Securities Act for which no exemption from registration was available.

1235.   If the FKF Firm had provided competent, disinterested accounting and consulting advice regarding the Debtor's obligations under the Securities Act, or the existing conflicts of interest, the Principals' numerous conflicts and breaches of their duties of loyalty to the Debtor would have been halted in their tracks before millions of dollars worth of damages were inflicted on the Debtor and its creditors.

1236.   Even if the Principals had wanted to comply with the Securities Act, they would not have been able to register the Debtor because the Debtor could not comply with the registration requirement under the Securities Act.  Had the Debtor tried to register, the Debtor's lack of certified financial statements, combined with the rampant conflicts of interest between the Debtor and its borrowers and lack of documentation for an overwhelming majority of the Debtor's loans and investments, would have made it impossible to obtain registration.

1237.   Alternatively, had the Principals refused to follow the advice of the FKF Firm that the Debtor needed to register, the FKF Firm's professional and ethical obligations would have made it incumbent on the firm to report the Principals' actual and intended crimes to the Debtor's creditors and the appropriate authorities.  Thus, had FKF Firm advised the Debtor

properly of its obligations under the federal securities laws, tens of millions of dollars in damages to the Debtor and its creditors could have been avoided.

1238. Similarly, beginning in or around early 2008, the FKF Firm's ethical obligations required the firm to report the Principals' actual and intended crimes to the Debtor's creditors and the appropriate regulatory authorities because the FKF Firm knew, or should have known, that the Principals were operating the Debtor as a Ponzi scheme.

1239. The FKF Firm knew, or should have known, that beginning in or around February 2009, Magee was collecting amounts due the Debtor from DRLLC and potentially other creditors. The FKF Firm's ethical obligations required the firms to report Magee's crimes to the Debtor's creditors and the appropriate regulatory authorities. The FKF Firm's failure to report Magee's theft and conversion caused and augmented damages to the Debtor and its creditors.

1240. The FKF Firm knew, or should have known, that it was improper to distribute the over $4.2 million in Member Distributions while the Debtor was insolvent. The FKF Firm's ethical obligations required the firm to report the improper distributions to the Debtor's creditors and the appropriate regulatory authorities. The FKF Firm's failure to report the improper Member Distributions caused and augmented damages to the Debtor and its creditors.

1241. Had the FKF Firm heeded its professional responsibilities and reported the Principals' criminal and wrongful acts to the Debtor's creditors, those creditors would have forced the Debtor into bankruptcy much sooner, as they ultimately did in 2010. The FKF Firm's negligence and breach of fiduciary duty to the Debtor caused and exacerbated the significant damage caused to the Debtor and its creditors by the wrongful acts of the Principals.

1242. Based upon the foregoing, the Trustee is entitled to a judgment against Klein and the FKF Firm for accounting malpractice and professional negligence in an amount to be determined at trial but in no event less than $25 million.

## COUNT THIRTEEN
### (Legal Malpractice and Professional Negligence)
### (Against Dorfman and the Dorfman Firm)

1243. Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 1242 of this Complaint as if fully set forth at length herein.

1244. Dorfman was an owner of both the Debtor and the Dorfman Firm. The Dorfman Firm simultaneously served as legal counsel to the Debtor, and several of the Debtor's borrowers and recipients of transfers from the Debtor, including: (i) FKF Madison; (ii) SF Properties; (iii) Aventine Edgewater; (iv) FKF Edgewater; (v) Aventine Retail; (vi) FKF Retail; (vii) Bashert; (viii) Rose Glasses; (ix) the Kennedy Funding Invitational; (x) Marc Jacobs; (xi) Ira Shapiro; (xii) Slazer Enterprises LLC; (xiii) Slazer Enterprises Owner LLC; (xiv) Madison Park Group Owner LLC; (xv) FKF Holding; (xvi) Route 9W; (xvii) Magee; and (xviii) Bradley.

1245. The Dorfman Firm was paid in excess of $57,356.75 by the Debtor for legal services. In addition, upon information and belief, the Dorfman Firm received significant fees from the Debtor's borrowers in connection with, among other things, performing legal services for transactions with the Debtor.

1246. The Dorfman Firm served as general counsel to the Debtor during its entire existence up until the Petition Date. All legal matters were run through the Dorfman Firm and the Debtor relied upon the Dorfman Firm to provide sound legal advice on all matters.

1247. The Dorfman Firm made numerous errors in the performance of services to the Debtor. Among other things, the Dorfman Firm simultaneously represented the Debtor

and its borrowers.  For example, the Dorfman Firm represented the OMP Borrowers in litigation against their lender at the same time that the Debtor was suing certain of the OMP Borrowers for amounts due the Debtor.

1248.  The Dorfman Firm knew or should have known that the notes and agreements entered into between the Debtor and its creditors constitute securities under the Securities Act for which no exemption from registration was available.

1249.  If the Dorfman Firm had provided competent, disinterested legal advice regarding the Debtor's obligations under the Securities Act, or the existing conflicts of interest, the Principals' numerous conflicts and breaches of their duties of loyalty to the Debtor would have been halted in their tracks before millions of dollars worth of damages were inflicted on the Debtor and its creditors.

1250.  Even if the Principals had wanted to comply with the Securities Act, they would not have been able to register the Debtor because the Debtor could not comply with the registration requirement under the Securities Act.  Had the Debtor tried to register, the Debtor's lack of certified financial statements, combined with the rampant conflicts of interest between the Debtor and its borrowers and lack of documentation for an overwhelming majority of the Debtor's loans and investments would have made it impossible to obtain registration.

1251.  Alternatively, had the Principals refused to follow the advice of the Dorfman Firm that the Debtor needed to register, the Dorfman Firm's professional and ethical obligations would have made it incumbent on the firm to report the Principals' actual and intended crimes to the Debtor's creditors and the appropriate authorities.  Thus, had the Dorfman Firm advised the Debtor properly of its obligations under the federal securities laws, tens of millions of dollars in damages to the Debtor and its creditors could have been avoided.

1252. Similarly, beginning in or around early 2008, the Dorfman Firm's ethical obligations required the firm to report the Principals' actual and intended crimes to the Debtor's creditors and the appropriate regulatory authorities because the Dorfman Firm knew, or should have known, that the Principals were operating the Debtor as a Ponzi scheme.

1253. The Dorfman Firm knew, or should have known, that beginning in or around February 2009, Magee was collecting amounts due the Debtor from DRLLC and potentially other creditors. The Dorfman Firm's ethical obligations required the firms to report Magee's crimes to the Debtor's creditors and the appropriate regulatory authorities. The Dorfman Firm's failure to report Magee's theft and conversion caused and augmented damages to the Debtor and its creditors.

1254. The Dorfman Firm knew, or should have known, that it was improper to distribute the over $4.2 million in Member Distributions while the Debtor was insolvent. The Dorfman Firm's ethical obligations required the firms to report the improper distributions to the Debtor's creditors and the appropriate regulatory authorities. The Dorfman Firm's failure to report the improper Member Distributions caused and augmented damages to the Debtor and its creditors.

1255. Had the Dorfman Firm heeded its professional responsibilities and reported the Principals' criminal and wrongful acts to the Debtor's creditors, those creditors would have forced the Debtor into bankruptcy much sooner, as they ultimately did in July 2010. The Dorfman Firm's negligence and breach of fiduciary duty to the Debtor caused and exacerbated the significant damage caused to the Debtor and its creditors by the wrongful acts of the Principals.

1256. Based upon the foregoing, the Trustee is entitled to a judgment against Klein and the Dorfman Firm for legal malpractice and professional negligence in an amount to be determined at trial but in no event less than $25 million.

## COUNT FOURTEEN
### (Contribution – N.Y. CPLR §§ 1401 & 1402)
### (Against Klein, Dorfman, Magee, the FKF Firm and the Dorfman Firm)

1257. Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 1256 of this Complaint as if fully set forth at length herein.

1258. The Principals defrauded the Debtor's creditors out of over $60 million. For example, the Principals caused the Debtor to sell unregistered securities to the Debtor's creditors based upon numerous material misrepresentations and that violated the Securities Act.

1259. In addition to the over $60 million in claims of creditors on account of monies loaned to the Debtor, certain creditors have asserted fraud claims in connection with the Principals' and Debtor's inducement of equity investments in other projects. Among others: (i) Kevin Romano has asserted claims for over $4 million in connection with his equity investment in the OMP Project and $1.5 million in connection with his equity investment in Rose Glasses; (ii) Walter Klauser has asserted a claim for over $750,000 in connection with his equity investment in the OMP Project; and (iii) Howard Josephs has asserted a claim for $1.5 million on account of his equity investment in the OMP Project.

1260. The Principals' fraud on the Debtor's creditors has exposed the Debtor to millions of dollars in liabilities to the Debtor's creditors. Even before the Debtor was forced into bankruptcy, investors filed various complaints against the Debtor, the Principals and the FKF Firm, alleging, among other things, common law fraud.

1261. The Debtor's creditors have now filed numerous proofs of claim against the Debtor asserting claims in excess of $100 million based upon breach of contract, tort and fraud.

1262. The Principals' acts and omissions, as described above, caused or augmented the damages suffered by the Debtor's creditors and give rise to contribution under one or more of the following bases of liability:

- Breach of Fiduciary Duty to the Debtor's Creditors. The Debtor operated in an almost constant state of insolvency or in the zone of insolvency and accordingly, owed fiduciary duties to its creditors. The Principals caused the Debtor to breach fiduciary duties owed to the Debtor's creditors by, among other things, misappropriating creditor funds, using creditor funds to make Member Distributions, investing creditor funds in projects owned in whole or in part by the Principals, making numerous fraudulent transfers of the Debtor's funds, and soliciting loans and investments without registering in accordance with the Securities Act. The Principals committed or substantially assisted these breaches of duty to the Debtor's creditors, thereby causing or augmenting their injuries.

1263. The FKF Firm's and Dorfman Firm's acts and omissions, as described above, caused or augmented the damages suffered by the Debtor's creditors and give rise to contribution under one or more of the following bases of liability:

- Malpractice / Professional Negligence. As set forth above, the FKF Firm and Dorfman Firm owed the Debtor the utmost duty of loyalty, candor, and good faith, as well as the duty to act as an objective accountant and attorney exercising that degree of care, skill and diligence commonly possessed and exercised by a member of the professional accounting or legal community, respectively. The FKF Firm and Dorfman Firm,

however, failed to exercise reasonable and professional care in providing accounting and legal services to the Debtor. The FKF Firm's and Dorfman Firm's professional negligence caused and augmented the creditors' damages by, among other things, enabling the Principals to continue to use the Debtor as a mechanism to illegally raise money from creditors and misappropriate creditor funds.

- Aiding and Abetting Breach of Fiduciary Duty to the Debtor's Creditors. The Debtor operated in an almost constant state of insolvency or in the zone of insolvency and accordingly, owed fiduciary duties to its creditors. The Principals caused the Debtor to breach fiduciary duties it owed to the Debtor's creditors by, among other things, misappropriating creditor funds. The FKF Firm and Dorfman Firm had actual knowledge that the Principals were causing the Debtor to breach their fiduciary duties to the Debtor's creditors by, among other things, using creditor funds to make Member Distributions, investing creditor funds in projects owned in whole or in part by the Principals, and soliciting loans and investments without registering in accordance with the Securities Act. The FKF Firm and Dorfman Firm substantially assisted these breaches of duty to the Debtor's creditors, thereby causing or augmenting their injuries.

1264. In summary, the FKF Firm's and Dorfman Firm's tortious conduct allowed the Debtor and Principals to defraud creditors and expand their scheme, and permitted the Principals' scheme to remain undetected while the Debtor dissipated all of its assets and creditors' money. The FKF Firm's and Dorfman Firm's actions and inactions contributed to the damages suffered by the Debtor's creditors.

1265. Based upon the foregoing, the Trustee is entitled to contribution from Magee, Klein, Dorfman, the FKF Firm and the Dorfman Firm for their proportionate share of damages to the Debtor's creditors, in an amount to be determined at trial.

## COUNT FIFTEEN
### (Aiding and Abetting Breach of Fiduciary Duties)
### (Against Magee, Klein, Dorfman, the FKF Firm and the Dorfman Firm)

1266. Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 1265 of this Complaint as if fully set forth at length herein.

1267. Magee, Klein, Dorfman, the FKF Firm and the Dorfman Firm each owed the fiduciary duties of loyalty and care to the Debtor.

1268. As set forth at length above, Magee, Klein, Dorfman, the FKF Firm and the Dorfman Firm each committed numerous breaches of their fiduciary duties to the Debtor.

1269. Magee, Klein, Dorfman, the FKF Firm and the Dorfman Firm each knowingly induced and/or participated in each other's breach of fiduciary duties to the Debtor.

1270. The Debtor suffered significant damages as a result of the breaches of fiduciary duties committed by Magee, Klein, Dorfman, the FKF Firm, and/or the Dorfman Firm.

1271. Based upon the foregoing, the Trustee is entitled to a judgment against Magee, Klein, Dorfman, the FKF Firm, and the Dorfman Firm, holding each joint and severally liable for each and every breach of fiduciary duties committed by Magee, Klein, Dorfman, the FKF Firm, and the Dorfman Firm, and for compensating the FKF Trust for any and all damages suffered by the Debtor on account of such breaches.

## COUNT SIXTEEN
### (Objection to Claim – 11 U.S.C. § 502(d))
### (Against Magee, Klein, Dorfman, Commercial Construction, FKF V, JDJ Holding, Melissa Magee, Patrice Magee, Jonathan Magee)

1272. Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 1271 of this Complaint as if fully set forth at length herein.

1273. Magee timely filed the Magee Claim against the Debtor with respect to his loan account on November 18, 2010, asserting an unsecured claim in the amount of $609,448.46.

1274. Magee timely filed the $30 Million Magee Claim against the Debtor on December 3, 2010, asserting an unliquidated, general, unsecured claim in the amount of $30,000.000.

1275. Magee received transfers of property of the Debtor that are recoverable pursuant to sections 544, 547, 548 and/or 550 of the Bankruptcy Code.

1276. Melissa Magee timely filed the Melissa Magee Claim against the Debtor with respect to the Melissa Magee Loan on October 26, 2010, asserting an unsecured claim in the amount of $1,257,250.00.

1277. Melissa Magee received transfers of property of the Debtor that are recoverable pursuant to sections 544, 547, 548 and/or 550 of the Bankruptcy Code.

1278. Patrice Magee timely filed the Patrice Magee Claims against the Debtor with respect to the Patrice Magee Loan on October 22, 2010, asserting unsecured claims in the amounts of $42,861.53, and $546,842.64, respectively.

1279. Patrice Magee received transfers of property of the Debtor that are recoverable pursuant to section 544, 547, 548 and/or 550 of the Bankruptcy Code.

1280. Jonathan Magee timely field the Jonathan Magee Claim against the Debtor on November 24, 2010, asserting an unsecured claim in the amount of $437,474.11.

1281. Jonathan Magee received transfers of property of the Debtor that are recoverable pursuant to sections 544, 547, 548 and/or 550 of the Bankruptcy Code.

1282. Commercial Construction timely filed the Commercial Construction Claim against the Debtor on November 24, 2010, asserting an unsecured claim in the amount of $1,741,939.71.

1283. Commercial Construction received transfers of property of the Debtor that are recoverable pursuant to sections 544, 547, 548 and/or 550 of the Bankruptcy Code.

1284. FKF V timely field the FKF V Claim against the Debtor on October 4, 2010, asserting an unsecured claim in the amount of $610,000.

1285. FKF V received transfers of property of the Debtor that are recoverable pursuant to sections 544, 547, 548 and/or 550 of the Bankruptcy Code.

1286. JDJ Holding timely field the JDJ Claim against the Debtor on September 22, 2010, asserting an unsecured claim in the amount of $957,000.

1287. JDJ Holding received transfers of property of the Debtor that are recoverable pursuant to sections 544, 547, 548 and/or 550 of the Bankruptcy Code.

1288. Based upon the foregoing, the Trustee is entitled to a judgment expunging the Magee Claim, $30 Million Magee Claim, Melissa Magee Claim, Patrice Magee Claims, Jonathan Magee Claim, Commercial Construction Claim, FKF V Claim, and JDJ Holding Claim, unless and until the property held by each that is recoverable under sections 542, 543, 550 and/or 553 of the Bankruptcy Code, or any transfers received by each that are avoidable under sections 522(f), 522(h), 544, 545, 547, 548 and/or 549 of the Bankruptcy Code, has been paid or turned over to the FKF Trust by the claimant.

### COUNT SEVENTEEN
**(Equitable Subordination of Claims – 11 U.S.C. § 510(b))**
**(Against Magee, Klein, Dorfman, Patrice Magee, Melissa Magee, Jonathan Magee, Commercial Construction, FKF V and JDJ Holding)**

1289.  Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 1288 of this Complaint as if fully set forth at length herein.

1290.  The Principals have committed to significant inequitable contact vis a vis the Debtors' legitimate, unsecured creditors.  Among other things, the Principals have:

- Distributed over $4.2 million to themselves from the Debtors' assets while the Debtor was insolvent or had unreasonably small capital;

- Invested a vast majority of the Debtor's assets in projects and companies that are owned in whole or in part by the Principals;

- Made numerous bad investments with the Debtor's assets based upon grossly insufficient due diligence that resulted in the loss of over $60 million;

- Borrowed money from creditors on behalf of the Debtor without disclosing material information about the Debtor's financial condition and nature of its assets;

- Stole the DRLLC and Gregory Hayden accounts receivable from the Debtor;

- Made numerous transfers of the Debtor's property to insiders;

- Comingled the Debtor's property with the Principals' other companies, including Commercial Construction, Bradley, FKF Edgewater, Rose Glasses, FKF Retail, Jerry's, FKF Holding, the TA Group and the Kennedy Funding Invitational; and

- Failed to register the Debtor pursuant to the Securities Act, or seek any independent, qualified advice with respect to the operation of the Debtor and solicitation of investments.

1291.  As a result of the Principals' gross misconduct, it would be inequitable to allow any of the Principals or their family members or affiliates to be paid before all third party creditors were paid in full.

1292.   Based upon the foregoing, any and all claims asserted against the Debtor's estate by Magee, Klein, Dorfman, Jonathan Magee, Melissa Magee, Patrice Magee, Commercial Construction, Bradley, JDJ Holding, and FKF V, should be subordinated to any and all other legitimate, allowed claims asserted against the Debtor's estate.

### COUNT EIGHTEEN
**(Re-Characterization of Claims from Debt to Equity)**
**(Against Magee, Klein, Dorfman, Commercial Construction, FKF V and JDJ Holding)**

1293.   Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 1292 of this Complaint as if fully set forth at length herein.

1294.   The Principals never capitalized their equity accounts in the Debtor, and received their membership interests in the Debtor for no consideration.

1295.   To the extent the Principals actually invested any of their own money in the Debtor they did so by way of separate, interest-bearing loan accounts.  The Principals freely moved money in and out of their "loan accounts", without any regard for the standard loan terms that applied to other, non-insider creditors of the Debtor.

1296.   Upon information and belief, the Debtor did not issue any promissory notes on account of the Principals' "loan accounts".

1297.   Over time, the Debtor made interest payments to Magee, Klein and Dorfman on account of their purported loans to the Debtor of $440,861.62, $255,827.44 and $5,535.00, respectively.

1298.   Upon information and belief, there was no fixed maturity date for any "loans" made by the Principals to the Debtor.

1299. In addition to the Principals' loan accounts, the Principals also took large Member Distributions from the Debtor while the Debtor was insolvent or had unreasonably small capital from which to run its business.

1300. In addition, Magee's daughters, Melissa Magee, Patrice Magee, Lizbeth Keefe and Valerie Magee, received and accepted large distributions from the Debtor purportedly on account of Magee's membership interests.

1301. The Principals also invested in, and purportedly loaned money to, the Debtor through certain affiliated entities, including Commercial Construction, FKF V and JDJ Holding.

1302. Loan accounts of Commercial Construction, FKF V and JDJ Holding were all treated as equity accounts rather than like a traditional lending relationship. Commercial Construction, FKF V and JDJ Holding freely moved money in and out of their accounts despite any standard restrictions.

1303. Money invested by the Principals' entities should similarly be treated as equity rather than debt.

1304. Based upon the foregoing, any and all claims asserted against the Debtor's estate by Magee, Klein and Dorfman, and their companies, Commercial Construction, FKF V and JDJ Holding, should be re-characterized as membership interests, and any and all interest paid to Magee, Klein, Dorfman, Commercial Construction, FKF V or JDJ Holding, should be returned to the Debtor.

**WHEREFORE**, the Plaintiff demands judgment against the Defendants as follows:

a) A judgment against Magee, Klein and Dorfman on account of the Principals' myriad breaches of the fiduciary duties of loyalty and care, holding each jointly and severally liable for

actual and compensatory damages in an amount to be determined at trial but estimated to be not less than $75,000,000, plus punitive damages of not less than $20,000,000 or such other amount as would be required to return the Debtor's creditors and Principal's victims to the place that they were prior to loaning money to the Debtor;

b)     A judgment against Klein requiring the turnover of all books and records of the Debtor's estate pursuant to 11 U.S.C. § 542(a);

c)     A judgment against Magee requiring the turnover of the Debtor-Magee Funds pursuant to 11 U.S.C. § 542(a);

d)     A judgment against Bashert requiring the turnover of all amounts due under the Bashert Note in a principal amount of $4,700,000, plus interest, pursuant to 11 U.S.C. § 542(b);

e)     A judgment against Rose Glasses requiring the turnover of all amounts due under the Rose Glasses Note in a principal amount of $322,500, plus interest, pursuant to 11 U.S.C. § 542(b);

f)     A judgment against Jerry's requiring the turnover of all amounts due under the Jerry's loan account in a principal amount of $1,592,541.91, plus interest, pursuant to 11 U.S.C. § 542(b);

g)     A judgment against Magee for the avoidance and recovery of: (i) the 548 Magee Distributions, or the value thereof in the amount of $258,083, pursuant to 11 U.S.C. §§ 548(a)(1)(A) and (B), and 550, and against Magee's children holding them jointly and severally liable for that portion of the 548 Magee Distributions received by each as follows: (a) Patrice Magee - $80,000; (b) Melissa Magee - $30,000; (c) Lizbeth Keefe - $70,000; and (d) Valerie Magee - $7,000; and (ii) the Magee Distributions, or the value thereof in the amount of $1,488,227.50 (inclusive of the 548 Magee Distributions), pursuant to 11 U.S.C. §§ 544(b) and

550, and N.Y. Debtor and Creditor Law §§ 273, 274, 275 and 276, and against Magee's children holding them jointly and severally liable for the portion of the Magee Distributions received by each as follows: (a) Patrice Magee - $100,000; (b) Melissa Magee - $270,000; (c) Lizbeth Keefe - $310,000; and (d) Valerie Magee - $19,000;

h)     A judgment against Klein for the avoidance and recovery of: (i) the 548 Klein Distributions, or the value thereof in the amount of $175,000, pursuant to 11 U.S.C. §§ 548(a)(1)(A) and (B), and 550; and (ii) the Klein Distributions, or the value thereof in the amount of $1,418,394.50 (inclusive of the 548 Klein Distributions), pursuant to 11 U.S.C. §§ 544(b) and 550, and N.Y. Debtor and Creditor Law §§ 273, 274, 275 and 276;

i)     A judgment against Dorfman for the avoidance and recovery of the 548 Dorfman Distributions, or the value thereof in the amount of $196,943.89, pursuant to 11 U.S.C. §§ 548(a)(1)(A) and (B), and 550; and (ii) the Dorfman Distributions, or the value thereof in the amount of $1,398.180.39 (inclusive of the 548 Dorfman Distributions), pursuant to 11 U.S.C. §§ 544(b) and 550, and N.Y. Debtor and Creditor Law §§ 273, 274, 275 and 276;

j)     A judgment against Aventine Edgewater, FKF Edgewater, Magee, Klein and Dorfman, for the avoidance and recovery of: (i) the 548 FKF Edgewater Transfers, or the value thereof in the net amount of $1,581,189.32, and finding each jointly and severally liable for returning the 548 FKF Edgewater Transfers or their value to the FKF Trust, pursuant to 11 U.S.C. §§ 548(a)(1)(A) and (B), and 550; and (ii) the FKF Edgewater Transfers, or the net value thereof of in an amount not less than $1,862,196.77 (inclusive of the 548 FKF Edgewater Transfers), pursuant to 11 U.S.C. §§ 544(b) and 550, and N.Y. Debtor and Creditor Law §§ 273, 274, 275 and 276;

k)     A judgment against Aventine Retail, FKF Retail, Magee, Klein and Dorfman, for the avoidance and recovery of: (i) the 548 FKF Retail Transfers, or the net value thereof in an amount not less than $320,250, and finding each jointly and severally liable for returning the 548 FKF Retail Transfers or their value to the FKF Trust, pursuant to 11 U.S.C. §§ 548(a)(1)(A) and (B), and 550; and (ii) the FKF Retail Transfers, or the net value thereof in an amount not less than $977,411.33 (inclusive of the 548 FKF Retail Transfers), pursuant to 11 U.S.C. §§ 544(b) and 550, and N.Y. Debtor and Creditor Law §§ 273, 274, 275 and 276;

l)     A judgment against Magee, Klein and Dorfman, for the avoidance and recovery of: (i) the 548 OMP Transfers, or the net value thereof in an amount not less than $1,000,000, and finding each jointly and severally liable for returning the 548 OMP Transfers or their value to the FKF Trust, pursuant to 11 U.S.C. §§ 548(a)(1)(A) and (B), and 550; and (ii) the OMP Transfers, or the net value thereof in an amount not less than $27,092,659.59 (inclusive of the 548 OMP Transfers), pursuant to 11 U.S.C. §§ 544(b) and 550, and N.Y. Debtor and Creditor Law §§ 273, 274, 275 and 276;

m)     A judgment against Bashert, Rose Glasses, Klein and Dorfman, for: (i) the avoidance and recovery of the 548 Newtown Transfers, or the net value thereof in an amount not less than $876,164.92, and finding each jointly and severally liable for returning the 548 Newtown Transfers or their value to the FKF Trust, pursuant to 11 U.S.C. §§ 548(a)(1)(A) and (B), and 550; and (ii) the Newtown Transfers, or the net value thereof in an amount not less than $3,948,123.47 (inclusive of the 548 Newtwon Transfers), pursuant to 11 U.S.C. §§ 544(b) and 550, and N.Y. Debtor and Creditor Law §§ 273, 274, 275 and 276;

n)     A judgment against Magee for the avoidance and recovery of those Newtown Transfers that were made while Magee was an owner of Rose Glasses (prior to January 2006), or

the net value thereof in an amount not less than $2,293,201.53, and finding him jointly and severally liable for returning that amount of the Newtown Transfers along with Bashert, Rose Glasses, Klein and Dorfman, pursuant to 11 U.S.C. §§ 544(b) and 550, and N.Y. Debtor and Creditor Law §§ 273, 274, 275 and 276;

o)    A judgment against Jerry's, Magee, Klein and Dorfman, for the avoidance and recovery of the Jerry's Transfers, or the net value thereof in an amount not less than $1,008,691.39, and finding each jointly and severally liable for returning the Jerry's Transfers or their value to the FKF Trust, pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(A) and (B), and 550, and N.Y. Debtor and Creditor Law §§ 273, 274, 275 and 276;

p)    A judgment against the FKF Firm and Klein, for the avoidance and recovery of: (i) the 548 FKF Firm Transfers, or the net value thereof in an amount not less than $86,000, and finding each jointly and severally liable for returning the 548 FKF Firm Transfers or their value to the FKF Trust, pursuant to 11 U.S.C. §§ 548(a)(1)(A) and (B), and 550; and (ii) the FKF Firm Transfers, or the net value thereof in an amount not less than $406,104 (inclusive of the 548 FKF Firm Transfers), pursuant to 11 U.S.C. §§ 544(b) and 550, and N.Y. Debtor and Creditor Law §§ 273, 274, 275 and 276;

q)    A judgment against the Dorfman Firm and Dorfman, for the avoidance and recovery of the Dorfman Firm Transfers, or the net value thereof in an amount not less than $57,356.75, and finding each jointly and severally liable for returning the Dorfman Transfers or their value to the FKF Trust, pursuant to 11 U.S.C. §§ 544(b) and 550, and N.Y. Debtor and Creditor Law §§ 273, 274, 275 and 276;

r)    A judgment against FKF Holding, Magee and Dorfman, for the avoidance and recovery of: (i) the 548 FKF Holding Transfers, or the net value thereof in an amount not less

than $2,089,000, and finding each jointly and severally liable for returning the 548 FKF Holding Transfers or their value to the FKF Trust, pursuant to 11 U.S.C. §§ 548(a)(1)(A) and (B), and 550; and (ii) the FKF Holding Transfers, or the net value thereof in an amount not less than $1,163,729.78, pursuant to 11 U.S.C. §§ 544(b) and 550, and N.Y. Debtor and Creditor Law §§ 273, 274, 275 and 276;

s)     A judgment against Commercial Construction and Magee, for the avoidance and recovery of: (i) the 548 Commercial Construction Transfers, or the net value thereof in an amount not less than $883,549.19, and finding each jointly and severally liable for returning the 548 Commercial Construction Transfers or their value to the FKF Trust, pursuant to 11 U.S.C. §§ 548(a)(1)(A) and (B), and 550; and (ii) the Commercial Construction Transfers, or the net value thereof in an amount not less than $954,551.72 (inclusive of the 548 Commercial Construction Transfers), pursuant to 11 U.S.C. §§ 544(b) and 550, and N.Y. Debtor and Creditor Law §§ 273, 274, 275 and 276;

t)     A judgment against Bradley and Magee, for the avoidance and recovery of: (i) the 548 Bradley Transfers, or the net value thereof in an amount not less than $919,731.46, and finding each jointly and severally liable for returning the 548 Bradley Transfers or their value to the FKF Trust, pursuant to 11 U.S.C. §§ 548(a)(1)(A) and (B), and 550; and (ii) the Bradley Transfers, or the net value thereof in an amount not less than $1,319,734.46 (inclusive of the 548 Bradley Transfers), pursuant to 11 U.S.C. §§ 544(b) and 550, and N.Y. Debtor and Creditor Law §§ 273, 274, 275 and 276;

u)     A judgment against SF Properties, Magee, Klein and Dorfman for the avoidance and recovery of the SF Properties Transfers, or the net value thereof in an amount not less than $137,812, and finding each jointly and severally liable for returning the SF Properties Transfers

or their value to the FKF Trust, pursuant to 11 U.S.C. §§ 544(b) and 550, and N.Y. Debtor and Creditor Law §§ 273, 274, 275 and 276;

v)     A judgment against TA Group, Klein, Dorfman, FKF V and JDJ Holding, for the avoidance and recovery of: (i) the 548 TA Group Transfers, or the net value thereof in an amount not less than $210,150, and finding each jointly and severally liable for returning the 548 TA Group Transfers or their value to the FKF Trust, pursuant to 11 U.S.C. §§ 548(a)(1)(A) and (B), and 550; and (ii) the TA Group Transfers, or the net value thereof in an amount not less than $1,510,150 (inclusive of the 548 TA Group Transfers), pursuant to 11 U.S.C. §§ 544(b) and 550, and N.Y. Debtor and Creditor Law §§ 273, 274, 275 and 276;

w)     A judgment against Lawrence Keefe and Lizbeth Keefe, for the avoidance and recovery of the Lawrence & Lizbeth Keefe Transfers, or the net value thereof in an amount not less than $100,000, and finding each jointly and severally liable for returning the Lawrence & Lizbeth Keefe Transfers or their value to the FKF Trust, pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(A) and (B), and 550, and N.Y. Debtor and Creditor Law §§ 273, 274, 275 and 276;

x)     A judgment against Jonathan Magee for the avoidance and recovery of the Additional Jonathan & Patrice Transfers received by him, or the value thereof in an amount not less than $175,000, pursuant to 11 U.S.C. §§ 544(b) and 550, and N.Y. Debtor and Creditor Law §§ 273, 274, 275 and 276;

y)     A judgment against Patrice Magee for the avoidance and recovery of the Additional Jonathan & Patrice Transfers received by him, or the value thereof in an amount not less than $150,000, pursuant to 11 U.S.C. §§ 544(b) and 550, and N.Y. Debtor and Creditor Law §§ 273, 274, 275 and 276;

z)     A judgment against Magee, Klein, Dorfman, Patrice Magee, Melissa Magee, Lizbeth Keefe, Lawrence Keefe, Valerie Magee, Jonathan Magee, Aventine Edgewater, FKF Edgewater, Aventine Retail, FKF Retail, Bashert, Rose Glasses, Jerry's, the FKF Firm, the Dorfman Firm, FKF Holding, Commercial Construction, Bradley, SF Properties, TA Group, FKF V, and JDJ Holding, finding each jointly and severally liable for the Trustee's reasonable attorneys' fees incurred in connection with obtaining orders and judgments avoiding transfers pursuant to N.Y. Debtor and Creditor Law § 276, pursuant to N.Y. Debtor and Creditor Law § 276-a;

aa)     A judgment against Melissa Magee for the avoidance and recovery of the Melissa Magee Preferential Transfers, or the value thereof in an amount not less than $82,250, pursuant to 11 U.S.C. §§ 547(b) and 550;

bb)     A judgment against Magee on account of Magee's conversion of the Debtor's property in connection with his theft of amounts due the Debtor from Gregory Hayden and DRLLC, in an amount not less than $1,439,000, plus punitive damages and attorneys' fees;

cc)     A judgment against the FKF Firm and Klein on account of damages incurred by the Debtor as a result of the professional negligence and accounting malpractice of the defendants, in an amount to be determined at trial but estimated to be not less than $25 million;

dd)     A judgment against the Dorfman Firm and Dorfman on account of damages incurred by the Debtor as a result of the professional negligence and legal malpractice of the defendants, in an amount to be determined at trial but estimated to be not less than $25 million;

ee)     A judgment against Klein, Dorfman, Magee, the FKF Firm and the Dorfman Firm for contribution for their respective shares of amounts owed by the Debtor/FKF Trust to third parties on account of the parties' tortious conduct, in an amount to be determined at trial, pursuant to N.Y. CPLR . §§ 1401 and 1402;

ff)     A judgment against Magee, Klein, Dorfman, the FKF Firm and the Dorfman Firm for each parties' aiding and abetting the breach of fiduciary duties of their co-defendants, in an amount to be determined at trial;

gg)     An order expunging and disallowing the Magee Claim, the $30 Million Magee Claim, any claim by Klein or Dorfman, the Commercial Construction Claim, the FKF V Claim the JDJ Holding Claim, the Melissa Magee Claim, the Patrice Magee Claims, and the Jonathan Magee Claim, unless and until the property held by each that is recoverable under sections 542, 543, 550 and/or 553 of the Bankruptcy Code, or any transfers received by each that are avoidable under sections 522(f), 522(h), 544, 545, 547, 548 and/or 549 of the Bankruptcy Code, has been paid or turned over to the FKF Trust by the claimant;

hh)     An order, judgment and decree equitably subordinating the Magee Claim, the $30 Million Magee Claim, any claim by Klein or Dorfman, the Commercial Construction Claim, the FKF V Claim, the JDJ Holding Claim, the Melissa Magee Claim, the Patrice Magee Claims, and the Jonathan Magee Claim, to the allowed claims of all other creditors;

*[Continued on next page]*

ii)     An order, judgment and decree re-characterizing the Magee Claim, the $30 Million Magee Claim, any claim by Klein or Dorfman, the Commercial Construction Claim, the FKF V Claim, and the JDJ Holding Claim, to equity in the membership of the Debtor; and

jj)     Granting such other and further relief as this Court deems just.

Dated:   New York, New York
         September 12, 2011

                              **KLESTADT & WINTERS, LLP**


                              By: _s/ Fred Stevens_____
                                   Fred Stevens
                                   570 Seventh Ave., 17th Floor
                                   New York, New York 10018
                                   Tel: (212) 972-3000
                                   Fax: (212) 972-2245
                                   Email: fstevens@klestadt.com

                                   *Counsel to Plaintiff Gregory Messer, as*
                                   *   Trustee of the FKF Trust*